# Thomas S. Henderson
### Attorney at Law

South Tower, Pennzoil Place
711 Louisiana, Suite 3100
Houston, Texas 77002-2716

Telephone: 713-227-9500
Facsimile: 713-620-3023
thenderson@tsh-atty.com

August 11, 2010

**BY EMAIL AND HAND DELIVERY**

Hugh M. Ray, III
McKool Smith
600 Travis Street, Suite 7000
Houston, Texas 77002

RE:     *Bittner v. Kazeminy, NJK Holding Corp., DCC Ventures, LLC, Otto B. Candies, Jr., Otto B. Candies, III, Otto Candies, LLC, and Otto Candies Shipbuilders, LLC.*
Civil Action No.: 09-39313

Dear Counsel:

I write for me and on behalf of my co-counsel at the firms of Winthrop & Weinstine and Baldwin Haspel Burke & Mayer.  This correspondence is intended to serve as the 21-day "safe harbor" letter provided for under Bankruptcy Rule 9011. As such, enclosed herewith and served upon you is a draft of Defendants' Motion to Dismiss Complaint or Strike Pleadings and For Imposition of Sanctions.  At the outset, we must emphasize that if you and your client do not promptly take corrective action as contemplated by this letter, we will go forward and seek appropriate sanctions against you, your law firm, and your client, the Liquidating Trustee, John Bittner.

Upon review of Mr. Bittner's Complaint, it is clear that many of the allegations contained therein are essentially duplicative of those made in the October 10, 2008 shareholder demand letter to the Board of Directors of Deep Marine Holdings, Inc., the Verified Complaint captioned *FLI Deep Marine LLC and Bressner Partners Ltd. v. McKim, et al.*, Civil Action No. 4138-VCN, State of Delaware, Court of Chancery, and the Petition captioned *McKim v. Kazeminy, et al.*, Civil Action No. 2008-64385, State of Texas, Harris County District Court, 129th Judicial District.

You will recall that at the outset of these insolvency proceedings, legal counsel for all of the defendants in the above-referenced Complaint traveled to Houston to provide you with a full and complete background with respect to the facts and circumstances surrounding the debtor, as well as the specious, frivolous and otherwise non-meritorious allegations raised by Bressner Partners, Ltd., FLI Deep Marine, LLC, and various members of the Langberg family in litigation that was dismissed in Delaware and Paul McKim in litigation partially dismissed in the Harris County District Court in Texas.

EXHIBIT "A"

Hugh M. Ray, III
August 11, 2010
Page 2

As you were made aware, immediately upon receipt of a purported demand letter directed to DMT in October 2008, the Board of Directors formed an independent Special Litigation Committee and engaged the independent international law firm of Greenberg Traurig to conduct an independent investigation. There followed an extremely thorough and otherwise exhaustive investigation of all of these purported claims, which included specifically, but not exclusively, 24 depositions or interviews and the review of thousands of documents. At the conclusion of this diligent, independent, and thorough eight-month investigation, the Special Litigation Committee issued an over 400-page report that explicitly discredited all of the allegations made in the demand letter and that you and Mr. Bittner are pursuing in the instant action. The SLC Report was subsequently presented as support for the dismissal of the derivative claims asserted in the Texas litigation. In dismissing the claims, the Texas court noted: "[t]he Court also FINDS that the SLC lawfully assumed control of the derivative proceedings, and determined in good faith, after conducting a reasonable inquiry based on the factors the SLC considered appropriate under the circumstances, that the continuation of the action would be detrimental and not in the best interest of DMH and DMT." *See* Judge Gomez's August 14, 2009 Order, a copy of which is attached hereto; *see also* Tex. Bus. Organizations Code art. 21.558 (2010).

Hence, if reasonable review had been undertaken, the above-referenced Complaint should not have been pursued as the claims made therein have no basis in fact or law. The SLC Report explicitly concluded that our clients did not commit any wrongdoing, that a lawsuit against our clients would not be in the best interests of the estate, and the only DMH-related person guilty of wrongdoing was Paul McKim. Moreover, the Company and my clients were on the verge of being awarded attorneys' fees and costs as sanctions against Paul McKim in the above-referenced Harris County District Court proceeding before the current bankruptcy action stayed such proceedings. In other words, by urging sanctions against Mr. McKim, the Debtors clearly adopted the SLC Report's conclusions, which totally eviscerate the claims you now assert.

You are also aware that Mr. Bittner, (then in his capacity as Chief Restructuring Officer for the Debtors), as well as your law firm have previously taken the position in the bankruptcy action that the SLC Report is the property of the Debtors' estates and now, as a consequence of the confirmation of the Debtors' plan of reorganization, of the Liquidating Trust. Further, as recently as July 16, 2010, the date that this matter was filed, Mr. Bittner personally advised counsel at Winthrop & Weinstine that he would not be pursuing any of the allegations made in the October 10, 2008 "demand letter." Nevertheless, such allegations appear throughout your Complaint.

In light of the exhaustive report of the Special Litigation Committee, of which you were fully aware, there clearly was inadequate due diligence and investigation of the claims prior to your filing the current Complaint to meet your Rule 11 obligations, even though over $1 million in fees has been billed to the estate by both your law firm and the Liquidating Trustee/Chief Restructuring Officer. As such, we find your Complaint to be specious, spurious, and otherwise lacking in either merit or good faith. Far from looting or taking advantage of this entity, the interests of the Candies and Kazeminys have lost hundreds of millions of dollars. For purposes of this safe harbor letter, we have painstakingly compared the allegations in your Complaint against the exhaustive findings of the SLC Report. What follows is a non-exhaustive list of the

Hugh M. Ray, III
August 11, 2010
Page 3

many allegations in your Complaint that were specifically discredited in the SLC Report and the specific text of the SLC Report that demonstrates the inaccuracy, if not the falsity, of your allegations.

| Paragraph of Complaint | Section of SLC Report |
|---|---|
| Paragraph 55: "Over time, Mr. Kazeminy increased his influence and control over Deep Marine's business affairs. He personally influenced and controlled Deep Marine's Board of Directors and was a member of the board for a period of time." | P. 12 of Appendix A: "While both Nasser Kazeminy and Otto Candies Jr. exercise considerable influence by virtue of the shareholder status of DCC Ventures and Otto Candies LLC, it is an overstatement to say that DMT is dominated and controlled by Nasser Kazeminy and Otto Candies LLC. Rather, DMT is managed by its officers and directors, and is controlled by its Board." |
| Paragraph 56: "Under the Oversight Agreements, Mr. Kazeminy, through NJK Holding, was purportedly given the personal and discretionary power to designate advisory, consulting, and other services in relation to the day-to-day operations of Deep Marine, strategic planning, domestic and international marketing, and financial oversight."<br><br>Paragraph 118: "The Oversight Agreements were not binding and enforceable, but to the extent they were, this count is made in the alternative. To the extent they were enforceable contracts, the Kazeminy Defendants breached the June 12, 2006 and May 31, 2008 Oversight Agreements by, without limitation failing to provide advisory, consulting, and other services in relation to the day-to-day operations of the Company, strategic planning, domestic and international marketing and financial oversight. As a result, | PP. 19-20 of Appendix B: "The Oversight Agreement was executed on behalf of DMT by Paul McKim. There is no evidence that McKim objected to the terms of the Oversight Services Agreement at the time he executed it on behalf of DMT... While there is evidence that, because of significant capital investments and because of the Oversight Services Agreement, Nasser Kazeminy personally exerted increasing influence over DMT's strategic planning and capital structuring, there is no evidence that he personally exerted control over DMT's day-to-day operations... There is no evidence that DMT was forced into an Oversight Services Agreement, or that the Oversight Services Agreement granted individual powers to Nasser J. Kazeminy."<br><br>P. 35 of Appendix B: "The evidence shows that, at all relevant times, the Hays Companies had an established business relationship with NJK Holding, which was providing services to DMT under an Oversight Services Agreement, and that such services included financial consulting which presumably includes insurance matters." |

Hugh M. Ray, III
August 11, 2010
Page 4

| Paragraph of Complaint | Section of SLC Report |
|---|---|
| Deep Marine suffered damages and ultimately filed for bankruptcy." | |
| Paragraph 63: The trustee alleges that DMT was free to back out of the time charter agreement for the *Mother Theresa* at any time. If that allegation is true, then there will be no merit to OC's proof of claim number 10. Proof of claim number 10 is for the $1,698,899.85 in lost revenue when DMT backed out of the time charter. <br><br> *See also* Paragraph 119 | P. 65 of the Final Report: "the crux of the dispute is whether the Company timely terminated the charter, thus avoiding about $1.1 million in charges sought by OC. To date, the amount in question has not been paid by the Company. While the Company now has determined, after conduct of due diligence, that the amounts in question are owed to OC, the fact that this dispute lasted nearly two years and the amounts have not yet been paid demonstrates about as effectively as any other evidence that OC does not dominate the management or board of the Company" - more detail can be found on p. 40-41 of Appendix A and p. 42-43 of Appendix B |
| Paragraphs 64-65: The trustee alleges that DMT bought the *Diamond* from OC, and the companies entered a Vessel Operating Agreement. Inspections revealed numerous problems that caused the boat to be dry docked for four months at a cost to DMT of between $8 and $15 million. OC did very little repair work, and none of the work was satisfactory. DMT entered a charter agreement with Technip. Technip required replacement of the OC crew because of the ship's technical violations. The OC crew was reinstated, and the contract with Technip was terminated. | P. 65 of the Final Report: "there is no evidence of self-dealing by OC with respect to the *Diamond* or *Topaz* transactions. Furthermore, both of the charter transactions and the *Diamond* purchase transaction were consummated before OC owned any stock in the Company, so, by definition, self-dealing was not possible." <br><br> P. 37-38 of Appendix A: "There is no evidence that at the time such boats were delivered to DMT by Otto Candies that there were substantial deferred maintenance issues with respect to such boats, that the vessels were not inspected and certified by the United States Coast Guard, that Otto Candies refused to remedy any maintenance issues observed, that Otto Candies delivered vessels not substantially in accordance with the agreement of the parties, that the vessels were in a substantially substandard condition compared to industry standard for boats of similar design, age, and configuration, or that DMT lost hundreds of thousands of dollars of contracts with customers as a result of the condition of the vessels…" <br><br> P. 46 of Appendix A: "...DMT also used, from time to time, at least one other company to provide crews to DMT vessels but that the cost of such crews were greater than that being charged by Otto Candies and the skill and maintenance results were not substantially different." |

Hugh M. Ray, III
August 11, 2010
Page 5

| Paragraph of Complaint | Section of SLC Report |
|---|---|
| | P. 50 of Appendix B: "The evidence is that some 6 months later the Candies crews were returned to the Diamond because the Hornbeck crews cost considerably more than the Candies crews, the maintenance issues were not markedly less under the Hornbeck crews, and the maintenance problems were largely addressed through clarification as to who (Otto Candies or DMT) had responsibility for identifying the scope of maintenance activities and who had responsibility for performing the maintenance activities." <br><br> P. 51 of Appendix B: "Importantly, the fact that DMT could easily remove the Otto Candies crews, even if later it became apparent that they would be more cost effective than using the crews available from Hornbeck, demonstrates that Otto Candies is not able to use its position as a shareholder of the Company to loot the Company or to dominate the Company's Board of Directors or management." |
| Paragraphs 66-69:  The trustee alleges that DMT leased and chartered the *Topaz* from OC for $30,000 per day, which included crew and maintenance. The vessel did not meet the Coast Guard Regulations as promised, so it had to be dry docked.  OC improperly charged DMT for the vessel on the days it was dry docked. Additionally, the dry dock time caused significant losses of revenue for DMT on its Horizon Offshore contract. <br><br> *See also* Paragraph 120 | P. 65 of the Final Report: "there is no evidence of self-dealing by OC with respect to the *Diamond* or *Topaz* transactions. Furthermore, both of the charter transactions and the *Diamond* purchase transaction were consummated before OC owned any stock in Company, so, by definition, self-dealing was not possible." <br><br> P. 64-65 of the Final Report: "in the fiscal year ending March 31, 2008, the *Agnes/Topaz* was on hire for 187 days out of a possible 366... with 59 days in dry dock due to unscheduled repairs... fiscal year ending March 31, 2009, the *Topaz* was on hire for 165 days out of a possible 365... 84 days lost for compliance or other inspections and scheduled maintenance activities…" <br><br> P. 38 of Appendix A: "the maintenance issues were typical of those where the crews were not employees of the boat owners... the rates Otto Candies was charging for those crews was at or below market rates…" <br><br> P. 39 of Appendix A: "the seal system on a bow thruster below the water line leaked... the leakage was most likely not as a result of poor maintenance... the crank shaft on |

Hugh M. Ray, III
August 11, 2010
Page 6

| Paragraph of Complaint | Section of SLC Report |
|---|---|
| | the engine (bow thruster) cracked... it is impossible to say if the cracked crank shaft occurred due to substandard maintenance, manufacturing defect or ordinary wear and tear."<br><br>P. 39 of Appendix A: "DMT obtained good turn around by the shipyard in Massachusetts and good response by Otto Candies, with the boat in drydock a total of 22 days. The evidence is that DMT was not penalized by the customer, nor cancelled off of the job during which the repair work was being done.  At completion of the work in question, the *Topaz* came back to its home port and sat because no work was then available... it would be pure speculation to say that if [the vessel] had not lost 22 days of downtime during the course of a job lasting 90 days there would have been work available and it would have been working." Repeated nearly verbatim on p. 45-46 of Appendix B.<br><br>P. 39-40 of Appendix A: "DMT did incur crew costs... because DMT wished to keep the boat in a state of readiness in the event that work materialized." Repeated nearly verbatim on p. 46 of Appendix B.<br><br>P. 46 of Appendix A: "DMT had already leased such boats under charter and was intimately familiar with the boats prior to their acquisition…"<br><br>P. 44-45 of Appendix B: "Shortly after the chartering of the boat by DMT, a Failure Modes and Effects Analysis was conducted by L3 Communications to determine if the boat was in a condition whereby its dynamic positioning system would function according to design... The conclusions reached in [L3's] comprehensive report was that the 'Result of the analysis show that the NMS6000 DP system has been designed with sufficient redundancy (multiple consoles, multiple SPUs, multiple data highways, multiple DPS sensors) to meet the ABS 2006 DPS-2 classification.  There are no known single point failures with the NMS6000 system that can cause loss of DP control of the vessel.'  Furthermore, the evidence is that the boat, when delivered by Otto Candies, had all the other |

Hugh M. Ray, III
August 11, 2010
Page 7

| Paragraph of Complaint | Section of SLC Report |
|---|---|
| | certifications necessary to indicate its seaworthiness.  The only evidence offered to the contrary is an e-mail from a sales person at a company that provides DP2 systems know as Nautronix that suggested in June of 2006 that there should be an upgrade to the DP2 system of the Agnes." |
| Paragraphs 70-71:   The trustee alleges that DMT purchased the *Emerald* from OC for a $7 million markup.  DMT and OC agreed that OC would crew the *Emerald*.  OC backed out, and DMT had to hire Hornbeck at a significantly higher price. | PP. 34-35 of Appendix A: "DMT negotiated the purchase agreement with Otto Candies for the acquisition of the boat that came to be known as the Emerald prior to Otto Candies holding any equity interest in DMT.  At the time of the negotiations, Otto Candies did hold a note that was convertible into common stock of DMT at the option of Otto Candies if not sooner paid by DMT, with the amount of stock Otto Candies would be entitled to receive increasing over time if DMT did not repay the note.  However, the convertible note expressly precludes Otto Candies having the rights and benefits of a shareholder unless and until the note is converted into equity, so that the leverage held by Otto Candies over DMT at the time the purchase agreement for the Emerald was negotiated was not that of an equity holder, but a lender.   The evidence is that Otto Candies and its affiliates did not breach a fiduciary duty owed to DMT in connection with the purchase, construction or financing of the Emerald.  The evidence is that Otto Candies did not require DMT to purchase the Emerald as a condition of its prior loan to the company, nor as a stockholder, that Otto Candies became a stockholder in the company only at the same time as the purchase agreement of the Emerald was finalized and not prior, that Otto Candies did likely make a profit on the sale of the Emerald to DMT, but such profit was built in to the transaction at the time it was negotiated, that both parties honored the terms of the negotiated sales price, that there was no last minute change in price or 'hold-up' by Otto Candies, that the transaction was fair to DMT as the purchase price was less than the value of the boat…"

P. 47 of Appendix B: "at the time the purchase agreement for the Emerald was negotiated, the only leverage held by Otto Candies over DMT was not that of an equity holder, but a lender.   The convertible note, in fact, expressly provided  that  a  holder  thereof  had  no  rights  as  a |

Hugh M. Ray, III
August 11, 2010
Page 8

| Paragraph of Complaint | Section of SLC Report |
|---|---|
| | shareholder of the Company... The evidence is that Otto Candies and its affiliates did not breach a fiduciary duty owed to DMT in connection with the purchase, construction or financing of the Emerald." |
| | P. 48 of Appendix B: "There is no evidence that in May of 2007 the purchase price paid to Otto Candies for the Emerald was arbitrarily increased, or that Otto Candies [used] any undue influence over the Officers and Directors of the company to hold up the company for $6 million to which Otto Candies was otherwise not entitled." |
| | PP. 67-68 of the Final Report: "The total amount eventually paid for the *Emerald* was a little more than $40 million, of which $37.9 million was paid to OC... OC did not receive $8 million in excess compensation for the *Emerald*, but in fact all of such funds flowed through OC to third parties as a direct result of changes sought and obtained by DMT, with the sole exception of approximately $3 million in interest paid to OC for the use of its funds during the construction of the boat, at the reasonable floating rate of LIBOR plus 250 basis points." |
| | P. 68 of the Final Report: "The reasonableness of the costs of the vessel as paid by the Company may be further checked to determine if OC sold a vessel to the Company at unreasonable cost. First, we examined the assignment documents assigning the contract with Bender from OC to the Company, which was signed by all three parties. Then we noted that Merrill Lynch loaned the Company $41.4 million with the *Emerald* as security. We also obtained a copy of an appraisal of the value of the vessel dated May 2007, prepared by Dufour Laskay and Strouse, Inc. ('*Dufour Laskay*'), showing the value of the vessel once fully outfitted with the heave compensator to be $52 million (or nearly $11 million more than the cost paid to OC plus approximately $2 million paid to a third party related to the heave compensator)." |
| Paragraphs 72-73: The trustee alleges that when DMT purchased | P. 42 of Appendix A: "There is no evidence other than the bare assertion of Defendant McKim that the crane Otto |

Hugh M. Ray, III
August 11, 2010
Page 9

| Paragraph of Complaint | Section of SLC Report |
|---|---|
| the *Sapphire* from OC, OC was supposed to install a new crane. OC used the money and bought a new crane for a different vessel. OC then used the crane from that vessel, repainted it, and installed it on the *Sapphire*. Upon inspection, the crane was found to be unseaworthy. | Candies was procuring for the benefit of DMT was given to a DMT competitor, nor is there sufficient evidence that the crane installed on the *Sapphire* was a used crane... The purchase agreement for the *Sapphire* did specify that a crane would be installed as part of the acquisition of the boat, but that agreement did not specify that the crane was to be new." Repeated nearly verbatim on p. 51-52 of Appendix B.

P. 43 of Appendix A: "The evidence is that substantially all of the substandard conditions noted by Marine & Mainland were corrected prior to the deployment of the *Sapphire* at no cost to DMT, that since April 2008 the boat has been on continuous deployment in the Indian Ocean and has actively used the crane in its operations in that location, and that there has been no reported repairs or downtime as a result of the crane's operations while on deployment there." Repeated nearly verbatim on p. 53 of Appendix B.

P. 52 of Appendix B: "parts used in the assembly of the crane may have been in the fabricators location or yard for different lengths of time and some non-critical parts may have been remanufactured. Accordingly, some elements of the crane assembly may have suffered evidence of aging, even if the crane is newly manufactured or even if the individual part has never been previously placed into service." Repeated nearly verbatim on p. 52 of Appendix A. |
| Paragraph 75: "In March 2007, Mr. Kazeminy began ordering the payment of corporate funds to Hays Insurance Companies for insurance consulting services. Over the objections from Deep Marine's CEO, Mr. McKim, Deep Marine engaged the Hays Company and sent them three checks in the amount of $25,000. It is questionable whether any of the Hays Companies provided any meaningful services to Deep | PP. 7-8 of the Final Report: "While the Company engaged the Hays Companies and made $75,000 in payments to the Hays Companies... there is no credible evidence that the engagement was made for an improper purpose. There was a business purpose for engaging the Hays Companies or other business insurance broker to review the policies procured by the Company and the premiums being paid; and there existed a proper business purpose under the Oversight services Agreement for NJK Holding Corporation ("NJK") to recommend the Hays Companies. The actions of McKim thwarted those business purposes… There is evidence that McKim: …breached his fiduciary duties by (i) approving payments to the Hays |

Hugh M. Ray, III
August 11, 2010
Page 10

| Paragraph of Complaint | Section of SLC Report |
|---|---|
| Marine.  On August 19, 2008, Mr. Hudgens, Deep Marine's CFO, ordered that there should be no further payments to Hays Companies." | Companies with no intention to utilize the services offered..."<br><br>P. 26 of the Final Report: "Yet further, in November 2008, McKim offered to sign an affidavit stating that the following:  "...it now appears that I did not have a full understanding or appreciation of the scope of work being performed by Hays." "...I now recall that Hays was involved with facilitating Deep Marine's D&O, EPLI, fiduciary and crime coverage in 2006 and 2007." "...it appears that I was not kept informed of, nor did I necessarily take it upon myself to inquire into, various decisions specifically involving Deep Marine and risk management consulting services provided by Hays."<br><br>PP. 54-59 of the Final Report: "After review of various documents and the conduction of various interviews, Special Counsel concluded that the payments to the Hays Companies in 2007 in the total amount of $75,000 (three quarterly payments, each for $25,000) were not for the purpose of improperly funneling money to then-Senator Norman Coleman or his family or as a disguised political contribution to his campaign.  Rather, the engagement was undertaken for the purpose of securing insurance consulting services from the Hays Companies, and neither Senator Coleman nor his wife, Laurie, received any direct or indirect benefit from those payments. …[A Hays representative] confirmed to Special Counsel that Thomas and McKim were reluctant to divert any business away from their existing relationship with AON in Houston, ...Nevertheless, [Hays] submitted the fee agreement and McKim executed the same. ...[Hays] encouraged the Company to take advantage of the consulting and brokerage services [it] was offering, and to use the services of Hays that the Company was paying for. ...Ultimately, however, [Hays] was never re-contacted by Thomas or McKim to procure insurance for the Company… [Hays] confirmed that [it] never spoke to NJK or Nasser Kazeminy about the fee that was charged to the Company... Hays stated that the fee charged by Hays Companies to the Company was fair and reasonable in lieu of commissions and for the consulting work that |

Hugh M. Ray, III
August 11, 2010
Page 11

| Paragraph of Complaint | Section of SLC Report |
|---|---|
| | was to be performed, and that Laurie Coleman did not get any of the fees received from the Company… Based upon these interviews and Coleman's written responses to questions, the size of the insurance portfolio of the Company, a review of the relevant documents, including invoices from the Hays Companies, and the fact that the payments were stopped shortly after the departure of Thomas, that such payment stoppage was initiated by the Company, that neither Thomas nor McKim brought before the Board a concern that any of the payments to the Hays Companies were inappropriate, and the draft affidavits prepared by McKim and Thomas proposed to retract their prior allegations concerning the payments to Hays being for a disguised purpose, Special Counsel could find no factual basis or evidence supporting the allegation that the $75,000 paid to Hays Companies was really a disguised payment to then-Senator Coleman or his family. ...As more thoroughly detailed in Appendices A and B, attached, however, it appears that if the Company, in fact, made gratuitous payments to the Hays Companies, that is payments with no business purpose, this was done by McKim in an attempt to prevent or subvert any effort by Nasser J. Kazeminy (or NJK under the terms of the Oversight Services Agreement) to try to force the Company to adopt practices designed to reduce its ongoing insurance premiums, and was not the act of the major shareholders or the other officers and directors of the Company."<br><br>The SLC Report discussed, at length, that both B.J. Thomas and Paul McKim were prepared to sign affidavits recanting all allegations of the impropriety of the Hays Companies payments.  As such, on p. 59 of the SLC Report, it was determined that the pursuit of such allegations was sanctionable.<br><br>P. 17-18 of Appendix A: "Rather, the evidence shows that Nasser Kazeminy proposed that the Hays Companies be engaged to provide insurance services to DMT, and that in the Spring of 2007 Paul McKim executed on behalf of DMT an insurance advisory services agreement and that thereafter DMT sent three checks of $25,000 each to the |

Hugh M. Ray, III
August 11, 2010
Page 12

| Paragraph of Complaint | Section of SLC Report |
|---|---|
| | Hays Companies pursuant to the terms of that written fee agreement.  The evidence also shows that Paul McKim approved the service fee invoices for the three payments of $25,000 each, that Paul McKim sent three checks of $25,000 each to the Hays Companies, and that the initial engagement of Hays was for a legitimate business purpose. Evidence was obtained from several witnesses and e-mail or other documentation that (i) Nasser Kazeminy was concerned with the large amount of insurance premiums paid by DMT, (ii) he believed using the Hays Companies in a co-brokerage, fee-in-lieu of commissions or consulting agreement would result in lower insurance premiums, (iii) Paul McKim resented any intrusion by stockholders or the Board into the area of insurance, and (iv) only Paul McKim, B.J. Thomas and the folks at the Hays Company saw or negotiated the written insurance advisory services agreement. ...All the evidence obtained shows that it was Paul McKim that negotiated the arrangements with the Hays Companies, executed the agreement with the Hays Company, and caused the funds to be paid to the Hays Company. There is no evidence that Nasser Kazeminy took a direct role in any of those activities other than expressing a desire that DMT use the Hays Company in some manner to reduce or contain its insurance costs."<br><br>P. 23-24 of Appendix A: "The evidence shows that Hays provided insurance consulting services to DMT, that such services were provided in exchange for a fee, that the fee was disclosed in a document entitled "Disclosure of Service Fee," that Hays did not purport to place an insurance policy for the fee, and that the fee was not intended to serve as a premium for an insurance policy. ...Furthermore, the evidence is that the Hays Companies was ready, willing and able to provide detailed insurance consulting services as well as being willing to enter into a fee-in-lieu of commission, or commission splitting arrangement in exchange for the compensation it was receiving, but that Paul McKim chose not to use the Hays Companies for such services despite executing the written fee agreement, that Paul McKim never sought or made further inquiry of the Hays Companies as to services it |

Hugh M. Ray, III
August 11, 2010
Page 13

| Paragraph of Complaint | Section of SLC Report |
|---|---|
|  | could provide, but that Paul McKim was never directed by Nasser Kazeminy or any one on his behalf to not use the Hays Companies to provide insurance consulting services or to obtain policies of insurance by or through the Hays Companies on a fee-in-lieu of commission or commission splitting arrangement." |
|  | P. 26-27 of Appendix A: "The evidence obtained during the investigation demonstrates that there was no fraud in making these payments, and the lack of value to the company resulted from Paul McKim's refusal to utilize the consulting services offered by the Hays Companies, and not from Defendant Kazeminy instructing that payments be made to the Hays Companies with no intent to actually procure insurance related services. ...The evidence obtained was that Paul McKim negotiated the agreement for fees with the Hays Companies without notifying the Board or the other Officer or Director Defendants, Paul McKim approved each payment in question, Paul McKim caused three payments to be made to the Hays Companies, and Paul McKim caused DMT to not avail itself of the insurance services that it was able to obtain from the Hays Companies in exchange for such payments." |
| Paragraph 78: "As set forth above, the Kazeminy Defendants breached their fiduciary duties by, without limitation, the following:<br>        (a) installing certain members on Deep Marine's Board of Directors thereby controlling the board with proxy members;<br>        (b) acting in bad faith and for their own personal and corporate interests;<br>        (c) mismanaging Deep Marine to its detriment;<br>        (d) paying money to Hays Insurance Companies;<br>        (e) engaging in self-dealing | P. 6 of the Final Report: "There is no evidence of wrongdoing by the major shareholders of the Company – DCC Ventures, LLC, Nasser J. Kazeminy or Otto Candies LLC. There is no evidence that the major stockholders have colluded to loot the Company for either of their benefit or to commit acts amounting to corporate waste to the detriment of the minority stockholders.  To the contrary, there is substantial evidence that the major stockholders have continued to invest substantial resources into the Company that has substantially contributed to any positive enterprise value that exists today, which has accrued to the benefit of the Company as a whole, including the minority stockholders."<br><br>P. 53 of the Final Report: "With the exception of certain conduct of McKim, Special Counsel found no fraudulent |

Hugh M. Ray, III
August 11, 2010
Page 14

| Paragraph of Complaint | Section of SLC Report |
|---|---|
| transactions unfair to Deep Marine;<br>  (f) directing the Board to approve the self-dealing Oversight Agreements which further increased Mr. Kazeminy's control over the company while providing no legitimate services to Deep Marine;<br>  (g) increasing Deep Marine's insolvency by, among other things, approving transfers and characterizing equity contributions to Deep Marine as loans; and<br>  (h) directly and proximately causing Deep Marine's bankruptcy."<br><br>Paragraph 91: "The Candies Defendants breached their fiduciary duties as set forth above. The Kazeminy Defendants had direct knowledge that the Candies Defendants' conduct constituted breaches of their fiduciary duties."<br><br>Paragraph 92: "The Kazeminy Defendants participated in and/or intended to assist the Candies Defendants' breaches of fiduciary duties by allowing and approving the actions set forth above."<br><br>Paragraph 93: "The Kazeminy Defendants' assistance was a substantial factor in causing the Candies Defendants' breaches of fiduciary duties."<br><br>Paragraph 128: "The Defendants have wrongfully secured benefits through fraud, duress, or taking | activities or funds wrongfully diverted from the Company. …With the exception of certain conduct of McKim, the investigation has not revealed facts or circumstances warranting the initiation of a lawsuit to recover funds from any current or former director, officer, or shareholder."<br><br>P. 3 of Appendix A: "In sum, there is no credible evidence supporting the allegation that DMT's officers and directors aided or allowed Nasser Kazeminy or Otto Candies LLC or entities or persons within their control or acting at their direction to exploit or loot DMT for their own economic benefit and/or improper purposes."<br><br>P. 6 of Appendix A: "There is no evidence that DMT has been looted (i.e. plundered) either for the personal gain of the Controlling Shareholders, or to the detriment of the minority stockholders, nor any evidence that there was concerted action between two or more groups of shareholders to cause waste, mismanagement or the wrongful diversion of corporate assets or opportunity. ...There is no evidence that Defendants acted jointly or collectively to cause millions of dollars of damage to DMT or to impair [minority shareholders] interests in DMT.  However, there is evidence of individual actions by Defendant Paul McKim, with specific regard to the acquisition of remotely operated vehicles and submarines, that did not result from prudent business planning, that contributed to financial losses for DMT, and that necessitated capital funding through the exchange of equity that diluted shareholder value."<br><br>PP. 24-25 of Appendix B: "Although Nasser J. Kazeminy and Otto Candies Jr. may own or control entities that are shareholders in DMH/DMT, and while there is evidence that Nasser J. Kazeminy and Otto Candies Jr. have exercised influence with the Board of Directors of DMH/DMT, there is no evidence that Nasser J. Kazeminy and Otto Candies Jr. have disregarded the best interests of DMH and DMT, or that persons associated with Nasser J. Kazeminy and Otto Candies Jr. adversely dominated the Board, or that Nasser J. Kazeminy and Otto Candies Jr. conspired with any other shareholder to wrongfully divert |

Hugh M. Ray, III
August 11, 2010
Page 15

| Paragraph of Complaint | Section of SLC Report |
|---|---|
| undue advantage of Deep Marine, or have received benefits which would be unconscionable for Defendants to retain."<br><br>Paragraph 129: "The trustee is entitled, in equity and good conscience, to the return of the benefits that Defendants took from Deep Marine which unjustly enriched Defendants at Deep Marine's expense."<br><br>Paragraph 137: "The Trustee asserts that upon information and belief, without limitation, the Kazeminy Defendants and Otto Candies, LLC conspired to: (1) breach their respective fiduciary duties to Deep Marine; (2) convert funds; and (3) oppress other shareholders, as set forth above."<br><br>Paragraph 142: "These transactions were made through self-dealing for which no fairness opinions were obtained or sought. The transactions were not authorized by Deep Marine and the transfers were based upon obligations that were never enforceable." | the assets or business opportunities of DMT. Nor is there evidence that during the period August 2004 to present, DMT has been victimized by egregious self-dealing and corporate waste in its transactions with Otto Candies LLC. Nor is there evidence that 'Defendants misused corporate funds, committed waste, wrongfully terminated senior management, disregarded corporate formalities, and committed numerous frauds.' There is no evidence that DMT paid millions of dollars to Otto Candies LLC needlessly in connection with vessels DMT leased, chartered and purchased from Otto Candies LLC. ...Rather, all leasing and charter arrangements and vessel purchase agreements with Otto Candies LLC resulted from arms-lengths business negotiations, were largely favorable to DMT, and such arrangements and purchases remain valuable corporate assets."<br><br>P. 26 of Appendix B: "As Nasser J. Kazeminy, DCC Ventures LLC and Otto Candies LLC continued to invest in DMT, or lend it money on terms that the Company would not likely achieve from traditional commercial lenders, in each instance contributing to the asset value of the company..."<br><br>P. 54 of Appendix B: "There is no evidence that Otto Candies and Nasser Kazeminy have colluded on matters involving DMT, but the evidence is that they have acted as independent shareholders. Mere consultation between two major shareholders as to the strategic direction of a company or as to major acquisitions is not only evidence of collusion in a closely-held company, but may be evidence of prudence. The evidence is that since 2004, the shareholder that has paid the greatest amount of consideration for its stock is Otto Candies, so that no other shareholder has been unfairly diluted in the transactions that resulted in Otto Candies selling three large vessels to DMT in exchange for common stock." |
| Paragraphs 81-85: The trustee alleges that OC breached its fiduciary duty as controlling shareholder by acting in bad faith | P. 5 of Appendix A: "except for approximately 15 days in October 2008, no person affiliated with Otto Candies LLC was a member of Board of DMT, and no affiliate of Otto Candies LLC has ever served as an officer of DMT. None |

Hugh M. Ray, III
August 11, 2010
Page 16

| Paragraph of Complaint | Section of SLC Report |
|---|---|
| for its own personal interest, engaging in self-dealing, making misrepresentations to DMT which DMT relied upon to its detriment, breaching agreements with DMT, characterizing equity contributions as loans, and causing DMT's bankruptcy. | of Plaintiff's allegations assert any self-dealing by Otto Candies LLC during such 15-day period.  Thus, by definition, there could be no self-dealing.  There is no evidence that persons associated with Otto Candies LLC adversely dominated the Board, nor that Otto Candies LLC conspired with any other stockholder to wrongfully divert the assets or business opportunities of DMT."

P. 34 of Appendix A: "The evidence is that the material transactions between Otto Candies and DMT were either at arms length, or on commercial terms better than DMT could expect on an arms length basis and that *in toto*, such transactions were fair to DMT."

PP. 54-55 of Appendix B: "The evidence is that Otto Candies, either in the form of notes or trade payables, has provided millions of dollars in financing to DMT, in addition to the contribution of boats for equity, on terms inherently advantageous to DMT, and if disputes arose over the commercial terms of the dealings between DMT as customer and Otto Candies as supplier, such disputes either are on-going, or were not resolved unfairly to the detriment of DMT merely because Otto Candies was a shareholder or was able to exert undue influence over any officer, director or other shareholder."

P. 44-45 of Appendix A: "Because Otto Candies does not own a controlling interest in DMT, had no prior relationship with Nasser Kazeminy prior to each of them becoming a shareholder in DMT, and has no other significant business dealings with Nasser Kazeminy, and because no employee, stockholder, officer, or person otherwise indebted to Otto Candies serves, or at all times relevant, served as either an officer or director of DMT, there can be no self dealing, per se, by Otto Candies. There is no evidence that Otto Candies and Nasser Kazeminy have colluded on matters involving DMT, but have acted as independent shareholders."  Repeated nearly verbatim on p. 54 of Appendix B. |
| Counts 8 and 9 (Paragraphs 99-116).  The trustee alleges that OC made material misrepresentations | *See* 72-73 Above.

P. 39 of Appendix A regarding the *Topaz*: "the seal |

Hugh M. Ray, III
August 11, 2010
Page 17

| Paragraph of Complaint | Section of SLC Report |
|---|---|
| regarding the crane on the *Sapphire* (¶ 100), the seaworthiness of the *Topaz* (¶ 101), and the willingness to crew the *Emerald* (¶ 102). DMT relied on these misrepresentations to the detriment of the shareholders and creditors. | system on a bow thruster below the water line leaked... but in the opinion of knowledgeable sources, this is a system that is hard to inspect and maintain... the leakage was most likely not as a result of poor maintenance... the crank shaft on the engine (bow thruster) cracked... it is impossible to say if the cracked crank shaft occurred due to substandard maintenance, manufacturing defect or ordinary wear and tear." |
| | P. 45-46 of Appendix A: "The evidence is that DMT procured appraisals regarding the vessels obtained from Otto Candies from qualified third party appraisers, had independent third parties evaluate other major equipment that was procured from Otto Candies if DMT personnel perceived that there were concerns with such equipment, that several of the employees at DMT are qualified by training, education, and experience to evaluate the transactions with Otto Candies, that even the testimony of Paul McKim, in the main, confirmed that DMT received fair value and 'good buys' for what was acquired from Otto Candies, that in the case of the acquisition of two of the four boats acquired from Otto Candies, DMT had already leased such boats under charter and was intimately familiar with the boats prior to their acquisition…" |
| Paragraph 141: "Upon information and belief Otto Candies, LLC, the Kazeminy Defendants, and Deep Marine formed a partnership or joint venture because each of the entities did, without limitation, one or more of the following:<br><br>        (a) Otto Candies, LLC and the Kazeminy Defendants shared or had a right to share in Deep Marine's profits, gross returns, or revenues pursuant to the terms of the Oversight Services Agreements and Deep Marine's bylaws.<br>        (b) Otto Candies, LLC and the Kazeminy Defendants expressed an intent to be partners in Deep Marine's business when they | PP. 17–18 of Appendix B: "Although Nasser J. Kazeminy controls DCC Ventures LLC, and Otto Candies Jr. controls Otto Candies LLC, there is no evidence to support the allegation that Nasser J. Kazeminy or Otto Candies Jr. or other co-Defendants 'disregarded the best interests of DMH and DMT and utilized the companies and their assets as their own personal bank account.' ...There is no evidence that Nasser J. Kazeminy or Otto Candies Jr. had access, or utilized the access of others, to the DMT/DMH bank accounts, or that they 'utilized the companies and their assets' for personal reasons."<br><br>P. 54 of Exhibit B: "There is no evidence that Otto Candies and Nasser Kazeminy have colluded on matters involving DMT, but the evidence is that they have acted as independent shareholders. Mere consultation between two major shareholders as to the strategic direction of a company or as to major acquisitions is not only not |

Hugh M. Ray, III
August 11, 2010
Page 18

| Paragraph of Complaint | Section of SLC Report |
|---|---|
| decided, among other things, to execute the Oversight Services Agreements and hold positions on Deep Marine's Board of Directors and Advisory Board.<br><br>(c) Otto Candies, LLC and the Kazeminy Defendants participated or had a right to participate in the control of the business pursuant to, among other things, the terms of the Oversight Services Agreements and through their positions on Deep Marine's Board of Directors and Advisory Board.<br><br>(d) Otto Candies, LLC and the Kazeminy Defendants shared or agreed to share in Deep Marine's liabilities for claims by third parties by paying for release of the DMT Emerald after it was seized by the U.S. Customs office as a result of non-payment for amounts owed to a vendor, and purchasing many of Deep Marine's promissory notes from National City Commercial Capital Company.<br><br>(e) Otto Candies, LLC and the Kazeminy Defendants contributed money or property to Deep Marine's business to meet daily operating expenses." | evidence of collusion in a closely-held company, but may be evidence of prudence. The evidence is that since 2004, the shareholder that has paid the greatest amount of consideration for its stock is Otto Candies, so that no other shareholder has been unfairly diluted in the transactions that resulted in Otto Candies selling three large vessels to DMT in exchange for common stock." |

Based upon the above, it is unequivocally clear that the Bittner Complaint is in clear violation of, among other provisions, Bankruptcy Rule 9011(b)(2) and (3) in that the claims and legal contentions are not warranted and the factual contentions have insufficient—or in many cases, no—evidentiary support. Further, while the above analysis specifically addresses the various derivative claims investigated in the SLC Report, the allegations presented in those counts of the Bittner Complaint are also urged in support of many of the bankruptcy-related claims asserted, as well as providing support for the objections to claims, including those founded solely upon 11 U.S.C. § 502(d), which claims (and claim objections), absent the defects described herein, would likewise fail.

EXHIBIT "A"

Hugh M. Ray, III
August 11, 2010
Page 19

      Accordingly, we demand that you immediately withdraw your pleading or we will vigorously pursue sanctions.  As you can see from the draft Motion, it is the intention of my clients to seek, in the alternative, recovery of sanctions under Rule 9011 against you, your firm and your client, under 28 U.S.C. § 1927 against you and your firm for engaging in vexatious litigation, and further requesting that the Court give consideration to the imposition of sanctions as may be appropriate under its inherent power to police its docket against frivolous litigation.

      We believe the record demonstrates that this wasteful and expensive pursuit is not in the best interests of the estate and demonstrates a potential intent of incurring unnecessary legal fees, which will continue to be paid from the estate.  It is clearly not in the best interests of the estate, nor its creditors to have the liquidating trustee and its counsel pursue frivolous and bad faith litigation with their fees guaranteed.   Notwithstanding the foregoing, we stand ready to visit with you on these issues.  However, if you and your client so choose, we will go forward with appropriate motion practice seeking *inter alia* sanctions if this matter is not otherwise resolved. In light of the same, we respectfully propose that if Mr. Bittner refuses to withdraw the instant Complaint, Defendants' responses to the Complaint shall be due ten days after service of an Amended Complaint or upon the Court's ruling on our Rule 11 motion.

      Thank you for your attention to this matter.

                Very truly yours,

                Thomas S. Henderson

Enclosures

P.2
DismX

NO. 2008-64385

| | | |
|---|---|---|
| PAUL MCKIM, Individually and Derivatively on behalf of Nominal Defendants Deep Marine Holdings Inc. and Deep Marine Technology Inc., | § § § § § | IN THE DISTRICT COURT OF |
| Plaintiff, | § § § | HARRIS COUNTY, TEXAS |
| vs. | § § § | 129th JUDICIAL DISTRICT |
| NASSER KAZEMINY, OTTO CANDIES JR., JOHN HUDGENS, DCC VENTURES LLC, OTTO CANDIES LLC, NJK HOLDING CORPORATION, OTTO CANDIES III, JOHN ELLINGBOE, DANIEL ERICKSON, LARRY LENIG JR., BRUCE C. GILMAN, EUGENE DEPALMA, and WADE ABADIE JR., | § § § § § § § § § § § § § § § § | |
| Defendants, | § § § | |
| DEEP MARINE HOLDINGS INC. and DEEP MARINE TECHNOLOGY INC., | § § § § | |
| Nominal Defendants | § | |

**FILED**
Loren Jackson
District Clerk

AUG 1 4 2009
Time: 8·14·09
Harris County, Texas
By _____
Deputy

## ORDER GRANTING THE AMENDED MOTION TO DISMISS

On this day, the Court considered the Amended Motion to Dismiss asserted by the Special Litigation Committee ("SLC") of the Board of Directors of Deep Marine Holdings Inc. ("DMH") and Deep Marine Technology Inc. ("DMT"), which was also joined by certain other Defendants. The Court also considered the Notice of Discontinuance asserted by Derivative Plaintiff Paul McKim which requests, in the alternative, that this Court approve the discontinuance of the derivative proceedings.

RECORDER'S MEMORANDUM:
This instrument is of poor quality
and not satisfactory for photographic
recordation and/or alterations were
present at the time of filming

EXHIBIT "A"

The Court FINDS that Derivative Plaintiff Paul McKim no longer has standing to pursue his claims derivatively on behalf of DMH and DMT because he is no longer a shareholder of DMH or DMT. The Court also FINDS that the SLC lawfully assumed control of the derivative proceedings, and determined in good faith, after conducting a reasonable inquiry based on the factors the SLC considered appropriate under the circumstances, that the continuation of the action would be detrimental and not in the best interest of DMH and DMT.

Therefore, the Court hereby DENIES the Notice of Discontinuance and hereby GRANTS the Amended Motion to Dismiss.

The Court ORDERS that the derivative proceedings, and the claims asserted therein, brought on behalf of DMH and DMT by Derivative Plaintiff Paul McKim are hereby terminated and dismissed with prejudice.[1] This Order does not dispose of Plaintiff Paul McKim's individual claims for wrongful discharge and quantum meruit against Defendant Nasser Kazeminy and Plaintiff Paul McKim's individual claim for tortious interference with existing contract against Defendant Otto Candies Jr.

The award of expenses in a derivative proceeding by a trial court is discretionary. *Pace v. Jordan*, 999 S.W.2d 615, 625-26 (Tex.App.—Houston [1st Dist.], 1999). The SLC, and certain other Defendants, have failed to provide this Court with legally sufficient evidence to support the claim that the derivative proceedings maintained by Derivative Plaintiff Paul McKim were without reasonable cause or for an improper purpose.

Therefore, the Court DENIES the request of the SLC, and certain other Defendants, for an award of expenses, pursuant to the Amended Motion to Dismiss.

Signed August 14, 2009.

Michael Gomez
Judge Presiding

---

[1] The Court finds the termination of the derivative proceedings pursuant to the Amended Motion to Dismiss to be an adjudication on the merits based on the Court's finding that the SLC lawfully assumed control of derivative proceedings, concluded its investigation, and as a result moved to dismiss.

EXHIBIT "A"