**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| **IN RE:** | § | **(Chapter 11)** |
| | § | **Jointly Administered Under** |
| **DEEP MARINE HOLDINGS, INC. et al.** | § | **Case No. 09-39313-H1-11** |
| **Debtors** | § | |

| | | |
|---|---|---|
| **John D. Bittner, Liquidating Trustee** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **V.** | § | **Adv. Proc. No. 10-3312** |
| | § | |
| **Nasser Kazeminy,** | § | |
| **NJK Holding, Corp.,** | § | |
| **DCC Ventures, LLC,** | § | |
| **Otto B. Candies, Jr.,** | § | |
| **Otto B. Candies, III,** | § | |
| **Otto Candies, LLC, and** | § | |
| **Candies Shipbuilders, LLC** | § | |
| | § | |
| **Defendants,** | § | |
| | § | |
| **and** | § | |
| | § | |
| **Deep Marine Holdings, Inc. and** | § | |
| **Deep Marine Technologies, Inc.,** | § | |
| | § | |
| **Nominal Defendants/Debtors** | § | |

**GENERAL ELECTRIC CAPITAL CORPORATION'S
COMPLAINT IN INTERVENTION**

General Electric Capital Corporation ("GE") files this Complaint in Intervention

("Complaint") with respect to the Trustee's Original Complaint and Objections to

Defendants' Proofs of Claim ("Trustee's Original Complaint"), and in support thereof,

GE states as follows:

**INTRODUCTION**

1.      On July 29, 2010, the Court held a status conference in Adversary No. 10-3271, styled *Deep Marine 1, LLC v. The Deep Marine Liquidating Trust, et. al.*  After considering the claims and various cross claims asserted by the parties in the adversary proceeding, the Court determined and the parties agreed that the claims for equitable subordination and recharacterization of debt asserted by GE in Counts III and IV, respectively, of General Electric Capital Corporation's Cross-Claim Against Otto Candies, LLC should, in the interest of judicial economy, be severed from Adversary No. 10-3271 and consolidated with Adversary No. 10-3312, styled *John D. Bittner, Liquidating Trustee v. Nasser Kazeminy, et. al.*, which is currently pending before this Court.

2.      The Order severing GE claims III and IV from Adversary No. 10-3271 and consolidating them with Adversary No. 10-3312 was signed on August 18, 2010.

3.      Thus, GE is filing this Complaint to consolidate its equitable subordination and recharacterization of debt claims against Otto Candies, LLC ("Otto Candies")  in this adversary proceeding.

**JURISDICTION AND VENUE**

4.      The Court has jurisdiction over this action pursuant to 28 U.S.C. §1334(b). GE's Complain is a core proceeding under 28 U.S.C. §157(b).

5.      Venue is proper in this District pursuant to 28 U.S.C. §1409.

**BACKGROUND FACTS**

6.      On November 30, 2006, National City Commercial Capital Corporation ("National City") made a $15 million loan ("Diamond Loan") to Deep Marine 1, LLC

("DM1") pursuant to a Loan Agreement also dated November 30, 2006, ("Diamond Loan Agreement"), executed by DM1 and National City.

7.      The Diamond Loan is evidenced by a Secured Promissory Note ("Diamond Note") dated November 30, 2006 in the original principal amount of $15 million, executed by DM1, as maker, payable to the order of National City, as payee.

8.      The Diamond Note was secured by (i) a United States first priority Preferred Mortgage and Deed of Covenants ("Diamond Mortgage") on the Borrower's United States flag vessel, the DMT Diamond," Official No. 1091373, and other collateral described in the Diamond Loan Agreement; (ii) an Earnings Assignment covering, among other things, a Bareboat Charter Party dated April 22, 2005 between DM1 and Deep Marine Technology ("DMT") and all earnings of the DMT Diamond; and (iii) an Insurance Assignment covering, among other things, all insurance proceeds with respect to the DMT Diamond and all claims and other monies due and to become due under the insurance policies, all of which loan documents were executed by the parties of even date with the Diamond Note.

9.      The Diamond Mortgage was filed with the United States Coast Guard National Vessel Documentation Center on or about December 1, 2006.

10.     On June 18, 2007, National City assigned all of its rights, title and interest in the Diamond Loan Agreement, Diamond Note, Diamond Mortgage, Guarantees, and other loan documents to GE.

11.     During 2008 and 2009, and thereafter, DM1 violated the Diamond Loan Agreement by failing to keep the DMT Diamond clear of liens, encumbrances, or charges.

12.     During the latter part of 2009, the DMT Diamond required major repairs and, as a result, DM1 cold-stacked the vessel in Louisiana.  Thereafter, DM1 failed to maintain the DMT Diamond in good working condition, in violation of the Diamond Mortgage.

13.     DM1 also committed payment defaults. On November 16, 2009, GE gave written notice that DM1 had defaulted under the Diamond Note by, among other things, failing to make installment payments due thereunder.

14.     Despite demand, no further payments were made by DM1 on the Diamond Note.

15.     Subsequently, DM1 filed a voluntary petition for relief under Chapter 11 of the United States Bankruptcy Code on December 4, 2009.  As of that date, a total of $13,796,587.31 in principal, accrued interest, and other charges were due and owing under the Diamond Note.

16.     On June 2, 2010, the Court entered the Confirmation Order, confirming the Plan and approving the sale of the Debtors' assets.

17.     The Plan provides the following classification of claims filed against DM1:

a.      Class 1: Priority Non-Tax Claims;
b.      Class 2: Maritime Senior Secured Claims;
c.      Class 3: Secured Mortgage Claim of GE;
d.      Class 4: Maritime Junior Secured Claims
e.      Class 5: Other Secured Claims;
f.      Class 6: General Unsecured Claims; and
g.      Class 7: Subordinated Claims.

18.     GE's claim against DM1, secured by the Diamond Mortgage, is treated under Class 3 of the Plan.

- 4 -

19.     The Plan became effective on the Effective Date, July 12, 2010.

20.     On July 9, 2010, the DMT Diamond was sold for $10 million to Seacor. The funds are supposed to be paid into the registry of the Court.

21.     At all time relevant to this action, Otto Candies was part-owner and an insider in control of the Debtors' business.  Otto Candies has filed notices pursuant to 11 U.S.C. 546(b) and proofs of claim in, *inter alia*, the DM1 bankruptcy case, claiming to hold preferred maritime liens on the DMT Diamond seeking "reimbursement" of amounts advanced for crewman's wages under general maritime law of the United States ("Insider Priming Liens").

22.     Otto Candies claims that the Insider Priming Liens are senior in priority to GE's Diamond mortgage.  GE disputes the nature, extent, validity and claimed priority of the Insider Priming Liens which are, by law, subordinate to GE's preferred maritime lien, if they are liens at all.  Further, GE seeks to subordinate the Insider Priming Liens based on Otto Candies' inequitable conduct described herein.

**A.     Otto Candies' Insider Status With Respect To DM1 And Its Knowledge Of The Terms Of The Diamond Loan**

23.     Otto Candies originally sold the DMT Diamond to DM1.  The sale was financed by a loan of $15.2 million ("Candies Loan") made by Otto Candies to DM1 pursuant to a senior secured convertible note loan dated April 22, 2005 ("Candies Note"). The Candies Loan was secured by a preferred ship mortgage dated April 22, 2005 on the DMT Diamond ("Candies Mortgage").

24.     The Candies Loan and the Candies Mortgage were released at closing of the Diamond Loan.  Based on its direct connection with the Diamond Loan, and its insider/control/ownership position with DM1 and its affiliates, Otto Candies was fully

aware of the terms of the Diamond Loan Agreement and the Diamond Mortgage, including the contractual commitments by DM1 set forth hereafter.

25.     Article II, Section 7 of the Diamond Mortgage both prohibited and required DM1 to cause the removal or discharge of liens against the DMT Diamond as follows:

> Section 7. <u>Removal of Liens</u>.  Except for the lien of this Mortgage Deed, the Shipowner will not suffer to be continued any lien, encumbrance or charge on the Vessel and in due course and in any event within thirty (30) days after the same becomes due and payable or, upon the same being due and payable, within fourteen (14) days after being requested to do so by the Mortgagee, the Shipowner will pay or cause to be discharged or make adequate provision for the satisfaction or discharge of all claims or demands, and will cause the Vessel to be released or discharged from any lien, encumbrance or charge therefore.

26.     The accrual of Insider Priming Liens against the DMT Diamond (presuming Otto Candies has any liens at all) was a direct breach of the Diamond Mortgage.

27.     Article II, Section 9 of the Diamond Mortgage required DM1 to maintain the DMT Diamond in a good state of repair, as follows:

> The Shipowner will at all times and without cost or expense to the Mortgagee maintain and preserve, or cause to be maintained and preserved, the Vessel and all its equipment, outfit and appurtenances, sufficiently tackled, appareled, furnished, equipped, tight, staunch, strong, in good condition, working order and repair and in all respects seaworthy and fit for its intended service, and will keep the Vessel, or cause her to be kept, in such condition as will entitle her to the highest classification and rating for vessels of the same size, age and type in American Bureau of Shipping or other classification society of like standing approved by the Mortgagee.

28.     In addition to knowing the terms of the Diamond Loan prohibited liens on the DMT Diamond, Otto Candies also knew the loan agreements required DM1 to report

violations of the exact nature that Otto Candies itself has attempted to orchestrate through the device of the Insider Priming Liens.

29.     For example, Section 5.01(c)(i) of the Diamond Loan Agreement required DM1 to advise GE of any Event of Default under the agreement:   "The Borrower shall promptly inform the Lender of a Default or an Event of Default."  Section 6.01(j) of the Diamond Loan Agreement provides that Events of Default include any event of default under the Diamond Mortgage.  Events of default under the Mortgage, in turn, include non-observance and performance of the covenant against liens in Article II, section 7 of the Diamond Mortgage referred to above.

30.     Otto Candies' proof of claim filed against DM1, demonstrates that it began accruing maritime lien charges for seaman's wages against the DMT Diamond on December 1, 2006, *which was the day after the closing of the Diamond Loan.*  Hence, one can easily infer that Otto Candies planned to do so at the time the Diamond Loan was made.

31.     DM1 and its insiders, including Otto Candies, had *both* a contractual duty to refrain from allowing such liens to accrue, and a duty to report such liens as they were accruing.   Instead, DM1 and its insiders secretly ran up millions of dollars worth of alleged "wage" liens on the DMT Diamond – liens that, upon information and belief, were designed to prime GE's collateral.

**B.     Otto Candies' Insider Status And Self-Dealing With  the Debtors**

32.     As stated above, Otto Candies asserts Insider Priming Liens against the DMT Diamond for periods dating back to December 1, 2006, the day after the closing of the Diamond Loan.   Otto Candies has been a substantial owner of DM1 during the entire

period it wrongfully accrued the Insider Priming Liens.  In March 2007, Otto Candies owned 22.5% of DMT, the parent of DM1 prior to the corporate reorganization.  By June of 2008, after the corporate reorganization, it owned 40% of Diamond Marine Holdings ("DMH"), the ultimate parent of both DMT and DM1.  As of the December 2009 filing of the Debtors' Chapter 11 cases, Otto Candies and NJK Holdings Corporation ("NJK"), an entity controlled by Nasser Kazeminy ("Kazeminy"), were each 50% shareholders of DMH.

33.     Upon information and belief, Otto Candies increased its ownership interest in DMT and DMH and its affiliates over time by funding loans that were later converted to equity.  The Candies Loan, pursuant to which DM1 originally acquired the DMT Diamond, was one of these loans that were converted into equity.

34.     On April 22, 2005, at the same time DM1 acquired the DMT Diamond pursuant to the Candies Loan, DMT and DM1 entered a "Bareboat Charter Party" agreement ("Charter Agreement") pursuant to which DMT agreed to charter the vessel from DM1.  On the same day, DMT and Otto Candies entered into a "Vessel Operating Agreement" (the "Operating Agreement") pursuant to which Otto Candies agreed to provide crewing and other services to DMT with respect to the DMT Diamond.

35.     Otto Candies was fully aware of the terms of the Diamond Loan Agreement, including the lien prohibitions cited earlier, when it accepted the benefits of the National City financing.

36.     GE's predecessor required Otto Candies to execute a letter dated November 27, 2006 ("Confirmation Letter"), immediately prior to closing the Diamond Loan.  The Confirmation Letter signed by Otto Candies expressly (1) acknowledged that

the Diamond Loan would be secured by a first preferred ship mortgage on the DMT

Diamond in favor of National City, and (2) confirmed, *inter alia*, (a) that the debt

evidenced by the Candies Note was to be converted into common stock, (b) that DM1

was not a party to the Operating Agreement, and (c) that DM1 had "no further obligations

or liabilities of any kind to Otto Candies."

37.     In the context of the closing of a $15 million loan secured by a preferred

ship mortgage, Otto Candies' statements in the Confirmation Letter either expressly or

implicitly represented that neither DM1 nor its vessel would be responsible for or incur

obligations for seaman's wages payable by DMT under the Operating Agreement.

38.     The confirmations and statements made in the Confirmation Letter, and

the terms and covenants in the Diamond Mortgage prohibiting the accrual of liens against

the DMT Diamond, were material inducements to the making of the Diamond Loan.

39.     Finally, DMT's and DM1's transactions with Otto Candies which have

given rise to the Insider Priming Liens, including the terms of the Operating Agreement,

were not arms-length.  Upon information and belief, Otto Candies charged DMT above-

market prices for crews, maintenance and equipment.

C.     **Otto Candies' And The Debtors' Concealment Of The Accrual Of The
       Insider Priming Liens Caused Serious Prejudice To GE**

40.     The Operating Agreement required DMT to pay Otto Candies within 30

days of receipt of a monthly invoice.  Notwithstanding this, and knowing that the terms

of the Diamond Mortgage required that any liens of any type against the DMT Diamond

had to be promptly discharged, Otto Candies accrued astronomical crewmen's wage

claims for three years, while at the same time concealing its attempt to prime GE's

collateral.

41.     In addition, that $5,668,890.54 in asserted Insider Priming Liens were allowed to accrue is evidence of the non-arm's length nature in which Otto Candies dealt with DMT, DM1, and their affiliates.  No rational third party would have allowed itself to go unpaid for almost three years to the extent of the amounts asserted in the Insider Priming Liens.

42.     Otto Candies' concealment of the accrual of the Insider Priming Liens was in direct violation of the Diamond Mortgage.  As these liens were accruing, Otto Candies knew full well, and was reminded on many occasions, of both the prohibitions in the Diamond Loan Agreement against Insider Priming Liens against GE's collateral, and that GE would not permit liens of this type.

43.     For example, in late July 2008, GE was notified by Bollinger Texas City, LLC ("Bollinger Texas") that Bollinger Texas was filing notices of maritime liens against the DMT Diamond on account of work Bollinger Texas had performed thereon.  In response, GE demanded that DM1 pay the outstanding amounts to Bollinger Texas and cause any such liens to be immediately released, as the liens violated the obligations of DM1 under the Diamond Loan Agreement and Diamond Mortgage.   DM1/DMT complied, and the liens were released in early September 2008.

44.     The events described above were kept hidden from GE during negotiations that started in late 2008 concerning a proposed forbearance agreement ("Forbearance Agreement") relating to the loan ("Emerald Loan Agreement") secured by the DMT Emerald, by which DMT requested GE's affiliate to forbear from enforcing its rights under the Emerald Loan Agreement and its preferred ship mortgage secured by the DMT Emerald ("Emerald Mortgage").  The DMT Emerald was owned at the time by

DM1's affiliate, DM2, which, like DM1, was owned 100% by DMT.  Otto Candies has assessed and asserted in the Bankruptcy Case the same sort of liens for seaman's wages accrued from 2007-09 against the DMT Emerald as it has asserted against the DMT Diamond pursuant to the Insider Priming Liens.  The Emerald Loan Agreement contained the same type of prohibitions against liens against that vessel as are found in the Diamond Mortgage.

45.     During negotiations over terms of the proposed Forbearance Agreement, including the distribution of proceeds of a proposed sale of certain DMT assets, GE's affiliate's representatives requested a description in the agreement of the indebtedness that would be repaid by such proceeds, including amounts due Otto Candies.  Despite the negotiation and exchange of numerous drafts of the Forbearance Agreement (which was never finalized), DMT never provided a description of the amounts payable to Otto Candies, and never disclosed the existence of the alleged priming liens for seaman's wages.

46.     Additionally, under the proposed Forbearance Agreement, DMT, DMH, and DM2 were required to affirm all representations and warranties they had made in the Emerald Loan Agreement and Emerald Mortgage, and represent that they remained true and correct.  DMT's counsel prepared a draft Schedule purporting to list the specific instances where such representations were not true or correct.  The Schedule did not provide any indication that the DMT Emerald was subject to any liens in violation of the Emerald Loan Agreement.   And in no correspondence during the course of the negotiations did DMT or its counsel indicate that any liens were accruing on the DMT

Emerald, let alone the type of massive seaman's wage claims Otto Candies has apparently accrued, and has sought to prime GE with.

47.     Because the same GE departments administered the loans secured by the DMT Diamond and DMT Emerald, discovery of these practices with respect to the DMT Emerald would have led to discovery of the same practices (were they taking place) with respect to the DMT Diamond.

48.     In June of 2009, GE learned that DM1 had again breached its obligations under the Diamond Loan Agreement and Diamond Mortgage, when it was advised that Bollinger Fourchon had recorded liens against the DMT Diamond on June 8, 2009. Discussions between GE and DM1 concerning the release of these liens continued during late summer 2009 in connection with other negotiations concerning, *inter alia*, liens which had been recorded on the DMT Emerald.  In correspondence with the DMT, GE made it unmistakably clear that releases of any liens on the DMT Diamond and the DMT Emerald were of utmost importance.

49.     The first indication to GE management of Otto Candies' concealed priming scheme surfaced on August 31, 2009, after a default notice had been issued under the loan secured by the DMT Emerald.

50.     An email from counsel for Otto Candies and Nasser Kazeminy setting out a proposal to deal with various pending DMT Emerald defaults included the following term:  "Otto Candies, L.L.C. will agree to subordinate any liens it may have against the Vessel that secure amounts owed to it for providing crews for the Vessel to all liens securing the Borrower's obligations under the Loan Agreement."

51.     Still, this email did not disclose either the amount of the alleged claim for seaman's wages, or that Otto Candies had attempted the same concealment and wrongful accrual with respect to the DMT Diamond.

52.     In the course of the negotiations that followed, GE management was provided with DMT payables records showing large outstanding balances due to Otto Candies.  The schedule did not, however, identify what the accounts payable related to, or that Otto Candies would be asserting priming liens for the amounts claimed against GE's and its affiliate's collateral.

53.     After the delivery of the default notice and during the course of the negotiations described above, DMT and Otto Candies were made aware that GE would not permit senior or priming liens against its collateral.  Hence, as an insider, Otto Candies not only knew of the prohibitions against liens in the loan agreement and mortgage cited earlier; it knew that GE, like any other lender, took these prohibitions seriously, and refused to tolerate priming liens against its collateral.

54.     The first time Otto Candies *ever* notified GE of the amount of the Insider Priming Liens against the DMT Diamond had been secretly accruing since December 1, 2006, and that it sought to prime GE's mortgage by this amount, was on February 19, 2010, during the Bankruptcy Case.  On that day Otto Candies filed, among other things, a notice pursuant to 11 U.S.C. §546(b) and a proof of claim alleging it held a preferred lien on the DMT Diamond of more than $5.6 million for reimbursement of seaman's wages.

55.     In addition to the concealment and wrongful accrual of the Insider Priming Liens, DMT, DM1 and Otto Candies violated the Diamond Mortgage and Diamond Loan Agreement by failing to maintain the DMT Diamond in proper state of repair, and failing

to obtain and maintain all operational and regulatory inspections required for the vessel to be operational.

56.     When the DMT Diamond was sold at auction, it required at least $1.5 – 2 million in known repairs, with the potential for more.  As a result, the sales price obtained at auction was well below both its fair market value, and the value that would have been realized had the vessel been maintained in a state of good repair.

57.     The prejudice to GE from DMT's and Otto Candies' concealment and failure to promptly disclose the scheme to accrue massive priming liens against the DMT Diamond is real.   The accrual of the Insider Priming Liens started immediately after the closing of the Diamond Loan.  Had GE been made aware of the potential for the accrual of any of these priming liens when Otto Candies' first invoice to DMT under the Operating Agreement went unpaid, years ago, it would have required DM1/DMT to have the liens paid and released (as it did with respect to the other liens it learned of), or it would have declared default under the Diamond Loan Agreement and foreclosed its preferred ship mortgage and sold the vessel.

58.     In either case, GE would have been in a far better position with respect to its collateral, because (1) either all liens would have been released, or (2) had GE had enforced the Diamond Mortgage in 2007 and sold the vessel, the DMT Diamond was in better condition then than it was when it was recently sold, and would have sold for much more than it sold for in the recent auction.

59.     Finally, if the Insider Priming Liens are allowable as asserted, GE would have received millions more in proceeds from a liquidation in 2007/08, because Insider Priming Liens would not have accrued after the foreclosure.

**COURT ORDERED CONSOLIDATION**

60.     On August 18 2009, the Court issued an Order that GE's claims for equitable subordination and recharacterization of debt asserted by GE in Counts III and IV, respectively, of General Electric Capital Corporation's Cross-Claim Against Otto Candies, LLC should, in the interest of judicial economy, be severed from Adversary No. 10-3271 and consolidated with this adversary proceeding.

61.     Thus, GE is filing this Complaint to replead its equitable subordination and recharacterization of debt claims against Otto Candies, in this adversary proceeding.

**COUNT I**
**(Equitable Subordination of Insider Priming Liens)**

62.     GE incorporates each factual allegation set forth above, the same as though restated herein.

63.     Otto Candies was an owner and an insider that had the power to, and did, control the operation of the Debtors.

64.     Otto Candies' conduct and dealings with respect to the Debtors was wrongful and inequitable, and resulted in injury to GE and other innocent creditors.  The wrongful and inequitable conduct and dealings included, but were not limited to, the following:

> (a)     Otto Candies operated the Debtors in a "zone of insolvency" or insolvent condition, and by doing so caused a deepening insolvency of the Debtors;
>
> (b)     Otto Candies concealed the accrual of the Insider Priming Liens, and similar liens against other DMT vessels;
>
> (c)     Otto Candies was paid dividends and distributions from DM1 or its affiliates that caused or contributed to their insolvency;
>
> (d)     Otto Candies caused the Debtors to incur lien obligations in direct violation of the contractual prohibitions against such liens in the loan

agreement[s] and mortgage[s] pursuant to which Otto's Candies was paid substantial sums;

(e) Otto Candies caused or permitted the Debtors to fail to maintain the DMT Diamond in a state of good repair, in violation of the Diamond Loan Agreement;

(f) Otto Candies caused or contributed to the undercapitalization of the Debtors; and

(g) Otto Candies transacted business with the Debtors on terms that were not arms-length, profiting at the expense of creditors of those entities and contributing to or ultimately causing the Debtors' insolvency.

65.     For these and other reasons, all claims of Otto Candies against DM1 and the DMT Diamond should be equitably subordinated to the claims of GE and other creditors, based on the injury and harm Otto Candies has caused these innocent creditors through its wrongful and inequitable conduct.

66.     In connection with the remedy of subordination, all Otto Candies liens on the DMT Diamond should be expunged.

## COUNT II
### (Recharacterization of Debts Underlying the Insider Priming Liens)

67.     GE incorporates each factual allegation set forth above, the same as though restated herein.

68.     The obligations underlying the Insider Priming Liens should be treated as, and were in substance, equity advances to DMT or DM1, for the following reasons, among others:

(a) At relevant times, Otto Candies was a controlling owner/insider of the Debtors;

(b) There is no contract between Otto Candies and DM1 evidencing the obligations;

(c) There was no fixed maturity date or schedule for DM1 to pay the obligations;

(d)     There was no agreement between Otto Candies and DM1 for the interest assessed;

(e)     DM1 had no available source of income to repay the obligations;

(f)     DM1 and its affiliated debtors were undercapitalized;

(g)     Taking into account dealings between the insiders, there was an identity of interest between Otto Candies and the equity holders of the Debtors;

(h)     There was no security for the obligations at the time the advances were made;

(i)     DM1 could not have financed the seaman's wages advanced by Otto Candies from outside lending institutions;

(j)     There was no sinking fund established to pay the obligations; and

(k)     Otto Candies had a history of converting loans it made to DMT and DM1 specifically, into common stock of the enterprise.

69.     The obligations underlying the Insider Priming Liens should be recharacterized and treated as equity interests, and all liens arising from the obligations should accordingly be expunged.

## PRAYER FOR RELIEF

GE prays for the following relief, after trial or summary disposition of this case, as to the Insider Priming Liens asserted by Otto Candies against the DMT Diamond and its proceeds:

a)   Judgment determining the Insider Priming Liens to the DMT Diamond proceeds junior to GE's preferred ship mortgage lien and claims to the proceeds;

b)   Judgment expunging any such lien or claim by Otto Candies to the DMT Diamond proceeds;

c)   Declaratory relief consistent with the foregoing;

d)  An Order directing the disbursement of the proceeds of the DMT Diamond from the registry of the Court to GE;

e)  An award of attorneys' fees and expenses incurred by GE in litigating this action;

f)  Costs of court; and

g)  Such other and further relief as GE may show itself entitled.

Respectfully submitted,

ADAMS AND REESE LLP


By:    */s/ Susan C. Mathews*
       John Duck *
       Federal Bar No. 17156
       Susan C. Mathews
       State Bar No. 05060650
       Michael N. Mire
       State Bar No. 24010757
       4400 One Houston Center
       1221 McKinney
       Houston, TX  77010
       Telephone:  (713) 652-5151
       Facsimile:  (713) 652-5152

**Attorneys for Defendant,**
**General Electric Capital Corporation**

---

\* Admitted in the State of Louisiana.

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the above and foregoing has been forwarded to all parties on the attached Service List via electronic file notification by the Clerk of the Court, except those parties as indicated (*), on this 16th day of September 2010.

<u>/s/ Susan C. Mathews</u>
Susan C. Mathews

## SERVICE LIST

| ***Counsel for John Bittner, Liquidating Trustee*** | ***Counsel for Defendant – Otto Candies, LLC*** |
|---|---|
| Hugh Massey Ray, III<br>McKool Smith<br>600 Travis, Suite 7000<br>Houston, TX 77002<br>713-485-7300<br>Fax : 713-485-7344<br>Email: hmray@mckoolsmith.com<br><br>Nicholas Zugaro<br>McKool Smith<br>600 Travis St., Suite 7000<br>Houston, TX 77002<br>713-485-7324<br>Fax : 713-485-7344<br>Email: nzugaro@mckoolsmith.com | Thomas S Henderson, III<br>Thomas S Henderson, Attorney at Law<br>711 Louisiana, Ste 3100<br>Houston, TX 77002<br>713-227-9500<br>Fax: 713-620-3023<br>Email: thenderson@tsh-atty.com |