## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| In re: | § | (Chapter 11) |
| | § | Jointly Administered Under |
| DEEP MARINE HOLDINGS, INC. et al. | § | Case No. 09-39313-H1-11 |
|     Debtors | § | |

| | | |
|---|---|---|
| John D. Bittner, Liquidating Trustee | § | |
| | § | |
|     Plaintiff, | § | |
| | § | |
|     v. | § | Adv. Proc. No. 10-3312 |
| | § | |
| Nasser Kazeminy, | § | |
| NJK Holding, Corp., | § | |
| DCC Ventures, LLC, | § | |
| Otto B. Candies, Jr., | § | |
| Otto B. Candies, III, | § | |
| Otto Candies, LLC, and | § | |
| Candies Shipbuilders, LLC | § | |
| | § | |
|     Defendants, | § | |
| | § | |
|     and | § | |
| | § | |
| Deep Marine Holdings, Inc. and | § | |
| Deep Marine Technologies, Inc., | § | |
| | § | |
|     Nominal Defendants/Debtors. | § | |

## TRUSTEE'S RESPONSE TO MOTION OF DEFENDANTS TO DISMISS COMPLAINT AND/OR STRIKE PLEADINGS AS SANCTION FOR VIOLATION OF FED. R. BANKR. P. 9011 AND FOR IMPOSITION OF MONETARY SANCTIONS (Docket 18)

# TABLE OF CONTENTS

I.      INTRODUCTION ..........................................................................................................1

II.     FACTUAL BACKGROUND .......................................................................................2

        A.      Deep Marine..........................................................................................................2

        B.      Mr. Kazeminy and Mr. Candies Controlled Deep Marine......................................2

        C.      The Shareholder Demand Letter and Formation of the SLC ..................................3

        D.      The SLC's Lack of Independence...........................................................................4

        E.      Greenberg Traurig's Lack of Independence ...........................................................5

        F.      The Texas and Delaware Actions and the Subsequent
                Short-Form Merger ...............................................................................................6

        G.      Defendants Seek Dismissal of the Texas and Delaware
                Actions .................................................................................................................8

        H.      Deep Marine's Bankruptcy ..................................................................................10

        I.      The Joint Plan of Reorganization.........................................................................10

        J.      The   Trustee's   Complaint   and   McKool   Smith's
                Investigation.......................................................................................................11

        K.      Defendants' Rule 11 Letter ..................................................................................13

        L.      Defendants' Motion for Extension of Time to Respond to
                the Trustee's Complaint ......................................................................................13

        M.      Defendants' Rule 11 Motion................................................................................14

        N.      Defendants' Pattern of Threats ............................................................................14

                1.      Defendants used threats and sanctions allegations in
                        the Delaware action..................................................................................14

                2.      Defendants used threats and sanctions allegations in
                        the Texas state action..............................................................................15

                3.      Defendants continue to use threats and sanctions
                        allegations in this case. ...........................................................................15

III.    ARGUMENT AND AUTHORITIES.........................................................................16

A.    Defendants    Violated    Rule    9011's    Safe-Harbor
      Requirements. ...................................................................................16

      1.    Defendants presented the draft Rule 11 motion to
            the Court before the 21- day safe-harbor period
            expired...................................................................................18

      2.    Defendants filed the current Rule 11 Motion
            without ever having previously served the Trustee
            with a copy of the same. ...................................................19

B.    Defendants Have No Legal or Factual Basis for Their
      Sanctions Motion ...............................................................................19

      1.    Defendants fail to produce any evidence supporting
            their Rule 11 Motion...........................................................20

      2.    The Trustee and his counsel conducted an adequate
            and reasonable inquiry into the factual allegations in
            the Complaint........................................................................21

      3.    Defendants fail to even address the overwhelming
            majority of the Complaint...................................................21

      4.    The Trustee did not file the Complaint for an
            improper purpose. ...............................................................22

C.    The SLC Report Does Not Bind the Trustee or Absolve
      Defendants from the  Trustee's Claims. ...........................................23

      1.    The SLC was neither independent nor disinterested..................24

      2.    The SLC Report in no way affects the Trustee's
            claims. ..................................................................................25

            a)    Greenberg Traurig was neither thorough nor
                  independent. .............................................................26

            b)    Greenberg Traurig failed to interview
                  important witnesses with information of
                  wrongdoing. .............................................................27

            c)    Greenberg Traurig failed to review
                  important documents.................................................27

            d)    The SLC Report contains no denials from
                  Mr. Kazeminy. .........................................................28

e)     The SLC Report supports the Trustee's
allegations in the Complaint. .........................................................28

3.     The Trustee and his counsel's investigation revealed
countless inaccuracies in the one-sided and biased
SLC Report. .........................................................................................29

IV.    CONCLUSION...................................................................................................33

TO THE HONORABLE MARVIN P. ISGUR, UNITED STATES BANKRUPTCY JUDGE:

John D. Bittner, Liquidating Trustee ("Trustee"), by and through his attorneys of record, files his Response to Motion of Defendants to Dismiss Complaint and/or Strike Pleadings as Sanctions for Violation of FED. R. BANKR. P. 9011 and for Imposition of Monetary Sanctions ("Rule 11 Motion"), as follows:

## I.        INTRODUCTION

1.        In their Rule 11 Motion, Defendants seek death penalty sanctions (dismissal of the entire Complaint), alleging that the Trustee violated Rule 9011 (Rule "9011" or "Rule 11") by bringing this adversary proceeding.  The Court should deny the Rule 11 Motion for any one of three reasons.

2.        First, Defendants violated Rule 9011's strict procedural requirements by (1) submitting the draft Rule 11 motion to the Court before the 21-day safe-harbor period expired, and (2) filing the current Rule 11 Motion without ever having previously served the Trustee with a copy of the same.  Either violation is fatal to Defendants' Rule 11 Motion.

3.        Second, Defendants have no legal or factual basis for their sanctions motion because: (1) McKool Smith conducted an adequate and reasonable pre-filing investigation, and (2) the SLC Report in no way alters the reasonableness of McKool Smith's investigation and good faith basis on which such claims are alleged.  Defendants have not carried their burden of proof.  Thus, it would be an understatement to say that dismissal based on Rule 11 would be inappropriate.

4.        Third, the sole basis for the Defendants' argument is the SLC Report.  Contrary to Defendants' contention, the SLC Report is not some form of uncontroverted, definitive evidence absolving Defendants from liability or extinguishing the Trustee's claims. As an initial matter,

the SLC itself was neither independent nor disinterested.  Similarly, the SLC chose Greenberg

Traurig as counsel, a firm that is also neither independent nor disinterested.  Moreover,

Greenberg Traurig did not even conduct a thorough investigation.  In any event, the SLC Report

is nothing more than an advocacy piece prepared on Defendants' behalf.

## II.    FACTUAL BACKGROUND

### A. Deep Marine

5.    In 2001, Deep Marine[1] began providing comprehensive subsea services to the

offshore oil and gas industry.  In 2007, Deep Marine was named in the Top 10 of Entrepreneur

Magazine's Hot 500 as the sixth fastest growing company in America.  (Ex. A to Declaration of

Mark L. Mathie attached hereto as Ex. 1,[2] July 31, 2007 Deep Marine Press Release)  As Deep

Marine's business expanded, it required capital support.  Deep Marine sought capital support

from various sources, including the Defendants.  Over time, Deep Marine had difficulty

borrowing money from financial institutions to run its daily operations because it was burdened

with debt caused by Defendants' insider dealings.[3]

### B. Mr. Kazeminy and Mr. Candies Controlled Deep Marine

6.    Through multiple equity contributions, Defendants became majority shareholders

of Deep Marine.  (Ex. B, May 31, 2008 Shareholder Allocation Chart)  As time passed, Mr.

Kazeminy asserted more and more control as the self described "controlling shareholder."  (Ex.

C, July 30, 2008 Letter to Employees of DMT from Nasser Kazeminy)  Francis Wade Abadie,

---

[1] The Debtors are Deep Marine Holdings, Inc. ("DMH"), Deep Marine Technology Incorporated ("DMT"), Deep Marine 1, LLC ("DM1"), Deep Marine 2, LLC ("DM2"), Deep Marine 3, LLC ("DM3"), and Deep Marine 4, LLC ("DM4").  For convenience, the Debtors may be referred to collectively as "Deep Marine."

[2] All exhibits attached to the Declaration of Mark L. Mathie will be simply referred to in this response as a lettered exhibit.

[3] At the time, the Defendants were "insiders" as defined under 11 U.S.C. § 101(31), although the statutory definition of an insider is not an exclusive one.

former COO and President of DMT, testified about Mr. Kazeminy's control of Deep Marine as follows:

> Q:  How frequently would you deal with Mr. Kazeminy by telephone?
>
> A:  We typically had - as a group the management team had a weekly phone call scheduled, and we - we wouldn't perform it every week, but it was fairly often, fairly - it was nearly every week, not quite every week.
>
> Q:  What was the - was it typically scheduled for a particular time?
>
> A:  Yes, it was scheduled for 9:00 o'clock or 10:00 o'clock on Tuesdays
> …
> Q: Okay.  And was there an agenda for these phone calls?
>
> A:  Typically the agenda was focused mostly on sales and how things were progressing.

(Ex. D, Wade Abadie's Feb. 4, 2010 Deposition Testimony, 39:13-22, 40:10-13)

7.    Deep Marine also entered into numerous transactions with controlling shareholder Otto Candies.   (*See* Otto Candies' Proof of Claim Nos. 9-13, Case No. 09-39314)  As these transactions were taking place, Deep Marine's financial condition spiraled downward.

**C.  The Shareholder Demand Letter and Formation of the SLC**

8.    On October 10, 2008, Deep Marine's minority shareholders sent a demand letter to the board of directors of DMH demanding that the board establish a special litigation committee ("SLC") and take immediate action to recover damages sustained by DMT because of Defendants' wrongful conduct.  (Ex. E, Oct. 10, 2008 Shareholder Demand Letter)

9.    The week before receiving the demand letter, both DMT and DMH amended its bylaws to increase its board of directors to seven members.  Immediately after amending, Deep Marine elected Otto Candies, III, Daniel Erickson, Eugene DePalma, and Francis Wade Abadie, Jr. to the DMT and DMH boards.  (Ex. F, Oct. 3, 2008 DMT Written Action of Shareholders;

Ex. G, Oct. 3, 2008 DMH Written Action of Directors; Ex. H, Oct. 3, 2008 Written Action of

Directors)  On October 13, 2008, the new board of directors of DMH met with Otto Candies, Jr.

to address the demand letter, as well as to discuss the creation of a special litigation committee.

The majority believed that Mr. Lenig and Mr. Gilman were appropriate choices, however, Deep

Marine's CEO, Paul McKim, disagreed and argued that the SLC should consist of only non-

board members.  (Ex. I, Oct. 13, 2008 DMH Board of Directors Meeting Minutes)  Over Mr.

McKim's objections, the rest of the board voted 6-1 that Larry Lenig and Bruce Gilman would

serve as the sole SLC members after "concluding" not that they were impartial, but that they

were the "most appropriate" of the board members.  (*Id*.)

### D.  The SLC's Lack of Independence

10.    Larry Lenig and Bruce Gilman were neither independent nor impartial.

Controlling shareholder Mr. Kazeminy had personally invited both Mr. Gilman and Mr. Lenig to

serve on the board of directors of Deep Marine.  (Ex. J, May 5, 2006 Letters from Nasser J.

Kazeminy to Bruce Gilman and Larry Lenig)  In consideration for their service as directors, Mr.

Kazeminy personally committed Deep Marine stock options on behalf of the company to Mr.

Gilman and Mr. Lenig.

11.    Additional evidence shows that Mr. Lenig's lack of independence and impartiality

is based on his and Mr. Kazeminy's financial and business relationship with a company called

ComVest.  ComVest is a private investment company. On its website (www.comvest.com),

ComVest describes itself as follows:

> The ComVest Group ("ComVest") is a leading private investment
> firm focused on providing debt and equity solutions to lower
> middle-market companies with enterprise values of less than $350
> million. Since 1988, ComVest has invested more than $2 billion of
> capital in over 200 public and private companies. Through
> extensive financial resources and a broad network of industry
> experts, we are able to offer our companies total financial

> sponsorship, critical strategic support and business development assistance. We seek to invest $5-50 million of debt or equity into healthy or distressed companies.

(Ex. N, ComVest webpage)

12.     Mr. Lenig and Mr. Kazeminy's ties to ComVest are significant.  Mr. Lenig has been employed by ComVest from August 2004 to the present, which coincides with the time he was a board member of Deep Marine.  He is presently an Operating Partner for ComVest.  (Ex. K, The ComVest Group bio for Larry Lenig)  Mr. Kazeminy is a limited partner in and a co-investor with ComVest and a member of the ComVest Advisory Board.  (Ex. L, App. A to SLC Report, p. 64, at ¶ 85; Ex. M, The ComVest Group bio for Nasser J. Kazeminy)

13.     Additionally, Mr. Kazeminy owns DCC Ventures and is chairman of NJK Holding, both of which have partnered with ComVest in several business ventures.  (Ex. O, Chart of Relationships with Nasser J. Kazeminy; Ex. P, Catalyst International Announces New Board of Directors; Ex. Q, Mar. 4, 2005 Business Times Article)

### E.  Greenberg Traurig's Lack of Independence

14.     On October 14, 2008, the SLC officially retained Greenberg Traurig as its "special investigatory and litigation counsel."  (Ex. R, June 25, 2009 SLC Report, p. 3)  Just as with Mr. Lenig and Mr. Gilman, Greenberg Traurig was far from being independent or impartial. When discussing law firm representation in response to the demand letter, Mr. Lenig acknowledged his "extensive experience" with Greenberg Traurig and suggested that the firm serve as the SLC's special counsel.  (Ex. I)

15.     Greenberg Traurig also has a long standing and extensive relationship with Mr. Kazeminy.  For example, Greenberg Traurig represented DCC Ventures and NJK Holding, defendants in this adversary proceeding.  Not only did Mr. Lenig have extensive experience with Greenberg Traurig, but Greenberg Traurig also represented DCC Ventures and NJK Holding

(and thereby Mr. Kazeminy because he controls both companies) along with ComVest in various matters over the past decade.  (Ex. S, Kenneth A. Gerasimovich's bio; Ex. T, Oct. 6, 2004 Asset Purchase Agreement; Ex. U, Brian K. Gart's bio)  In essence, the SLC hired Greenberg Traurig to investigate claims of its own clients' alleged wrongdoings.  Nothing in the SLC Report shows that Greenberg Traurig addressed this conflict of interest.

16.     The same day that the SLC retained Greenberg Traurig as "outside" counsel, and one day after attending their one and only board meeting, and only eleven days after joining the DMT and DMH boards, three of the board members (Wade Abadie, Eugene DePalma, and Daniel Erickson) resigned from the board of directors of DMH.  (Ex. V, Oct. 16, 2008 DMT Letter from Bruce Gilman)  Two days later, Otto Candies, III resigned from his positions on the boards of DMH and DMT.  (*Id.*)  Based on the timing of the election and resignation of these board members, it appears this board was actually formed for the sole purpose of forming an SLC, appointing its members, and retaining Greenberg Traurig as its special counsel.

### F.  The Texas and Delaware Actions and the Subsequent Short-Form Merger

17.     On October 30, 2008, Paul McKim filed a lawsuit in state court in Texas that included both personal claims and derivative claims on behalf of DMH and DMT.  In response, on October 31, 2008, Otto Candies, LLC and DCC Ventures, using their position as majority shareholders, adopted a resolution to remove Paul McKim as a DMH director.  (Ex. W, Oct. 31, 2008 DMH Written Consent of Stockholders)  This action left Mr. Gilman and Mr. Lenig as the sole DMH directors.  (*Id.*)

18.     On November 3, 2008, two of DMT's minority shareholders, FLI Deep Marine LLC and Bressner Partners Ltd., brought a shareholder derivative action in Delaware against Deep Marine's officers and directors and controlling shareholders, including many of the same defendants in this case.  On April 21, 2009, the Delaware court dismissed the suit without

prejudice based on a procedural issue and allowed the SLC adequate time to finish its investigation in response to the demand letter. (Ex. X, Order, *FLI Deep Marine v. McKim, et al.*, C.A. No. 4138-VCN)  Although the Delaware court did not need to reach the question of whether the board or the SLC was comprised of conflicted directors, it explained that it dismissed the complaint without prejudice on procedural grounds:  "Plaintiffs made demand and, because the allegations in the derivative complaint are precisely those raised in their demand, they are bound by their concession that demand was required.  Yet, the Plaintiffs implore the Court for exception from this well established rule."  (*Id*. at 8-9)  Thus, the Delaware court dismissed the case without prejudice on procedural grounds.  (*Id*. at 12)

19.     Ten weeks after the Delaware court's dismissal on procedural grounds, the Kazeminy and Candies Defendants, with the help of their attorneys, began a plan to freeze out the Deep Marine minority shareholders by conducting a short-form merger.  Specifically, on July 1, 2009, the Kazeminy and Candies Defendants contributed their stock to a new corporation, NKOC, Inc.,[4] which then became the new parent of DMH.  (Ex. Y, July 3, 2009 Email chain re DMH short-form merger documentation)  NKOC, Inc. then immediately merged with DMH, thereby making all shareholders of NKOC, Inc. shareholders of DMH.  NKOC, Inc. then vaporized, leaving the Kazeminy and Candies Defendants as the sole DMH shareholders. Although the DMH corporate structure remained unchanged, this merger was conducted in secret, without the board's or the SLC's knowledge, and eliminated Mr. McKim (and all other minority shareholders) as DMH shareholders.

---

[4] NKOC, Inc. appears to be an acronym for Nasser Kazeminy and Otto Candies, Jr.

**G.  Defendants Seek Dismissal of the Texas and Delaware Actions**

20.    After eliminating Mr. McKim as a shareholder through the short-form merger, Defendants moved the Texas state court to dismiss Mr. McKim's derivative claims.  Defendants argued that Mr. McKim no longer had standing to pursue a shareholder derivative action on behalf of DMT and DMH.   Further, the boards of DMH and DMT adopted the SLC's recommendation not to go forward with derivative claims.  (Ex. Z, Amended Motion to Dismiss, *McKim v. Kazeminy, et al.*, Cause No. 2008-64385)

21.    On August 14, 2009, the Texas state court dismissed Mr. McKim's derivative claims based on the procedural issue of standing.  The Texas state court found "that Derivative Plaintiff Paul McKim no longer has standing to pursue his claims derivatively on behalf of DMH and DMT because he is not a shareholder of DMH or DMT."[5]  (Ex. AA, Order Granting the Amended Motion to Dismiss, *McKim v. Kazeminy, et al.*, Cause No. 2008-64385).

22.    The Texas state court went on, however, to find, without any citations to evidence, that the SLC lawfully assumed control of the derivative proceedings and determined in good faith, after conducting a reasonable inquiry that the continuation of the action would be detrimental and not in the best interest of DMH and DMT.  (*Id.*)  This language is perplexing for several reasons.  First, McKim did not oppose dismissal and, in fact, was seeking dismissal.  Second, because the short form merger eliminated all minority shareholders, there was not a single viable derivative plaintiff or independent shareholder left to even address the numerous problems with the SLC Report in the Texas state court action.  In any event, the Texas state

---

[5] The Texas state court found that the SLC lawfully assumed control of the derivative proceedings, and determined in good faith, after conducting a reasonable inquiry based on the factors the SLC considered appropriate under the circumstances, that the continuation of the action would be detrimental and not in the best interest of DMH and DMT.  (Ex. AA)

court's ruling is not even a final judgment on the facts underlying the derivative claims in the Texas action, and Defendants do not contend otherwise.

23.     In the same order, the Texas state court also denied the SLC's request for an award of expenses, finding that Defendants had failed to show that the derivative claims were filed without reasonable cause or for an improper purpose.  (*Id*.)  Mr. McKim's personal claims remain pending in the Texas action.

24.     On October 26, 2009, the Delaware action was re-filed.  During a hearing on November 2, 2009, Judge Leo Strine commented on:  (1) his impression that Defendants had misrepresented to the court what happened in the derivative action; (2) the fact that the judicial magistrate in the original Delaware action had doubts that the SLC was independent; (3) his belief that the SLC was formed to delay the process in order to create an argument to dismiss the claims; and (4) the clear appearance that the short-form merger was done to wipe out the derivative claims:

> I'm allowing expedited discovery because, frankly, this is a record that creates a situation that - at least a colorable perception that people are horsing around.  I mean, the moving papers, with all fairness to the defendants, telling me that they somehow got vindicated in the derivative action, that's not what happened at all.  This is not what vice Chancellor Noble's decision says.  What it says is people goofed up.  It's not the first time I've seen people goof up like this.  Folks who don't consult with Delaware lawyers early on in a process sometimes, when they make a demand, they go, "Oops."  But the point is, there's basis under the law to challenge even a special committee's investigation.  But you have to wait until it's done.
>
> As I understand what the defendants did before Vice Chancellor Noble is say, "Look, the law's the law." They goofed up.  I believe Vice Chancellor Noble indicated some doubts about the independence of the committee.  He let the process go forward.
>
> . . . .

> A special committee is formed in order to delay, doesn't really do
> a professional job or an independent job, issues a report which - to
> somebody, but not to any of the people who brought the derivative
> claims.  And while it gets the case dismissed on the grounds of
> delay, that we need to investigate this, and immediately upon
> concluding this thing, a short-form merger is done to excuse - to
> essentially wipe out the claim.  We do know that there is
> jurisprudence that says, when a merger is done specifically for the
> purpose of getting rid of claims, that that doesn't really get rid of
> the claims.  If there's ever a circumstance again where people have
> played themselves into a perception, I could not on a motion to
> dismiss rule out the inference that these folks wanted to get rid of
> these claims and did a short-form merger.  You know, mergers are
> powerful things.  They're not just thought of instantaneously.  This
> one was done fairly shortly after Vice Chancellor Noble
> considered a motion to dismiss and granted it.

(Ex. BB, Nov. 2, 2009, Office Conference Transcript, pp. 8-11, *FLI Deep Marine v. McKim, et al.*, C.A. No. 5020-VCS)

### H.  Deep Marine's Bankruptcy

25.    On December 4, 2009, Deep Marine filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.  (Case No. 09-39313, Dkt. No. 1)  On December 21, 2009, the Official Committee of Unsecured Creditors ("Committee") filed an application to employ and retain the law firm of McKool Smith, P.C.  (Case No. 09-39313, Dkt. No. 64)  On January 21, 2010, the Court granted the application.  (Case No. 09-39313, Dkt. No. 147)  Through its preliminary review on behalf of the Committee, McKool Smith examined evidence that warranted further investigation.  This review eventually turned into a litigation-oriented investigation of claims that included an extensive investigation, document collection and review, interviews and legal research.

### I.  The Joint Plan of Reorganization

26.    According to the Joint Plan of Reorganization ("Plan"), Plaintiff John D. Bittner was appointed to serve as the Trustee of the Deep Marine Liquidating Trust.  (Case No. 09-

39313, Dkt. No. 516-1)   Under Article 4 of the Plan, Deep Marine's causes of action were transferred to the Liquidating Trust.  (*Id.*)  Section 4.04 of the Plan sets forth the Trustee's duties as follows:

> The Liquidating Trustee will act as the Estates' representative for all purposes, and will be responsible for, among other things…(iii) filing, prosecuting and settling Claim objections; (iv) prosecuting and settling any Estate causes of action transferred to the Liquidating Trust pursuant to this plan.

27.   The Trustee was appointed as a representative of Deep Marine's estates under 11 U.S.C. § 1123(b) to pursue any such causes of action.

28.   Defendants insisted that a provision be included in the Order Confirming Debtors' Joint Plan of Reorganization and Approving Sale of Substantially All Assets ("Confirmation Order") that set a date for which all claims against them must be brought.   Specifically, Defendants offered the following language that appears in the June 2, 2010 Confirmation Order:

> All claims by the Debtors and Liquidating Trust against Otto Candies, LLC, Otto Candies, Jr., Otto Candies III, Candies Shipbuilders, LLC, Nasser Kazeminy, DCC Ventures, LLC, NJK Holding Corporation, NKOC, Inc. and Triomphe Investors, LLC, including objections to proof of claims and claims for surcharge against the DMT Topaz shall be brought by July 19, 2010.

(Case No. 09-39313, Dkt. No. 516, Paragraph 54)   The Effective Date of the Plan was July 9, 2010.

29.   Thus, at the Defendants' request, the Plan shortened the statutory deadline under 11 U.S.C. § 546 for bringing claims from a maximum of two years to ten days.   This provision required the Trustee to file all claims against Defendants by July 19, 2010, or lose them forever.

**J.   The Trustee's Complaint and McKool Smith's Investigation**

30.   Before the creation of the Liquidating Trust, the Committee had engaged McKool Smith to investigate the strengths and weaknesses of the proofs of claim and other potential

claims by the Kazemini and Candies Defendants.  (Ex. 1, ¶ 2)  This investigation dovetailed into McKool Smith's subsequent representation of the Trustee as litigation counsel, which included further investigation of these claims against Defendants and preparation of the Complaint.  This allowed McKool Smith a little over a month to complete its investigation and draft a complaint and objections to proofs of claim by the July 19, 2010 deadline imposed by Defendants.

31.     During that time period, McKool Smith conducted a litigation-oriented investigation of claims that included, among other things, the following actions:

| Document Collection & Review | • McKool Smith collected documents from various sources<br>• McKool Smith created databases to house, organize, and review documents<br>• McKool Smith created indices, timelines, charts, and other summaries<br>• McKool Smith reviewed and summarized deposition transcripts<br>• McKool Smith reviewed pleadings and proofs of claims<br>• McKool Smith reviewed documents made available by Bracewell & Guilliani<br>• McKool Smith reviewed documents provided by the Trustee |
|---|---|
| Interviews | • McKool Smith interviewed GE's counsel two several times<br>• McKool Smith interviewed Mr. McKim's counsel multiple times |
| Meetings with the Trustee | • McKool Smith met with the Trustee on several occasions<br>• McKool Smith exchanged drafts of the Trustee's Complaint prior to filing<br>• McKool Smith conducted several conferences with the Trustee on various issues |
| Research | • McKool Smith conducted research on various legal theories and causes of action |

(Ex. 1, ¶ 3)

32.     On July 16, 2010, McKool Smith filed Trustee's Original Complaint and Objections to Defendants' Proofs of Claim ("Complaint").  (Dkt. No. 1)

**K.  Defendants' Rule 11 Letter**

33.     On August 11, 2010, Defendants served the Trustee by hand a Rule 9011 letter, which included a Rule 9011 ("Rule 11") motion marked "draft" as an attachment.  (Ex. CC, Aug. 11, 2010 Letter from Thomas S. Henderson to Hugh M. Ray, III; Ex. 1, ¶ 4)   As discussed below, the version of the Rule 11 motion that Defendants served by hand on the Trustee is not the same as the Rule 11 Motion currently before the Court.

34.     In their letter, Defendants' counsel threatened that if the Trustee did not withdraw his Complaint, they would move for sanctions against everyone, including McKool Smith, individual McKool Smith attorneys, and the Trustee.  (*Id.*)  Then, Defendants' counsel attempted to use that threat of sanctions to negotiate an extension of time for Defendants to respond to the Complaint.  (Ex. DD, Aug. 18, 2010 Letter from Hugh M. Ray, III to Robert R. Weinstine)   The Trustee never responded to Defendants' Rule 11 letter.  (Ex. 1, ¶ 4)  Instead, he rejected the threats and pressed forward with the litigation.

**L.  Defendants' Motion for Extension of Time to Respond to the Trustee's Complaint**

35.     Defendants' answer to the Complaint was due August 19, 2010.  Rather than answer, Defendants filed a motion for extension of time on August 17, 2010.  (Dkt. No. 9)  As an exhibit to their motion for extension of time, Defendants attached their August 11, 2010 Rule 11 letter, arguing that they should not have to respond to the Complaint because they had served the Rule 11 letter.  (*Id.*)  In other words, Defendants presented their original Rule 11 motion to the Court before the 21-day safe-harbor period had expired.  On September 27, 2010, the Court held a hearing on Defendants' motion for extension, during which the Court ordered Defendants file an answer by October 4, 2010.

**M. Defendants' Rule 11 Motion**

36.    On September 7, 2010, Defendants filed the Rule 11 Motion currently pending. (Dkt. No. 18)  The Rule 11 Motion before the Court, however, is not the same Rule 11 motion that Defendants served on the Trustee on August 11, 2010, to trigger the 21-day safe-harbor period.  (Ex. 1, ¶ 5)  The first Rule 11 motion that Defendants served on the Trustee was a mere eight pages, whereas the filed Rule 11 Motion before the Court is <u>19</u> pages, or nearly <u>2½ times longer</u>.  The filed Rule 11 Motion before the Court now, which was never served upon the Trustee before filing, even admits that it contains "new information," which postdates the first Rule 11 motion served on the Trustee on August 11, 2010.  (Dkt. No. 18, ¶ 36; Ex. 1, ¶ 6)  The filed Rule 11 Motion advances new arguments relating to the investigation of the Trustee and his counsel that were not in the originally served Rule 11 motion.  (*Id.*)  For the Court's convenience, the Trustee has attached a redline comparison of differences between the two motions.  (Ex. EE, Redline Comparison of Motions).

**N.  Defendants' Pattern of Threats**

**1.  Defendants used threats and sanctions allegations in the Delaware action.**

37.    Defendants' counsel uses threats and allegations of sanctions as a standard litigation tactic.  In the Delaware action, Defendants' counsel was "extremely aggressive and unpleasant," and threatened to sue not only the Delaware plaintiffs, but their counsel personally.  (Ex. FF, Affidavit of Katherine B. Harrison, ¶¶ 11, 14)  Mr. Weinstine explicitly informed Ms. Harrison, "let me reiterate that any effort to leak this defamatory information in a derivative complaint or otherwise will result in litigation.  This is not a threat, it is reality."  (Ex. GG, Oct. 15, 2008 Letter from Robert R. Weinstine to Katherine B. Harrison)

**2. Defendants used threats and sanctions allegations in the Texas state action.**

38.     Defendants' counsel took the same approach in the Texas action.  As discussed above, Defendants disposed of the shareholder derivative suits by improperly eliminating all minority shareholders through the short-form merger.  In the Texas action, after Mr. McKim's derivative claims were subsequently dismissed for lack of standing, Defendants' counsel filed a motion for sanctions and sought attorneys' fees.  (Ex. HH, Oct. 2, 2009 Nasser Kazeminy's Motion for Sanctions Against Plaintiff, *McKim v. Kazeminy, et al.*, Cause No. 2008-64385) Although the Texas state court has not ruled on this motion, because the case is currently stayed during bankruptcy proceedings, it has previously addressed a request for an award of expenses by stating as follows:

> The award of expenses in a derivative proceeding by a trial court is discretionary.  *Pace v. Jordan*, 999 S.W.2d 615, 625-26 (Tex. App. — Houston [1st Dist.], 1999).  The SLC, and certain other Defendants, have failed to provide this Court with legally sufficient evidence to support the claim that the derivative proceedings maintained by Derivative Plaintiff Paul McKim were without reasonable cause for an improper purpose.

(Ex. AA)

39.     Defendants' counsel has repeatedly used threats and sanctions allegations against any litigant who seeks to hold Defendants accountable for their actions.

**3. Defendants continue to use threats and sanctions allegations in this case.**

40.     Continuing its pattern of threats, Defendants' counsel falsely accused the Trustee and his counsel of making a racial slur by calling one of the Defendants a terrorist.  (*See* Ex. DD) Defendants' counsel threatened to repeat these false accusations to the Court and to file a complaint against one of McKool Smith's attorneys with the Texas State Bar.  (Ex. II, Aug. 17, 2010 Letter from Robert R. Weinstine to Hugh M. Ray, III)

41.     Despite Defendants' accusations, the Trustee was not involved in the conversation at issue, a conversation which concerned Defendants' counsel's Rule 11 threats.  Moreover, Trustee counsel's use of the word "terrorist" referred directly to Defendants' counsel's actions, course of dealings, and baseless Rule 11 threats.  After sending the threatening letter falsely claiming that Trustee's counsel had somehow made a racial slur against Mr. Kazeminy, Defendants' counsel admitted the falsity of this claim when they later disclosed to the Court that Trustee's counsel was referring collectively to "Defendants [of which there are seven] and their counsel."  (Dkt. No. 17, ¶ 5)

42.     On August 23, 2010, the Trustee filed a motion requesting a preliminary status conference to address these problems caused by Defendants' conduct because it was essentially bringing this case to a standstill.  (Dkt. No. 12)  In response to that motion, Defendants' counsel specifically represented to the Court that the only statements they had made which could even possibly be "categorized" as threats were those set forth in their entirety in Defendants' Rule 11 letter and motion.  (Dkt. No. 17, ¶ 5)  This representation to the Court was false because Defendants failed to inform the Court of their counsel's threat to file a state bar grievance.

43.     Based on the facts, Defendants have violated the procedural requirements of Rule 9011.  Moreover, Defendants' behavior demonstrates that the Trustee was justified in conducting his own reasonable investigation because the SLC Report was neither independent nor binding on Deep Marine.

### III.     ARGUMENT AND AUTHORITIES

**A. Defendants Violated Rule 9011's Safe-Harbor Requirements.**

44.     A motion based on Rule 9011 (or Rule 11) must be served, but it must not be filed or be presented to the court if the challenged paper, claim, defense, contention, or denial is

withdrawn or appropriately corrected within twenty-one days after service. FED. R. BANKR. P. 9011(c)(2); *Cadle Co. v. Pratt (In re Pratt*, 524 F.3d 580, 586 (5th Cir. 2008) ("'Rule 9011 is substantially identical to Federal Rule of Civil Procedure 11,' therefore, we may refer to Rule 11 jurisprudence when considering sanctions under Rule 9011."). This is known as the "safe-harbor" provision of Rule 9011.

45.     The Fifth Circuit mandates strict compliance with the procedural requirements of Rule 9011 (and Rule 11), and a failure to comply is fatal to any related motion for sanctions. *In re Pratt*, 524 F.3d at 586-87 (affirming denial of sanctions motion under Rule 9011 because the movant did not serve the motion and instead sent a warning letter); *Tompkins v. Cyr*, 202 F.3d 770, 788 (5th Cir. 2000) (affirming denial of sanctions because the defendant failed to comply with the 21-day safe-harbor provision). The Fifth Circuit requires such strict compliance because of (1) the potentially severe nature of the rule, and (2) the safe-harbor provisions of the rule, which are designed to protect litigants whenever possible to mitigate the rule's potentially chilling effect. *In re Pratt*, 524 F.3d at 586-87; *Tompkins*, 202 F.3d at 788.

46.     When, as here, a movant fails to comply with Rule 9011's procedural requirements, the court need not even reach the merits of any Rule 11 arguments. *See Argent Mortgage Co. v. Diaz*, No. H-05-3058, 2006 WL 2092430, at *3 (S.D. Tex. July 26, 2006) (denying motion where movant violated the 21-day safe-harbor provision as it was procedurally defective and untimely); *T.L. Dallas (Special Risks), Ltd. v. Elton Porter Marine Ins. Agency, Inc.*, No. 3:07-cv-0419, 2008 WL 7627806, at *10 (S.D. Tex. Dec. 22, 2008) (dismissing Rule 11 motion for failure to comply with procedural requirements).

47.     As shown below, Defendants failed to meet the procedural requirements of Rule 9011(c)(2) in two respects: First, Defendants submitted the draft Rule 11 motion to the Court

before the 21-day safe-harbor period expired.   Second, Defendants filed the current Rule 11

Motion without ever having previously served the Trustee with a copy of the same.  (Ex. 1, ¶ 6)

Each failure is by itself a reason to deny Defendants' Rule 11 Motion.

**1. Defendants presented the draft Rule 11 motion to the Court before the 21-day safe harbor period expired.**

48.     On August 11, 2010, Defendants served the Trustee with a Rule 11 letter, which

attached a draft Rule 11 motion.  (Ex. CC)  In this letter, Defendants' counsel threatened that if

the Trustee did not withdraw his Complaint, they would "vigorously pursue" sanctions.  (*Id*. at p.

19)

49.     On August 17, 2010, Defendants attached the draft Rule 11 motion as an exhibit

to their motion for extension and made the arguments contained therein to the Court.  (Dkt. No.

9)  As set forth in Trustee's Opposition to Defendants' Motion for Extension, Defendants' action

constituted presentment of a motion under Rule 9011.  (*See* Dkt. No. 16)  Thus, Defendants

violated Rule 9011 by presenting the draft Rule 11 motion to the Court before the strict 21-day

safe-harbor period expired.  FED. R. BANKR. P. 9011.

50.     Defendants cannot fix or undo their improper presentment of the draft Rule 11

motion to the Court during the safe-harbor period.  (*See* Dkt. No. 16)  As a result of Defendants'

failure to adhere to the strict presentment requirements of Rule 9011, Defendants' Rule 11

Motion must be denied on this basis alone, and the Court need not even reach the substance of

Defendants' arguments.  *In re Pratt*, 524 F.3d 580, 586-87 (5th Cir. 2008); *Tompkins v. Cyr*, 202

F.3d 770, 788 (5th Cir. 2000); *Argent Mortgage Co. v. Diaz*, No. H-05-3058, 2006 WL 2092430,

at *3 (S.D. Tex. July 26, 2006); *see T.L. Dallas (Special Risks), Ltd. v. Elton Porter Marine Ins.

Agency, Inc.*, No. 3:07-cv-0419, 2008 WL 7627806, at *10 (S.D. Tex. Dec. 22, 2008).

**2. Defendants filed the current Rule 11 Motion without ever having previously served the Trustee with a copy of the same.**

51.     On August 11, 2010, Defendants served the Trustee with the Rule 11 letter and a draft Rule 11 motion.  (Ex. CC)  On September 7, 2010, Defendants filed the Rule 11 Motion currently pending.  (Dkt. No. 18)  At no time between the service of the Rule 11 letter and the filing of the Rule 11 Motion, did the Trustee respond to the Defendants' letter.  Thus, in complete disregard for the rules, Defendants once again committed a procedural violation – this time by filing a Rule 11 motion that is substantively different from the one served upon the Trustee.  (Ex. EE)  Based on Defendants' procedural violation of filing a different Rule 11 motion than what was served upon the Trustee, the Court should deny Defendants' Rule 11 Motion.

52.     Moreover, Defendants failed to disclose to the Court that their filed Rule 11 Motion is substantively different from the draft Rule 11 motion that they served on the Trustee. The Rule 11 letter, dated August 11, 2010, attached two things:  (1) the draft Rule 11 Motion; and (2) the August 14, 2009 order in Texas state case.  (Ex. CC)  Yet when Defendants attached the same Rule 11 letter as "Exhibit A" to their Rule 11 Motion filed with the Court, they included *only* the Texas state court order.  They omitted the draft Rule 11 motion presumably because it constitutes evidence of their procedural violation.

**B. Defendants Have No Legal or Factual Basis for Their Sanctions Motion**

53.     The Court should presume that the Trustee filed the Complaint in good faith and Defendants bear the burden to overcome this presumption.  *Pogo Producing Co. v. Moore*, No. H-06-2432, 2007 WL 4191757, at *3 (S.D. Tex. Nov. 21, 2007) (citing *Tompkins*, 202 F.3d at 788).  In this case, the Trustee filed the Complaint just two months ago.  The Court has not made any determination of the merits in this case, and Defendants wholly failed to produce any

evidence to overcome their burden of proof that the Trustee's Complaint was not filed in good faith.

54.     Federal courts use two factors to determine whether a party has filed a frivolous paper:  (1) whether the attorney conducted an adequate inquiry into the facts; and (2) whether the attorney conducted an adequate inquiry into the law prior to filing.  *In re General Homes Corp.*, 181 B.R. 870, 881 (Bankr. S.D. Tex. 1994).  Applying these factors to the investigation of the Trustee and his counsel shows that they did not violate Rule 9011.

55.     Here, Defendants do not complain that the Trustee and his counsel's inquiry into the law before filing was insufficient.  Rather, Defendants argue that the SLC Report vindicates Defendants from the Trustee's claims and suggest that the Trustee's counsel did not perform an adequate investigation into the facts.  (Dkt. No. 18, at 13-14.)  The Trustee filed the Complaint after he and his counsel conducted a reasonable investigation and for a proper purpose.

**1.  Defendants fail to produce any evidence supporting their Rule 11 Motion.**

56.     Defendants' Rule 11 Motion does not offer any evidence supporting their request for death penalty sanctions in this case.  Rather, Defendants focus their argument on the SLC Report, arguing it should be treated as conclusive and as a vindication of Defendants' conduct.  Thus, this argument has no factual or legal support, particularly in light of evidence that the SLC and Greenberg Traurig were neither independent nor disinterested.

57.     Contrary to Defendants' contention, the weight of the evidence supports the allegations in the Complaint.  The Rule 11 Motion admits that the "allegations made in the Complaint are . . . tied to specific testimony allegations *taken from the deposition of McKim*." (Dkt. No. 18, ¶ 36(a))  It is thus undisputed that the Complaint is factually supported.  The Rule 11 Motion further admits that counsel for the Trustee has billed extensive time investigating

claims against former directors and officers of Deep Marine (*id.* ¶ 36(e)), which demonstrates that the Complaint is the result of a substantial investigation.

## 2. The Trustee and his counsel conducted an adequate and reasonable inquiry into the factual allegations in the Complaint.

58.     Defendants criticize the Trustee and his counsel's investigation, arguing that the investigation did not compare with Greenberg Traurig's "thorough" and "independent" investigation.  Defendants cannot legitimately dispute either the pre-filing investigations by the Trustee or his counsel.  This is true in light of Defendants' insistence on shortening the statutory time allowed to file claims from two years to ten days.  Although there is a need for additional discovery, McKool Smith was able to conduct a pre-filing factual investigation that more than satisfies Rule 9011's requirements.

59.     McKool Smith, first on behalf of the Committee, and then on behalf of the Trustee, conducted an extensive investigation into the facts before filing the Complaint.  The range of Defendants' misconduct is vast and complex, and McKool Smith spent hundreds of hours investigating, reviewing documents, reviewing transcripts, creating databases, researching the law, drafting the Complaint, etc.  The Trustee has also spent significant time in addition to the time spent by McKool Smith investigating the claims of Defendants' wrongdoing.

## 3. Defendants fail to even address the overwhelming majority of the Complaint.

60.     The fifty-eight page Complaint contains 258 paragraphs.  It contains seventeen counts including fraudulent transfers, preferential transfers, recharacterization, equitable subordination, breach of fiduciary duties, aiding and abetting breach of fiduciary duties, shareholder oppression, fraud and fraudulent inducement, negligent misrepresentation, breach of contract, tortious interference, restitution and unjust enrichment, money had and received,

conversion, conspiracy, partnership liability, and attorneys' fees. The Complaint also includes numerous objections to Defendants' various proofs of claim.

61.     Even though they request death penalty sanctions, Defendants do not even attempt to specifically address the comprehensive Complaint in any detail whatsoever. Instead, Defendants cite to forty-eight out of the 258 paragraphs. Then, in a single sentence, and without any legal citation, Defendants argue that the rest of the Complaint should be dismissed because it is "infected." (Dkt. No. 18, ¶ 21) Defendants are dead wrong on even the few paragraphs they happen to mention. But the fact that Defendants would file a sanctions motion while they are unable to even address the entirety of the Complaint is yet additional confirmation that Defendants did not file the Rule 11 Motion in good faith.

### 4.     The Trustee did not file the Complaint for an improper purpose.

62.     Defendants make a cursory and unsupported argument that the Trustee and his counsel have filed the Complaint for an improper purpose. (Dkt. No. 18, ¶ 37) Essentially, Defendants accuse the Trustee and his counsel of dishonestly trying to extort money from Defendants and milking the fees. (*Id.*) Defendants have impugned the honesty of the Trustee and McKool Smith without a shred of evidence. This type of reckless behavior is indicative of the way Defendants and their counsel have conducted themselves in this case and in other related litigation.

63.     The Trustee filed the Complaint for a proper purpose. The Trustee was appointed under the Joint Plan of Reorganization, which transferred all of the debtor's causes of actions to the Trust, and the Trustee is authorized to pursue these claims. (Dkt. No. 1, ¶ 8.) The Trustee has the express authority to pursue these claims. *See* 11 U.S.C § 1123(b)(3). And he has a "duty to maximize the value of the estate." *La. World Exposition v. Fed. Ins. Co.*, 858 F.2d 233, 246 (5th Cir. 1988) (quoting *Commodity Futures Trading Comm'n v. Weintraub*, 471 U.S. 343, 352

(1985) (citing 11 U.S.C. § 704(1)).  Since these claims are part of the debtor's estate, the Trustee is "duty bound to assert [them] if doing so would maximize the value of the estate."  *Id.* at 246. Therefore, it is entirely proper for the Trustee to bring the claims of the Trust.  To not assert them would be a dereliction of the Trustee's duty, particularly in light of Defendants' wrongful conduct toward Deep Marine.

64.    There is no violation of the "improper purpose" prong of Rule 9011.  *See Sheets v. Yamaha Motors Corp., U.S.A.*, 891 F.2d 533, 538 (5th Cir. 1990) ("If a reasonably clear legal justification can be shown for the filing of the paper in question, no improper purpose can be found and sanctions are inappropriate.") (citations omitted).  Moreover, as shown above, because the allegations in the Complaint are not frivolous, there is no need to consider the subjective prong of Rule 9011.  *See FDIC v. Maxxam, Inc.*, 523 F.3d 566, 581 (5th Cir. 2008) ("And so long as the merits of their claim, viewed objectively, are supported by a good-faith belief that the allegations are well founded and not frivolous, the subjective motivation for pursuing the claim and the multiple purposes are ordinarily of no moment.").  Indeed, the Fifth Circuit has held that "if an initial complaint passes the test of non-frivolousness, its filing does not constitute harassment for the purposes of Rule 11."  *Nat'l Ass'n of Gov't Employees, Inc. v. Nat'l Federation of Fed. Employees*, 844 F.2d 216, 223 (5th Cir. 1988).

**C.  The SLC Report Does Not Bind the Trustee or Absolve Defendants from the Trustee's Claims.**

65.    Defendants make a variety of arguments regarding the weight that the Court should give the SLC's decision to adopt the conclusions found in the SLC Report.  Based on a statute and an article, Defendants request that this Court give deference to the SLC Report and consider it "uncontroverted evidence."  (Dkt. No. 18, ¶ 31, citing the TEX. BUS. ORG. CODE § 21.558 (2010) and an article from 2002 in Texas Business Litigation)  None of these alleged

authorities requires that this Court give the SLC Report deference, and Defendants do not specifically claim they are controlling. Rather, they apply to shareholder-derivative actions, not an adversary proceeding brought directly by the company by a court-appointed bankruptcy trustee.

**1. The SLC was neither independent nor disinterested.**

66.     Defendants argue that the SLC "concluded that it was not in DMT's interest to pursue any action against Defendants" because they believe that the SLC Report is "uncontroverted evidence" contradicting the Complaint. (Dkt. No. 18, ¶¶ 27, 33)  The Trustee and his counsel's investigation uncovered evidence that calls into question the SLC's independence, including strong connections between Mr. Lenig, Mr. Kazeminy, and Greenberg Traurig that the SLC Report simply glosses over.

67.      As discussed above, Delaware Judge Leo Strine stated his impression on the record that Defendants had misrepresented what happened in the derivative action before the magistrate judge.  He noted that the judicial magistrate had doubts about whether the SLC was independent.  He discussed his belief that a special litigation committee could be formed to delay the process and to create an argument to dismiss the claims.  He also addressed the clear appearance that the short-form merger was done to wipe out the Delaware plaintiffs' derivative claims. (Ex. BB)  This alone is evidence that the SLC was neither independent nor disinterested.

68.     The ties between Mr. Kazeminy, Mr. Gilman, Mr. Lenig, and Greenberg Traurig are discussed above.  They are significant and should not be ignored when determining independence and impartiality.  Greenberg Traurig, however, thought otherwise.  The SLC Report simply glosses over whether the SLC was truly independent.  The SLC briefly examines the connections between Mr. Gilman and Mr. Lenig, on one hand, and Mr. Kazeminy, on the other hand.  Despite known connections between the parties, the SLC Report found in a

conclusory fashion that "there is no evidence that Bruce Gilman or Larry Lenig are beholden to Nasser Kazeminy" and that "Bruce Gilman and Larry Lenig have been independent directors throughout the investigation." (Ex. L, ¶ 86)

69.    Greenberg Traurig was one-sided in its investigation.  Greenberg Traurig spent considerable effort scrutinizing the expense reports and personal problems of Mr. Thomas and Mr. McKim, who made the allegations the SLC was tasked to investigate.  Yet the SLC Report never thought it pertinent to mention that Mr. Kazeminy had, for years, held *weekly* telephonic meetings with senior management where he demanded attendance.  According to Mr. Abadie's sworn testimony, during these weekly telephonic meetings, Defendants (primarily Mr. Kazeminy) exercised control over the minutiae of which potential contracts were being pursued, the status of existing work, and other matters germane to running the daily operation of the business.  (Ex. D)

70.    The minority shareholders were never told of the meetings, given the same financial information, or otherwise privy to the business and financial documents that Mr. Candies and Mr. Kazeminy received.

71.    Somehow, the SLC Report is devoid of any mention of these meetings, or the Defendants' concomitant level of control.  The SLC Report concluded that there was "no domination" by Mr. Kazeminy or Mr. Candies, a result incongruous with the facts.  The omission of the weekly meetings is a conspicuous lapse.

72.    The Trustee and his counsel believe that discovery will lead to even more evidence that the SLC Report's conclusions on the SLC's independence were incorrect.

**2.  The SLC Report in no way affects the Trustee's claims.**

73.    Defendants have failed to offer evidence that would establish that the SLC Report should be granted any deference whatsoever, let alone evidence that the SLC Report somehow

extinguished the Trustee's claims. Indeed, there is evidence to form the opposite conclusion. As discussed herein, Greenberg Traurig produced a one-sided report regarding the allegations of Defendants' wrongdoing.

**a) Greenberg Traurig was neither thorough nor independent.**

74.     Mr. Lenig suggested using Greenberg Traurig based on his "extensive experience" with the firm. The Trustee and his counsel's investigation uncovered the fact that Greenberg Traurig accepted the position of investigating its own clients without ever disclosing any conflict of interest to Deep Marine. Greenberg Traurig has had relationships with both Mr. Lenig and Mr. Kazeminy. Over the past decade, Greenberg Traurig has represented Mr. Kazeminy's companies, DCC Ventures and NJK Holding, in various matters. Greenberg Traurig has also represented ComVest, a company for which Mr. Lenig serves as an operating partner and which Mr. Kazeminy serves as an advisory board member and limited partner. Greenberg Traurig omitted any mention in the SLC Report that the firm had represented Mr. Kazeminy's companies, even though it was providing its supposedly "independent" analysis of the various claims against him and his companies.

75.     Moreover, the Trustee has uncovered evidence that Mr. Kazeminy closely monitored Greenberg Traurig's investigation. And Greenberg Traurig was aware of Mr. Kazeminy's opinions regarding the investigation.

76.     Greenberg Traurig was not thorough in investigating the allegations of wrongdoing. The SLC Report has little substance. The SLC Report is seventy-five pages long, with almost 20 pages devoted to reciting the law regarding internal investigations and various federal bribery statutes. Relatively few of the seventy-five pages perform an analysis of the specific allegations of wrongdoing against the Defendants, particularly against Mr. Kazeminy, Mr. Candies, Jr., and Mr. Candies, III.

77.     Instead, as discussed above, the SLC Report singles out Mr. McKim's and Mr. Thomas's expense reports and unrelated personal issues in a one-sided effort to discredit them. Because the SLC was formed to investigate the claims against the Kazeminy and Candies Defendants, Greenberg Traurig's zealous focus on these unrelated issues was an incongruous and misdirected effort.

**b) Greenberg Traurig failed to interview important witnesses with information of wrongdoing.**

78.     Greenberg Traurig allegedly interviewed twenty-four persons.  Absent from this list, however, are any Deep Marine operations people.  There are multiple divisions within Deep Marine, including deep water, diving, and marine.  No one from these divisions was interviewed. Greenberg Traurig failed to interview the VP of Deep Water Operations, project managers, vessel superintendents, the former VP of the diving division, and the dive operations manager. Likewise, Greenberg Traurig failed to interview witnesses from the marine division, including the marine managers and port engineers.

79.     These individuals have knowledge about manning the boats and relationships with the Candies Defendants.  And they have information contradicting the SLC Report's preordained conclusions.  The project managers and vessel operations people would presumably have told Greenberg Traurig about the sloppy management of vessels and incompetent crews that resulted in losses to Deep Marine.  Thus, there is a serious question about whether Greenberg Traurig adequately investigated the dealings and maintenance of the crews and vessels with witnesses other than Otto Candies and his subordinates.

**c) Greenberg Traurig failed to review important documents.**

80.     The SLC Report lists pages of documents that Greenberg Traurig reviewed, but there are almost no emails at all.  In particular, there are no emails from Mr. Kazeminy, Mr.

Candies, Jr., or Mr. Candies, III. Greenberg Traurig does not appear to have reviewed operations related documents, such as ship logs or other correspondence between operations people regarding the ships. Thus, there is a serious question whether Greenberg Traurig reviewed documents that would have contradicted the SLC Report's conclusions.

**d)  The SLC Report contains no denials from Mr. Kazeminy.**

81.    Absent from the SLC Report is any denial from Mr. Kazeminy that any of the allegations against him are false.

**e)  The SLC Report supports the Trustee's allegations in the Complaint.**

82.    For example:

• Mother Teresa:  The SLC Report admits there were ongoing problems with the Candies Defendants regarding the contract at issue.  (Ex. TT, App. B to the SLC Report, pp. 40-42)

• Agnes/Topaz:  The SLC Report admits the boat sat in dry dock in Boston, but claims the boat lost no revenue.  (*Id*. at pp. 43-44)

• Emerald:  The SLC Report makes no rebuttal regarding the changing of crew and the subsequent loss of the BP contract.

• Diamond:  The SLC admits that deficiencies were found and that the crews were replaced.  The SLC Report does not address whether the Candies. Defendants' crews were then put back on the vessel after Mr. McKim's departure. (*Id*. at p. 49)

• Sapphire:  The SLC Report admits deficiencies in the crane.  (*Id*. at pp. 50-53)

• Board meetings:  The SLC Report has no discussion about Mr. Kazeminy's presence at board meetings.

83.    The SLC Report glosses over whether the SLC was truly independent.  The SLC briefly examines the connections between Mr. Gilman and Mr. Lenig, on one hand, and Mr. Kazeminy, on the other hand.  Despite known connections between the parties, the SLC Report determined in a wholly conclusory fashion that "there is no evidence that Bruce Gilman or Larry

Lenig are beholden to Nasser Kazeminy" and that "Bruce Gilman and Larry Lenig have been independent directors throughout the investigation." (Ex. L, ¶ 86)

### 3. The Trustee and his counsel's investigation revealed countless inaccuracies in the one-sided and biased SLC Report.

84.    The SLC Report is biased on its face.  No objective reader with knowledge of the undisputed facts would perceive it as a neutral exposition of facts, but rather advocacy.  The SLC Report lacks objectivity, in part, because it implies ill motives to Mr. McKim, without any support.  Likewise, the SLC Report admits that Mr. Kazeminy and Mr. Candies had absolute control over Deep Marine but then denies, without explanation, that they dominated the decision-making of the board.  These conclusions swim against the currents of common sense and weight of the factual evidence to the contrary.

85.    Attached to the Rule 11 Motion as Exhibit A is Defendants' Rule 11 letter, which includes a chart of excerpts from forty-eight out of 258 in the Complaint.  (Dkt. No. 18, at 3-18)  Defendants contend these paragraphs were "specifically discredited in the SLC Report."  (*Id.* at 3)  Defendants' chart establishes nothing about the merits of the Trustee's allegations in these paragraphs.

86.    For example, Defendants question the factual grounds for paragraph 63 in the Complaint, which concerns Deep Marine's right to terminate a charter agreement with Otto Candies.  Defendants argue as follows:

| Paragraph of Complaint | Section of SLC Report |
|---|---|
| Paragraph 63: The trustee alleges that DMT was free to back out of the time charter agreement for the Mother Theresa at any time.  If that allegation is true, then there will be no merit to OC's proof of claim number 10.  Proof of claim number 10 is for the $1,698,899.85 in lost revenue when | P. 65 of the Final Report: "the crux of the dispute is whether the Company timely terminated the charter, thus avoiding about $1.1 million in charges sought by OC.  To date, the amount in question has not been paid by the Company.  While the Company now has determined, after conduct of due diligence, that the amounts in question are owed to OC, the fact that this dispute lasted nearly two years and the amounts have not yet been paid demonstrates about as effectively as any other |

| DMT backed out of the time charter.<br><br>*See* also Paragraph 119 | evidence that OC does not dominate the management or board of the Company" - more detail can be found on p. 40-41 of Appendix A and p. 42-43 of Appendix B |

87.    Defendants cite a portion of the SLC Report that does not specifically address the contractual issue.  Instead, the SLC Report merely states that "the amounts in question are owed to OC."  This does not discredit the Trustee's allegations in paragraph 63 or any other paragraph.

88.    In any event, the Trustee conducted an extensive inquiry into the facts and concluded that Deep Marine had the right to cancel the charter agreement, that Deep Marine exercised that right, that Otto Candies wrongfully refused to recognize the termination, and that Otto Candies wrongfully continued to bill DMT under the charter agreement.  There is plenty of evidence to support the allegations in paragraph 63, including the following:

| Evidence | Excerpt |
|---|---|
| August 25, 2004 Blanket Time Charter Agreement  (Ex. JJ) | "3…B. Subject to the provisions of Article 2 hereof, <u>CHARTERER may terminate the hire of any vessel upon giving OWNER 7 days written notice</u> by certified mail, and charter hire shall continue during the vessels normal running time from the place of release to the place where redelivery has been specified in the Charter Order except that if the vessel released reports to neither charterer at a lesser distance from such place of release, charter hire shall be paid only for the time reasonably required to arrive at the point where the subsequent Charter commences." |
| October 25, 2006 Letter from Otto Candies to McKim re Exhibit "A" (Ex. KK) | "Pursuant to the terms of our Blanket Time Charter, dated August 25, 2004, this is to evidence our understanding and agreement that Otto Candies, LLC shall charter to you the M/V Mother Theresa subject to the following:<br><br>1.  Date of Delivery on or about : October 6, 2006<br>2.  <u>Either OWNER or CHARTERER may terminate this charter by advance written notice to the other, normal mobilization time to be added in case of replacement vessel under this Charter.</u>" |
| November 16, 2006 Letter from McKim to Candies  (Ex. LL) | "In abiding by the terms and conditions of the Blanket Time Charter dated August 25, 2004 between Deep Marine Technology, Inc. ('DMT') and Otto Candies, LLC ('Otto Candies'), <u>please accept this as an official notice to exercise our option of termination per Exhibit A, Time Charter of the M/V Mother Teresa</u>, job number 214022 effective as of the commencement date of the current job the vessel has assumed." |
| January 17, 2007 Letter from Candies to McKim  (Ex. MM) | "An agreement was reached that all would try to work the vessel for others as much as possible but DMT would be responsible for |

30

| | shortfalls in revenue until contract expired April 13, 2007." |
| --- | --- |
| February 2, 2007 Letter from McKim to Candies (Ex. NN) | "Please see the attached letter of termination sent to Otto Candies, LLC on November 16, 2006. We kindly request your attention to this matter and await your re-issuance of a corrected and adjusted invoice." |

89.     Defendants also question the factual basis for paragraph 55 in the Complaint,

which relates to Mr. Kazeminy's influence and control over Deep Marine's business affairs.

Defendants argue as follows:

| Paragraph of Complaint | Section of SLC Report |
| --- | --- |
| Paragraph 55: "Over time, Mr. Kazeminy increased his influence and control over Deep Marine's business affairs. He personally influenced and controlled Deep marine's Board of Directors and was a member of the board for a period of time." | P.12 of Appendix A: "While both Nasser Kazeminy and Otto Candies Jr. exercise considerable influence by virtue of the shareholder status of DCC Ventures and Otto Candies LLC, it is an overstatement to say that DMT is dominated and controlled by Nasser Kazeminy and Otto Candies, LLC. Rather, DMT is managed by its officers and directors, and is controlled by its Board." |

90.     Again, Defendants cite to a section of the SLC Report that actually admits that

"Nasser Kazeminy and Otto Candies Jr. exercise[d] considerable influence" over Deep Marine.

Nevertheless, the SLC Report concluded that it would be an overstatement to say that Mr.

Kazeminy and Otto Candies, LLC "dominated and controlled" Deep Marine. The SLC Report

further concluded that "DMT is managed by its officers and directors, and is controlled by its

Board." (Ex. L, at 12)  The Trustees and his counsel's investigation determined that the SLC

Report reached the wrong conclusions.

91.     The Trustee and his counsel's investigation found evidence that Mr. Kazeminy

was indeed controlling DMT.  Some of the evidence supporting paragraph 55 is as follows:

| Evidence | Excerpt |
| --- | --- |
| May 5, 2006 Letters to Larry Lenig and Bruce Gilman from Nasser Kazeminy (Ex. J) | "I will be pleased to instruct the board of Deep Marine Holdings to issue you an option for 15,000 shares." |
| July 30, 2008 Letter to Employees of DMT from Nasser Kazeminy (Ex. | "To: Employees of DMT From: Nasser Kazeminy - Controlling Shareholder |

| | |
|---|---|
| C) | …<br>One of the most important obligations of management is to ensure that we are appropriately to bring our firm to the next level.  That means that we should be prepared to shift our internal talent in a way that they are positioned to meet the challenges in front of us, not the challenges we have already met.  It also means that we should seek, externally, talented people if they can help make us a better company.  The Board, I, Otto Candies, Jr., and Paul McKim have had many discussions on how best to achieve that end." |
| October 26, 2004 Minutes of Special Shareholders' Meeting of DMT (Ex. OO) | "Resolutions<br>5.  The President announced that the item of business for the meeting was election of new Directors.  The nominated slate of Directors was Mr. Paul McKim, Mr. Joseph Grano, Mr. Nasser Kazeminy, and Mr. John Ellingboe.  The nominated slate of Directors was elected with the unanimous vote (5,827) of those present." |
| December 16, 2004 DMT Board of Directors Meeting  (Ex. PP) | "Nasser Kazeminy and Joe Grano, who had been elected to the Board, submitted their resignations and they were accepted by the Board.<br>…<br>The Board held an election for Chairman of the Board.  Paul McKim nominated John Ellingboe.  No further nominations were made and John Ellingboe accepted the position as Chairman." |
| McKim Deposition Testimony 211:20-212:8  (Ex. QQ) | "[Nasser] didn't want it to go to a vote.  Remember he has oversight.  He's the oversight guy.  He had - he's going to tell what the board is going to vote on or not.  There was not one vote ever with Nasser in place that the board did that Nasser did not already say what we're going to vote on and how that vote's going to turn out.  Every single vote that we did and I'm telling you every single vote, Nasser already told us what - we discussed it and Nasser said, 'Well, here's what I want.  Okay.  Now, you guys vote.'  Every single vote, every single - we never had one damn board meeting without Nasser telling us exactly what to stay - what this is going to go on and how he's going to take care of his buddy Otto.  And now this company is going kaput." |
| Thomas Deposition Testimony 63:22-25 (Ex. RR) | "Q: Do you know why Larry Lenig became a member of the board?<br>A: Yes. That was from Mr. Kazeminy. He had, he knew Mr. Lenig and wanted him on the board." |
| Thomas Deposition Testimony 104:19-25 (Ex. SS) | "Q:  Why was Mr. Kazeminy going to be the one who ultimately decided?<br>A:  NJK Holding had an oversight agreement with Deep Marine Technology.  Mr. Kazeminy, through his various entities, owned a significant if not controlling interest in DMT.  So he was, he was a reasonably active owner.  And it was, it was going to be his call." |
| Abadie Deposition Testimony 39:13-22, 40:10-13 (Ex. D) | "Q:  How frequently would you deal with Mr. Kazeminy by telephone?<br>A:  We typically had - as a group the management team had a weekly phone call scheduled, and we - we wouldn't perform it every week, but it was fairly often, fairly - it was nearly every |

| | week, not quite every week.<br>Q:  What was the - was it typically scheduled for a particular time?<br>A:  Yes, it was scheduled for 9:00 o'clock or 10:00 o'clock on Tuesdays<br>…<br>Q: Okay.  And was there an agenda for these phone calls?<br>A:  Typically the agenda was focused mostly on sales and how things were progressing." |
|---|---|

92.     The other portions of Defendants' chart are equally unavailing.  At best, the chart shows factual disputes amongst the parties, not exactly an uncommon occurrence during litigation.  At worst, Defendants' chart reflects that the SLC Report was a whitewash of the wrongdoing by Mr. Kazeminy and Mr. Candies to Deep Marine's detriment.

93.     The mere fact that the Trustee may have arrived upon different conclusions than Greenberg Traurig and the SLC, does not warrant this Court imposing the extreme sanction of dismissal of his claims.

94.     Defendants make two passing references to 28 U.S.C. § 1927 (Dkt. No. 18, ¶¶ 2, 38(c)).  Relief under § 1927 requires meeting a burden higher than even that for Rule 9011. *Argent Mortgage*, 2006 WL 2092430, at *4.  The statute is construed in favor of the sanctioned party, and it must be shown that the conduct multiplying proceedings is both unreasonable and vexatious.  *Id.* (citing *Proctor & Gamble Co. v. Amway Corp.*, 280 F.3d 519, 525 (5th Cir. 1997)).  Defendants fail to offer any support for any claim under § 1927.[6]

## IV.     CONCLUSION

95.     For the reasons stated above, the Court should deny the Rule 11 Motion.  The Rule 11 Motion is riddled with flaws, both procedurally and substantively.  Defendants have

---

[6] Defendants seek relief under the Court's inherent power, but they offers no explanation for why Defendants are entitled to this relief.  Given that sanctions under Rule 9011 and § 1927 are not warranted, neither are sanctions under the Court's inherent power.  *See Vlasek*, 2008 WL 167082, at *7 (finding that inherent powers "may be exercised only if essential to preserve the authority of the court" (quoting *Natural Gas Pipeline of Am. v. Energy Gathering Inc.*, 86 F.3d 464, 467 (5th Cir. 1996))).

failed to follow the safe-harbor provisions under Rule 9011. Likewise, they have failed to meet their burden of proof for the imposition of sanctions.

96.     The SLC and Greenberg Traurig were neither independent nor disinterested in their investigation of the claims of Defendants' wrongdoing. The SLC Report is one-sided and an advocacy piece in favor of Defendants.

97.     The Rule 11 Motion has also wasted significant assets of the bankruptcy estate by requiring the Trustee and his counsel to spend considerable time and expense responding to allegations that never should have been made filed.   And by filing the Rule 11 Motion, Defendants have required the Court to unnecessarily expend its resources to make a ruling.

98.     The Trustee respectfully submits that the Rule 11 Motion is exactly the type of pleading Rule 9011 was designed to prevent.

DATED: October 4, 2010.

Respectfully submitted,

MCKOOL SMITH P.C.

By:      /s/ Mark L. Mathie
_____
HUGH M. RAY, III
State Bar No. 24004246
MARK L. MATHIE
State Bar No. 13191550
600 Travis, Suite 7000
Houston, Texas 77002
Telephone: (713) 485-7300
Facsimile: (713) 485-7344

ATTORNEYS FOR LIQUIDATING
TRUSTEE

Dallas 310254v1

## CERTIFICATE OF CONFERENCE

I hereby certify that on September 30, 2010, I conferred via a telephone call with Thomas Henderson, counsel for Defendants.  The parties were unable to resolve the matter.

/s/ Mark L. Mathie
_____

MARK L. MATHIE

## CERTIFICATE OF SERVICE

I hereby certify that on October 4, 2010, a true and correct copy of the foregoing document has been served via DLR 5.1 and the ECF system, to the parties on the ECF service list.

/s/ Mark L. Mathie
_____

MARK L. MATHIE

Dallas 310254v1