## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| DEEP MARINE HOLDINGS, INC., et al. | § | CASE NO. 09-39313-H1-11 |
| | § | (Chapter 11) |
| Debtor | § | (Consolidated) |

| | | |
|---|---|---|
| JOHN BITTNER, LIQUIDATING TRUSTEE, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| V. | § | ADVERSARY NO. 10-3312 |
| | § | |
| NASSER KAZEMINY, NJK HOLDING CORP., DCC VENTURES, LLC, OTTO B., CANDIES, JR., OTTO B. CANDIES, III, OTTO CANDIES, LLC AND CANDIES SHIPBUILDERS, | § | |
| | § | |
| | § | |
| | § | |
| | § | |
| | § | |
| Defendants, | § | |
| | § | |
| - and - | § | |
| | § | |
| DEEP MARINE HOLDINGS, INC. AND DEEP MARINE TECHNOLOGIES, INC., | § | |
| | § | |
| | § | |
| Nominal Defendants/Debtors | § | |

## REPLY IN SUPPORT OF DEFENDANTS' MOTION TO STRIKE PLEADINGS AND FOR IMPOSITION OF SANCTIONS PURSUANT TO RULE 11, FRCP, AND BANKRUPTCY RULE 9011

**TO THE HONORABLE UNITED STATES BANKRUPTCY JUDGE:**

COME NOW Nasser Kazeminy, NJK Holding Corp. and DCC Ventures, LLC (collectively, the "Kazeminy Defendants"), and Otto Candies, Jr., Otto Candies, III, Otto Candies, LLC and Candies Shipbuilders, LLC (collectively, the "Candies Defendants") (the Kazeminy Defendants and the Candies Defendants shall be collectively referred to as "Defendants"), by and through their attorneys, and for their Reply in Support of Defendants'

Motion to Strike Pleadings and for Imposition of Sanctions (the "Motion") Pursuant to Rule 11, FRCP, and Bankruptcy Rule 9011, would respectfully show the Court as follows:

## I.     DEFENDANTS FULLY COMPLIED WITH RULE 9011 PROCEDURAL REQUIREMENTS.

Contrary to the Trustee's[1] assertions, Defendants did in fact comply with the procedural requirements of Bankruptcy Rule 9011.  The sanctions motion that was formally served on the Trustee was sufficient to begin the twenty-one day "safe harbor" period provided for in Rule 9011(c)(1)(A).  Moreover, the fact that a copy of the Motion was attached as an exhibit to Defendants' Motion for Extension of Time to Respond to Complaint ("Motion to Extend"), does not mean that it was "filed with or presented to the court" within the meaning of the Rule.  Fed. R. Bankr. Proc. 9011(c)(1)(A).  When Defendants attached a copy of the Motion as an exhibit, there was no intent to pursue relief through the Motion at that time.  They were not seeking any action on the Motion.  It was provided to the Court solely as support for its argument that an extension of time to answer the Complaint was warranted because the Rule 9011 process had been initiated by sending the 21-day letter and a draft of the Motion.  Therefore, Defendants fully complied with the procedural requirements of Rule 9011, and it would be improper to deny their Motion for that reason.

The relevant portion of Rule 9011 provides:

A motion for sanctions under this rule shall be made separately from other motions or requests and shall describe the specific conduct alleged to violate subdivision (b). It shall be served as provided in Rule 7004. The motion for sanctions may not be filed with or presented to the court unless, within 21 days after service of the motion (or such other period as the court may prescribe), the challenged paper, claim, defense, contention, allegation, or denial is not withdrawn or appropriately corrected[.]

---

[1]     All undefined capitalized terms shall have the same meaning as assigned in the Motion.

Fed. R. Bankr. Proc. 9011(c)(1)(A). In other words, a motion, sufficient to apprise the non-movant of his alleged misconduct, must first be served on the offending party. Then, the movant must give the recipient 21 days to correct the error before prosecuting the motion in court.

### A.  A Rule 9011 Motion Filed With The Court Need Not Be Identical To The Version That Was Served On The Non-Movant.

Here, Defendants complied fully with Rule 9011's procedural requirements. Defendants served the Trustee with a motion that was sufficient to put him on notice of the Trustee's sanctionable conduct and that the safe harbor period had begun to run. The fact that Defendants later filed a more refined and detailed version of the Motion is irrelevant. Whether the filed motion must be identical to the served motion has not been addressed by the Fifth Circuit. However, numerous courts have examined the issue and have held that as long as the initial motion was sufficient to put the non-movant on notice of the problem so that he might cure it, it is of no moment that the filed motion was not identical to the served version. *See, e.g., Ideal Instruments, Inc. v. Rivard Instruments, Inc.*, 243 F.R.D. 322 (N.D.Iowa 2007) (the versions of the motion do not have to be identical as long as the initial version is sufficient to put the opposing party on notice and filed version is not substantially different); *Thompson v. United Transportation Union*, 167 F.Supp.2d 1254, 1258 (D.Kan. 2001) (same); *Want Some Weather, Inc., v. Tuaolo*, 2009 WL 137536, *2 (Minn. App. 2009) (same; applying Minnesota version of Rule 11).[2]

---

[2]   Further, the cases the Trustee cites to support his position are inapposite. In the unreported decision of *Argent Mortgage Co., LLC v. Diaz*, No. H-05-3058, 2006 WL 2092430 (S.D. Texas July 26, 2006), the Court denied a party's Rule 11 Motion because the movant pursued sanctions prior to the expiration of the 21-day "safe harbor" period and because the movant only pursued its motion after the plaintiff voluntarily dismissed its Complaint. Similarly, in the unreported decision of *T.L. Dallas, Ltd. V. Elton Porton Marine Ins. Agency*, No. 3:07-cv-0419, 2008 WL 7627806 (S.D. Tex. Dec. 22, 2008), movant's Rule 11 Motion was denied for failure to allow the 21-day "safe harbor" period to expire prior to filing the motion and because the movant brought its Rule 11 Motion in combination with a Rule 12 Motion to Dismiss. Neither situation is comparable to the instant one.

*Ideal Instruments, supra*, is directly analogous to the matter at bar.  In that case, the plaintiff served a motion for sanctions against the defendant and later filed a more developed, albeit different, motion with the court.  Defendant argued that the safe harbor provision had been violated since the Rule required the filed motion to be identical to the one served.  *Id*. at 337. The court rejected such a "hypertechnical" reading of Rule 11.  *Id*. at 338.  It pointed out that "the purpose of requiring service of a 'warning shot' motion more than 21 days before filing of a Rule 11 motion is to afford the opposing party the benefit of the 21-day 'safe harbor' provision allowing it the opportunity to withdraw its allegedly frivolous pleading."  *Id*. at 339 (internal quotations omitted).

The court found that this purpose was met because the draft and filed motions were substantively the same.  *Id*. at 339-40.  The plaintiff simply had supplemented its argument in order to make "a fuller argument [like] one would expect to find in a separate brief in support of a Rule 11 sanctions motion."  *Id*. at 339.  "[T]he court conclude[d] that supplementation of the draft Rule 11 motion with a brief or supporting argument when the Rule 11 motion is ultimately filed does not mean that the motion ultimately filed is improper."  *Id.*  The court further found:

> …Rivard was afforded the benefit of the twenty-one day safe harbor provision allowing it the opportunity to withdraw its allegedly frivolous pleading even if the Rule 11 motion ultimately filed was not identical to the draft motion served on Rivard more than twenty-one days earlier. Rivard was apprised of the grounds for Ideal's Rule 11 motion and expressly advised of Ideal's demand that Rivard withdraw the allegedly unwarranted motion more than twenty-one days before Ideal filed its actual Rule 11 motion.

*Id*. at 340 (internal quotations and other punctuation omitted).

The case under examination is nearly identical to *Ideal Instruments* and should be decided the same way.  The Motion filed by the Defendants on September 7 was not a mirror image of the initial version served on the Trustee on August 11, but the two versions are not materially different.

The majority of the changes involved the addition of supporting law as well as the addition of supporting facts that arose after the initial Motion was served, *e.g.*, the August 20 fee applications filed by the firms of McKool Smith (Doc #651), counsel for the Trustee of record in this proceeding, and Grant Thornton, the Liquidating Trustee/Chief Restructuring Officer (Doc #650).  The core of the Motion remained the same, however.  In the draft of the Motion, the Defendants informed the Trustee that they would seek 9011 sanctions if he did not amend or withdraw the Complaint since it raised many of the same issues that had been rejected by the Special Litigation Committee ("SLC").  This demand was not altered or expanded in the filed Motion.  In sum, the Trustee was informed of the substantive grounds of the Motion and, as a result, was armed with sufficient facts to respond to the allegations.  As such, the purpose of the safe harbor rule, "to give the parties at whom the motion is directed an opportunity to withdraw or correct the offending contention," was met, and Defendants complied with that provision. *Elliott v. Tilton*, 64 F.3d 213, 216 (5th Cir. 1995) (*citing* Fed. R. Civ. Proc. 11, Advisory Committee Notes (1993 revision)).

Finally, it is significant that the Trustee was not prejudiced by the differences between the initial and final versions of the Motion.  After receiving the more detailed version, the Trustee continues to blindly pursue the unfounded claims rejected by the Debtor's SLC.

**B.      Defendants Did Not File Or Present The Motion To The Court Before The "Safe Harbor" Period Expired.**

The Trustee also alleges, without support for the proposition, that the Defendants violated the safe harbor rule when they included the draft sanctions motion as an exhibit to their Motion to Extend and submitted it to the Court within 21 days of the Trustee's receipt of the sanctions

motion.[3]  This was not a violation of the safe harbor provision, however, because attaching a document as an exhibit does not mean it was "filed with or presented to the court" within the meaning of the Rule.  Fed. R. Bankr. Proc. 9011(c)(1)(A).

A plain reading of Bankruptcy Rule 9011 and the revision comments under Federal Rule of Civil Procedure 11 make it clear that attaching a document as an exhibit does not mean that it was presented to the Court.  First, the language of the Rule suggests that presentment or filing includes the intention to argue the particular issue before the court.  This contention is bolstered by the revision comments which give several examples of "presenting to the court."  The comments state:

> [A]n attorney who during a pretrial conference insists on a claim or defense should be viewed as "presenting to the court" that contention and would be subject to the obligations of subdivision (b) measured as of that time. Similarly, if after a notice of removal is filed, a party urges in federal court the allegations of a pleading filed in state court (whether as claims, defenses, or in disputes regarding removal or remand), it would be viewed as "presenting"--and hence certifying to the district court under Rule 11--those allegations.

Fed. R. Civ. Proc. 11, Advisory Committee Notes (1993 Revision) (emphasis supplied).

In this case, the Defendants did not argue the merits of, or intend to enforce, the draft Motion when it was included as an exhibit to the Motion to Extend; therefore, no violation of the safe harbor provision occurred.  What was presented to the Court in the Motion to Extend was the argument for more time to answer the Complaint.  Since the Complaint might be substantially amended or dismissed, either as a curative response to the demand or as a result of the subsequent prosecution of the Motion, the fact that such a demand was pending was relevant support for that argument.  Therefore, it was the mere fact that the demand and cure period was

---

[3]     The 21-day period began to run on August 11, 2010, the day the Defendants served a copy of their motion on the Trustee.  Defendants submitted their Motion to Extend, with the draft sanctions motion attached, on August 17, 2010.

pending that was relevant to the extension request.  Because only the existence of the draft Motion was germane, it cannot be said that the Motion was presented to the Court at that time.

Moreover, in the Motion to Extend, Defendants twice recognized the expiration date of the 21-day period, September 1, 2010:  once in the body of the Motion and once in the request for relief.  (Motion to Extend, ¶¶ 9 & 11).  This also suggests that the Defendants did not intend to "present" the Motion to the Court at that time.  They knew the deadline and planned on presenting the Motion at that time, not when the Motion to Extend was filed.  Defendants actually waited until several days beyond the 21-day period passed before presenting their Motion by filing it with the Court.  These facts support the proposition that the copy of the Motion attached as an exhibit was not presented to or filed with the Court within the meaning of the Rule.

In sum, the Defendants complied with the safe harbor provision of Rule 9011.  The filing of a more detailed version of the Motion was of no moment since the new version was not materially different from the original.  The original was sufficient to put the Trustee on notice of the problems with the Complaint so that he might correct them.  Also, the Defendants did not "present" the Motion to the Court when they attached the draft to their Motion to Extend.  It was simply provided as relevant support for the argument that it was prudent to extend the time to answer the Complaint pending the outcome of the Motion.  Defendants did not present the Motion to the Court until September 7, 2010, the date that it was filed.  Accordingly, Defendants honored the 21-day safe harbor provision by giving the Trustee the benefit of the full period to amend or withdraw his Complaint, and the Motion should not be denied on that basis.

## II.    THE MOTION SHOULD BE GRANTED ON SUBSTANTIVE GROUNDS.

The Trustee's over the top and repetitive language aside, Rule 9011 sanctions are appropriate in the instant matter and the Motion should be granted.  The Trustee and McKool

Smith did not conduct a reasonable, good faith investigation prior to filing the instant Complaint. Further, the Complaint is being pursued for an improper purpose. In an impressive display of mud-slinging, the Trustee fails to explain how it was reasonable or in good faith to bill the estate over $400,000 (at least) to "recreate the wheel" and allegedly review thousands of documents that were produced as part of the SLC investigation, but never speak to the members of the SLC, the SLC's counsel, the Defendants, or the Defendants' counsel. Instead, arriving to the scene over eighteen months after the Demand Letter was sent, the SLC investigation concluded, and multiple lawsuits that formed the basis of the Trustee's claims were dismissed, the Trustee and his counsel completely ignored the findings and due diligence performed by the SLC, brought a frivolous "copycat" suit, and now defend that decision by disparaging everyone associated with the SLC investigation and arguing that they could simply reach a different conclusion. (*See* Trustee's Response to Motion of Defendants To Dismiss Complaint And/Or Strike Pleadings As Sanction For Violation of Fed. R. Bankr. 9011 And For Imposition Of Monetary Sanctions ("Response"), ¶ 90 ("The Trustee and his counsel's investigation determined that the SLC Report reached the wrong conclusion.")). The Trustee and McKool Smith (also counsel for the Unsecured Creditors Committee) are bent on maximizing the opportunity to unduly pressure the Movants to abandon their mostly secured, priority claims, at the expense of the Estate. Unfortunately for the Trustee and McKool Smith, disparaging remarks, no matter how many times repeated in one brief, do not equal a good-faith **pre-suit** investigation into the facts alleged in the Complaint.

It is insulting and reckless for the Trustee to allege that the SLC and its counsel were "neither independent nor disinterested" (Response, p. 2) and that the SLC's investigation and report was "a whitewash." (Response, p. 33). Incredibly, the Trustee and his counsel made

these representations to the Court without ever discussing the SLC's investigation or conclusions with the SLC, Greenberg Traurig, or Defendants.  The Trustee and McKool Smith have unilaterally concluded that the SLC was biased and violated numerous ethical and professional duties, despite the determination by Judge Gomez of the 129th District Court that the SLC acted "in good faith" and "conduct[ed] a reasonable inquiry." (A copy of Judge Gomez's order dismissing the derivative complaint filed by Paul McKim, discussed infra, is attached as Exhibit A).  Judge Gomez further found that "the termination of the derivative proceedings pursuant to the Amended Motion to Dismiss to be *an adjudication on the merits* based on the Court's finding that the SLC lawfully assumed control of [the] derivative proceedings, concluded its investigation, and as a result moved to dismiss."  (Exhibit A, fn. 1) (emphasis supplied).[4]  As a result, the Trustee and McKool Smith are not only accusing the SLC and Greenberg Traurig of ethical violations and of white-washing wrongdoing, but also accusing Judge Gomez of committing grave error.

Significantly, while the Trustee has filed a 36-page Memorandum in opposition to the Motion, only an extremely small amount of that rhetoric addresses a key point of the Motion: whether or not the Trustee and his counsel made a reasonable inquiry into the factual and legal basis for his allegations and claims in the Complaint before filing it.  *In re General Homes Corp.*, 181 B.R. 870, 880-81 (Bankr. S.D. Tex. 1994).  While the Trustee's argument is long on scandalous accusations against Defendants and implications that the SLC and its counsel had orders to exculpate the Defendants, he simply obfuscates the real point:  He and his attorneys conducted little in the way of a real investigation.  The Trustee uses essentially one page of the 36 to discuss its investigation and does so in blatantly summary fashion.  (*See* Response, p. 12).

---

[4]        Whether or not the Trustee and his counsel are "perplexed" by Judge Gomez's ruling is irrelevant.  After considering the evidence presented and overseeing the entire proceedings, Judge Gomez determined that the SLC investigation was pursued in good faith and that the SLC conducted a reasonable investigation.

The other 35 pages consist of repetitive attacks on the movants and the SLC.  The Trustee seems to have adopted the philosophy:  If you can't dispute the message, try to disparage the messenger.

### A.      The Demand Letter And The SLC's Investigation.

In the summer and fall of 2008, the Board of Deep Marine determined that its then CEO, Paul McKim needed to be relieved of his duties.[5]  Upset with the Board's decision, Mr. McKim traveled to New York City, equipped with the company credit card, to meet with other minority shareholders.  Mr. McKim's corporate credit card statements include charges for hotel stays at the rate of thousands of dollars per night, $500 steak dinners, tickets to Broadway shows, and airfare for Mr. McKim and guests.

In New York City, Mr. McKim manufactured a number of allegations against Otto Candies, Jr., Otto Candies, III, Nasser Kazeminy and certain board members.  As a result of Mr. McKim's trip to New York and his baseless allegations, a New York City attorney, Anthony Paduano, prepared a demand letter, dated October 10, 2008.[6]  The "Demand Letter" was sent on behalf of a group of East coast investors ("FLI Plaintiffs") and demanded that the Board of DMT immediately form a special litigation committee and investigate certain allegations which could form the basis of a derivative lawsuit.  The allegations in the Demand Letter form the basis of a substantial portion of the Trustee's claims in the instant action.  The timing of the Demand Letter was no coincidence. It was sent on the eve of a bitterly contested Senatorial election in Minnesota between Norm Coleman and Al Franken.  In a very thinly veiled threat, the FLI Plaintiffs' counsel indicated that if the derivative claims were not dealt with by a special

---

[5] Earlier in 2008, DMT's CFO, B.J. Thomas, was released from employment upon the company's realization of a previously undisclosed SEC violation by Mr. Thomas.

[6] The Demand Letter is attached to the SLC Report as Exhibit A.

litigation committee within five days, they would "go public." The Demand Letter was an especially volatile and aggressive tactic due to an allegation found therein that related to Mr. Kazeminy's supposed use of DMT to funnel $75,000 to then-United States Senator Norm Coleman.

The FLI Plaintiffs and their counsel knew that an allegation that a sitting United States Senator had been illegally funneled money was a hot-button topic regardless of its truth, and they immediately began to demand a settlement from DMT, Candies, and Kazeminy. Throughout October, the FLI Plaintiffs and their counsel would threaten that unless their clients were bought out of their shares at a grossly inflated valuation of DMT, they would "go public" with their baseless allegations. During these discussions, McKim and Thomas offered to sign affidavits that all but admitted that the allegations made in the demand letter were false.[7]

While the FLI Plaintiffs were making demands on Candies and Kazeminy, within two business days of the date of the Demand Letter, on October 14, 2008, the SLC retained the international law firm of Greenberg Traurig to represent it. John (Chip) Rainey and K.B. Battaglini of Greenberg Traurig agreed to represent the SLC. As Messrs Battaglini and Rainey have testified to this Court on October 12, 2010, contrary to the Trustee's allegations, at the time of engagement Greenberg Traurig did not have any outstanding matters involving ComVest, a company in which Mr. Kazeminy is an investor and which Larry Lenig, a member of the SLC, is employed. Further, as recently testified to in Court, at the time of retention, Mr. Rainey and Mr. Battaglini had never heard of Deep Marine Holdings, Inc., Deep Marine Technologies, Inc., or any of the Defendants. All of the parties also cleared Greenberg Traurig's thorough conflict check system without any waivers needed. Further, Mr. Rainey and Mr. Battaglini had no doubt that they would be anything short of ethical, independent, and objective counsel to the SLC.

---

[7]     McKool Smith was offered copies of these Affidavits on January 12, 2010.

(*See* SLC Report, p. 76 ("Special Counsel are independent, bound by ethical rules, and have taken steps to remain independent in conducting this investigation.  No person has sought to impose undue influence on, or to seek favorable treatment in, the conduct of the investigation by Special Counsel")).

Sometime during the last week of October 2008, the Demand Letter was leaked to the Minnesota Star Tribune.  Due to the nature of the allegations and their connection to Senator Coleman, the Demand Letter set off a nationwide media circus.  Hundreds of newspaper and internet articles that repeated the false and defamatory allegations were published.

Days later, on October 28, 2010, Paul McKim filed his own lawsuit in Harris County District Court, making many of the same allegations now brought by the Trustee that are the subject of the Rule 11 Motion.  At the insistence of the FLI Plaintiffs and fearing that he had "jumped the gun," McKim non-suited his Harris Count lawsuit one day after filing it.  It was too late.  The Associated Press and numerous other news outlets had picked up Mr. McKim's Complaint, scores of internet "bloggers" seized on the story and Mr. Kazeminy, a man who had never taken the opportunity to gain publicity from his own successes, was now thrown into a media frenzy in which he was constantly referred to as a " wild Muslim," a "crazy Iranian," and a "terrorist."  Within one week, the FLI Plaintiffs filed the Delaware Action and McKim refiled the Texas Action.

From October 14, 2008 until June 25, 2009, the SLC and their counsel engaged in a thorough investigation into the allegations in the Demand Letter.  As part of its investigation, Greenberg Traurig conducted 24 depositions and interviews and reviewed thousands of documents.  (*See* SLC Report, Appendix D).  The result of the SLC's diligence is a voluminous SLC Report that directly addresses, on a paragraph by paragraph basis, every allegation made by

Mr. McKim and the FLI Plaintiffs, and now, the Trustee.  Reviewing the Report and the basis for it, there can be no question that Greenberg provided a thorough analysis, and its conclusions refuted the allegations.

> **B.     The SLC And Its Counsel Were Independent And Conducted The Investigation In Good Faith.**

The Trustee argues at length that because Mr. Kazeminy and Mr. Lenig have some overlapping outside business associations, the SLC must have been conflicted.  Importantly, the Trustee does not even attempt to argue that somehow Bruce Gilman had any outside interaction with Defendants.  The reason is simple, he did not.  Further, to the extent that Mr. Kazeminy and Mr. Lenig had overlapping outside business associations, the SLC reviewed binding Delaware law, and concluded that "[m]ere evidence of friendship or outside relationships, standing alone, are insufficient to raise a reasonable doubt about a director's independence."  (SLC Report, p. 37 (citing *Beam v. Stewart*, 845 A.2d 1040, 1050 (Del. 2004))).

Furthermore, significantly, the Trustee never attempts to suggest any current or former relationship between Gilman, Lenig, or any Greenberg Traurig attorneys with any of the Candies individuals or entities.  Thus, there is no basis to suggest that the SLC's conclusions which totally exculpated the Candies Defendants were tainted in any way by conflict.

The Trustee also claims that because Mr. Kazeminy recommended Mr. Lenig for appointment to the Board of DMT, Mr. Kazeminy must have had control and influence over Mr. Lenig.  Again, the SLC considered Mr. Kazeminy's voting power and role in recommending Mr. Lenig, compared the same to binding Delaware law and found that "[o]verwhelming control of the voting power of a corporation by [] a person is, likewise, insufficient to demonstrate that the directors appointed by the vote of such person are dominated by the person."  (SLC Report, p. 37 (citing *Stroud v. Milliken Enters., Inc.*, 585 A.2d 1306, 1307 (Del. Ch. 1988))).   The SLC

considered the allegations made against Lenig and Gilman and any relationship Mr. Lenig had

with Mr. Kazeminy, in nearly four pages of its Report entitled "Director Independence and

Disinterestedness."  The SLC and Greenberg Traurig concluded that they were independent and

disinterested, stating:

> Special Counsel determined that the members of the SLC are sufficiently
> independent and disinterested to be able to conduct the investigation and to
> deliberate and act upon the conclusions and recommendations set forth herein.
> Neither Gilman nor Lenig participated in the complained transactions in a manner
> in which they would receive financial benefit from the transactions, and many of
> the transactions in question either pre-dated their involvement in the Company, or
> were immaterial in dollar values so as to not rise to the level of needing board
> approval.   During the occurrence of all of the transactions complained of,
> including those that may have been approved by them as members of the Board,
> both Lenig and Gilman were mere directors of the Company, and were not
> beholden to the Company for substantial financial benefits.  Neither of them have
> a personal relationship with any of the major shareholders such that they would be
> willing to risk more than their personal reputation than that friendship. Lenig
> continues in his role solely as a director and receives only a *de minimis* amount of
> income from the position.  While Gilman has assumed an interim role as Chief
> Executive Officer, Gilman was retired at the time he undertook such position.
> Gilman has independent personal financial means, and Gilman does not intend to
> retain the position of CEO.  Gilman has no other financial relationship with either
> Kazeminy, Otto Candies, Jr., or any of their affiliates and had no personal
> relationship with either man until he was elected a director of the Company.
> Hence, neither Gilman nor Lenig are beholden to any shareholder, and no
> shareholder or other person named as a defendant in either the Delaware
> Complaint or the Texas Petition can threaten either of them with the loss of a
> benefit that is of such subjective material importance as to destroy their ability to
> consider the corporate merits of the Allegations objectively.  Lastly, in neither the
> Delaware Complaint nor the Texas Petition, is there any allegation of bad faith on
> the part of Gilman, Lenig or any other director, nor did the Special Counsel
> discover or observe any conduct by Gilman or Lenig that would reasonably be
> characterized as bad faith, gross negligence or conscious disregard for oversight
> of the activities of the Company's officers. Hence, claims of director liability
> solely on the basis of failure to oversee the activities of the Company would be
> unlikely to survive any scrutiny by the court, and there is thus no implication that
> the independence and disinterestedness of Gilman and Lenig presumed to exist
> has been destroyed or compromised.

(SLC Report, pp. 52-53).  The SLC specifically investigated and analyzed Mr. Lenig's and Mr.

Kazeminy's relationship and concluded it was insignificant:

> Larry Lenig is a director of DMT, but is not a long-time business associate of Nasser Kazeminy. The evidence is that Larry Lenig is an employee and minority partner in an investment firm. Nasser Kazeminy is a non-control limited partner in and an occasional co-investor with the investment firm, but, other than as a passive investor with a less than 2% interest, Larry Lenig is not involved with any of the investments or co-investments between the investment firm and Nasser Kazeminy. Moreover, Lenig's principal responsibilies in the investment firm are to manage the firm's investment in a career college located in New York and a heavy equipment dealer located in Houston. Neither of these businesses have any business dealings with Nasser Kazeminy or DMT. **There is no evidence that Larry Lenig is beholden to Nasser Kazeminy.**

(SLC Report, Appendix A, pp. 64-65) (emphasis supplied).

At the time of its engagement, Greenberg Traurig did not have any outstanding matters involving ComVest, a company in which Mr. Kazeminy is an investor and by which Larry Lenig is employed. Further, at the time of retention, Mr. Rainey and Mr. Battaglini had never heard of Deep Marine Holdings, Inc., Deep Marine Technologies, Inc., or any of the Defendants. All the parties also cleared Greenberg Traurig's extensive and sophisticated conflict checks without any waivers needed. Further, Mr. Rainey and Mr. Battaglini had no doubt that they would be anything short of ethical, independent, and objective counsel to the SLC. (*See* SLC Report, p. 76 ("Special Counsel are independent, bound by ethical rules, and have taken steps to remain independent in conducting this investigation. No person has sought to impose undue influence on, or to seek favorable treatment in, the conduct of the investigation by Special Counsel.")).

Despite admittedly never contacting the SLC or its counsel, the Trustee now alleges that the SLC's investigation should be completely disregarded and that the Court should presume that the SLC is unethical and misrepresented a bias towards Defendants in multiple Courts. The Trustee is wrong. Worse, the Trustee did not conduct a good faith investigation before making these unfounded allegations.

### C.   The Trustee And McKool Smith Did Not Conduct A Good Faith, Reasonable Investigation Prior To Filing The Complaint.

The Trustee and McKool Smith knew of the thoroughness and completeness of the SLC's investigation.  The Trustee closely considered the Report and represented to the Court that the SLC's Report is the property of the Debtor.  (*See* Docket No. 109).  The Trustee and his counsel had full knowledge of the identity of the SLC and its counsel, the contents of the SLC Report, and the specifics of the SLC's investigation.  Nevertheless, they seemed determined to bring a lawsuit against Defendants regardless of whether or not such suit was factually or legally warranted and purportedly jumped into an investigation of their own with both feet.  However, as part of the "investigation," the Trustee and his counsel failed to ever **contact the SLC or its counsel and then failed to have any meaningfully discussion of the "facts" with Defendants or their counsel.**  The Trustee and his counsel have charged the estate over $325,000 to review documents.[8]  Simply because the Trustee and McKool Smith have "billed extensive time" to a purported investigation does not mean that such investigation was reasonable or that the Complaint was brought in good faith.  Quantity does not mean quality.

Further, the Trustee and his counsel cannot hide behind a shortened bar date to pursue claims as an excuse for failing to reasonably investigate the factual underpinnings of his claims or the lack of good faith in filing the Complaint. McKool Smith began billing time for its "investigation" in January of 2010 – a full eight months prior to the filing of the Complaint![9]  To be clear, but for two purported meetings with counsel for General Electric, a person with no first-hand knowledge (and little second-hand knowledge) of the facts alleged by the Trustee, and a

---

[8]       This does not include the approximately $145,000 in post Effective Date legal fees claimed by McKool for which McKool for which it refuses to provide any billing detail.

[9]       Interestingly, the Trustee has recently filed a Rule 26 Report with the Court that affords it over ten more months to conduct discovery.  The motivation is clear:  to conduct a reasonable investigation post-filing and to charge the estate even more professional fees.  Such behavior is not in the best interests of the bankrupt estate.

lunch interview with McKim's counsel—a meeting which apparently did not even include McKim—,[10] the Trustee and his counsel did nothing but "review documents." Essentially, the Trustee wants the Court to deny this Motion by merely assuring the Court that he and his counsel reviewed some documents and interviewed a couple of attorneys. *Id.* The Trustee and his counsel "collected documents from various sources." *Id.* They do not even hint at what those documents were to enable the Court to determine the adequacy of this part of the investigation. McKool Smith also states that it summarized those documents, which added nothing to their investigation. *Id.*[11] It is clear that the Trustee and his counsel failed to conduct a reasonable investigation prior to bringing suit and the Complaint is being pursued in bad faith.

The Trustee further argues that the Complaint is "factually supported" because he can point to deposition testimony from Paul McKim.[12] This completely disregards the fact that Paul McKim, the Plaintiff in the Texas Action, and the "confidential informant" in the Delaware Action[13], contradicted himself and the documentary evidence numerous times in his own deposition. As an example, in his deposition McKim could not decide the amount that he was alleging Otto Candies overcharged DMT in relation to the Emerald vessel transaction. (SLC Report, p. 66, fn. 29). Further, as described in detail on p. 26 of the SLC Report, in November 2008, McKim offered to sign an affidavit that directly contradicted the allegations he made in the Texas Action and in his deposition related to the insurance agreement that is the subject of the

---

[10]     Defendants know that this "interview" was conducted over lunch, as McKool Smith billed the estate for the meal.

[11]     Plaintiff states, "McKool Smith created indices, timelines, charts, and summaries." *Id.*

[12]     Mr. McKim's testimony was subject to a formal deposition and was taken under oath due to his refusal to cooperate with the SLC investigation. In fact, the SLC was forced to bring a formal motion pursuant to Rule 202 of the Texas Rules of Civil Procedure to compel Mr. McKim's attendance due to Mr. McKim's refusal to voluntarily cooperate with the SLC investigation.

[13]     In his Objection to Proof of Claim of Paul McKim, the Trustee states that "McKim facilitated the prosecution of the various Delaware suits for which he now seeks indemnification." (Main Case, Docket No. 769 at ¶ 11).

Trustee's Complaint.  Similarly, despite making allegations that DMT failed to comply with corporate formalities, McKim testified in his deposition, "I don't know what the formalities are." (McKim Dep., 92:5-9).  At his deposition, McKim's testimony "was long on hyperbole, short on verifiable facts, and generally inconsistent"; it was also "consistently self-serving, misleading, error prone, and generally unreliable and not credible."  (SLC Report, p. 27 and 29).  As a result, the SLC concluded that "[w]ith the exception of certain conduct of McKim, investigation has not revealed facts or circumstances warranting the initiation of a lawsuit to recover funds from any current or former director, officer or shareholder."  (SLC Report, p. 53).  Further, the SLC determined that due to a complete lack of verifiable "facts," McKim's Texas Action was "tactical, designed to extract a settlement with the Company."  (SLC Report, p. 74).

The Trustee argues that the SLC's conclusions do not "extinguish" the Trustee's claims. (Response, pp. 25-26).  Here, the Trustee is erecting a straw man.  Even if the Trustee has brought some "new" causes of action, they are based on the identical allegations that McKim and the FLI Plaintiffs made and which the SLC expressly discredited.[14]  Further, the Trustee has chosen to bring some of the exact same claims originally pursued by McKim and the FLI Plaintiffs and which were found to be without merit.  Specifically, the Trustee has alleged breach of fiduciary duties by Defendants, aiding and abetting breach of fiduciary duties by Defendants, shareholder oppression, fraud and fraudulent inducement, tortious interference, conspiracy, and unjust enrichment.  It is very persuasive evidence that the SLC determined that there is no merit to the claims that were birthed by a disgruntled Mr. McKim and the FLI Plaintiffs.  Under the

---

[14]     The FLI Plaintiffs have asserted that "[t]he Liquidating Trustee, on behalf of the Estate, has now filed a Complaint and Objection to Defendants' Proof of Claim against those 'former insiders' including Nasser Kazeminy and Otto Candies, Jr., asserting, inter alia, the same causes of action, based on the same facts, as those asserted by the FLI Plaintiffs in the Complaints filed in Delaware Chancery Court."  *See* Objection of FLI Deep Marine LLC, Bressner Partners, Ltd., Logan Langberg and Harley Langberg to Application of Greenberg Traurig, LLP For Allowance of Substantial Contribution Claim, Case No. 09-39313, Docket No. 634, ¶ 13.

Rule 11 standard, the Trustee is obligated to make reasonable inquiry before making allegations and claims.  He has not carried his burden by providing any evidence that he conducted a reasonable inquiry.  Much less he has not provided evidence to establish that he conducted a reasonably sufficient inquiry to re-urge these thread-bare claims in light of the investigation already concluded by the Debtor itself at the time the allegations were first made and while the Debtor was still a functioning entity.

The Trustee also claims that "the SLC Report never thought it pertinent to mention that Mr. Kazeminy had, for years, held *weekly* telephonic meetings with senior management where he demanded attendance."  (Response, p. 69).  First, the fact that Mr. Kazeminy had weekly telephonic meetings with management is irrelevant to the Trustee's Complaint.  Second, the SLC considered Mr. Kazeminy's attendance at these weekly telephone conferences and stated that "Nasser Kazeminy actively participates in the business and affairs of … DMT, but there is no evidence that Nasser Kazeminy dominates and controls DMT or uses DMT for his own personal financial gain."  (SLC Report, Appendix A, p. 11).  Further, the SLC determined that "[w]hile both Nasser Kazeminy and Otto Candies Jr. exercise considerable influence by virtue of the shareholder status of DCC Ventures and Otto Candies LLC, it is an overstatement to say that DMT is dominated and controlled by Nasser Kazeminy and Otto Candies LLC.  Rather, DMT is managed by its officers and directors, and is controlled by its Board."  (SLC Report, Appendix A, p. 12).

Perhaps the best example of the Trustee's mere closed-eyes repetition of McKim's claims that the Trustee knew were incorrect and at best failed to adequately investigate under Rule 11 is the Trustee's accusation that the Candies were self dealing when they had DMT enter the agreement with Candies LLC for the Diamond.  As noted by the Court in other Debtor-related

hearings prior to the date on which the Trustee filed the Complaint, at the time that agreement was entered, Candies owned no shares in DMT whatsoever.  The Trustee knew that fact when this Complaint was filed, and a quick review of the most basic documents would easily reveal that fact.

Another example of urging blatantly incorrect allegations that directly contradict the documents which the Trustee either reviewed or surely should have reviewed is the Trustee's allegation in Paragraph 141 of its Complaint that "Otto Candies, LLC and the Kazeminy Defendants expressed an intent to be partners in Deep Marine's business when they decided, among other things, to execute the Oversight Services Agreements …."  The Trustee and its attorneys know (or surely could have learned with the most basic investigation) that no Candies individual or entity ever executed any Oversight Services Agreement with the Debtor.  The Trustee desired only to urge these allegations to cast the Candies as the controlling shareholder of the Debtor.  It had no interest in investigating the facts under Rule 11 to verify whether the allegations are correct.

Finally, McKool Smith suggests that its investigation was adequate because "McKool Smith met with the Trustee on several occasions."  *Id.*  The Trustee, McKool Smith's client, also has <u>no</u> first-hand knowledge of any of these circumstances and had no involvement whatsoever with the Debtors in any way until <u>after</u> the bankruptcy was instituted.  The offending Complaint is based entirely on alleged pre-petition actions and omissions.  The Trustee even embellishes the fact that it met with its own client as part of this investigation to inflate its significance, repeating the statement three times in different ways, stating:

- McKool Smith met with the Trustee on several occasions
- McKool Smith exchanged drafts of the Trustee's Complaint prior to filing
- McKool Smith conducted several conferences with the Trustee on various issues

*Id.*  For McKool Smith to meet with the Trustee would yield *no* information useful in investigating the grave allegations they were about the make, but somehow they felt like meeting with him several times would make it better.

## CONCLUSION

The SLC conducted 24 interviews or depositions and reviewed thousands of documents received from both the Debtor and third-parties, including Defendants, as part of its independent and thorough investigation.  After conducting this extensive investigation, the SLC determined that Defendants were not guilty of any wrongdoing, but rather McKim was guilty of filing a "strike suit."  He had simply spread these bogus allegations around in an attempt to pressure the Kazeminy and Candies entities to have him bought out of the struggling company for millions of dollars.  Nevertheless, the Trustee recklessly chose to regurgitate the allegations.  As such, dismissal as well as monetary Rule 9011 sanctions are appropriate.

Dated:  October 13, 2010

THOMAS S. HENDERSON, Attorney At Law

By:_____
     Thomas S. Henderson (TBA No. 09432300)

South Tower, Pennzoil Place
711 Louisiana, Suite 3100
Houston, Texas 77002-2716
Telephone: (713) 227-9500
Facsimile:   (713) 620-3023

COUNSEL FOR THE MOVANTS

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that the foregoing pleading has been served on the attorneys for the Plaintiff, Hugh M. Ray, III and Paul D. Moak, McKool Smith, 600 Travis, Suite 7000, Houston, Texas 77002, by ECF filing on the 13th day of October, 2010.

_____
Thomas S. Henderson

P.2
DismX

NO. 2008-64385

| | | |
|---|---|---|
| PAUL MCKIM, Individually and Derivatively on behalf of Nominal Defendants Deep Marine Holdings Inc. and Deep Marine Technology Inc., | §<br>§<br>§<br>§<br>§ | IN THE DISTRICT COURT OF |
| | § | |
|      Plaintiff, | §<br>§ | HARRIS COUNTY, TEXAS |
| | § | |
| vs. | §<br>§ | 129th JUDICIAL DISTRICT |
| | § | |
| NASSER KAZEMINY,<br>OTTO CANDIES JR.,<br>JOHN HUDGENS,<br>DCC VENTURES LLC,<br>OTTO CANDIES LLC,<br>NJK HOLDING CORPORATION,<br>OTTO CANDIES III,<br>JOHN ELLINGBOE,<br>DANIEL ERICKSON,<br>LARRY LENIG JR.,<br>BRUCE C. GILMAN,<br>EUGENE DEPALMA, and<br>WADE ABADIE JR., | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | |
| | § | |
|      Defendants, | §<br>§ | |
| | § | |
| DEEP MARINE HOLDINGS INC.<br>and DEEP MARINE TECHNOLOGY INC., | §<br>§<br>§ | |
| | § | |
|      Nominal Defendants | §<br>§ | |

**F I L E D**
Loren Jackson
District Clerk

AUG 1 4 2009

Time: _8-14-09_
Harris County, Texas

By: _____
Deputy

## ORDER GRANTING THE AMENDED MOTION TO DISMISS

On this day, the Court considered the Amended Motion to Dismiss asserted by the Special Litigation Committee ("SLC") of the Board of Directors of Deep Marine Holdings Inc. ("DMH") and Deep Marine Technology Inc. ("DMT"), which was also joined by certain other Defendants. The Court also considered the Notice of Discontinuance asserted by Derivative Plaintiff Paul McKim which requests, in the alternative, that this Court approve the discontinuance of the derivative proceedings.

RECORDER'S MEMORANDUM:
This instrument is of poor quality
and not satisfactory for photographic
recordation and/or alterations were
present at the time of filming

EXHIBIT "A"

The Court FINDS that Derivative Plaintiff Paul McKim no longer has standing to pursue his claims derivatively on behalf of DMH and DMT because he is no longer a shareholder of DMH or DMT.  The Court also FINDS that the SLC lawfully assumed control of the derivative proceedings, and determined in good faith, after conducting a reasonable inquiry based on the factors the SLC considered appropriate under the circumstances, that the continuation of the action would be detrimental and not in the best interest of DMH and DMT.

Therefore, the Court hereby DENIES the Notice of Discontinuance and hereby GRANTS the Amended Motion to Dismiss.

The Court ORDERS that the derivative proceedings, and the claims asserted therein, brought on behalf of DMH and DMT by Derivative Plaintiff Paul McKim are hereby terminated and dismissed with prejudice.[1]  This Order does not dispose of Plaintiff Paul McKim's individual claims for wrongful discharge and quantum meruit against Defendant Nasser Kazeminy and Plaintiff Paul McKim's individual claim for tortious interference with existing contract against Defendant Otto Candies Jr.

The award of expenses in a derivative proceeding by a trial court is discretionary.  *Pace v. Jordan*, 999 S.W.2d 615, 625-26 (Tex.App.—Houston [1st Dist.], 1999).  The SLC, and certain other Defendants, have failed to provide this Court with legally sufficient evidence to support the claim that the derivative proceedings maintained by Derivative Plaintiff Paul McKim were without reasonable cause or for an improper purpose.

Therefore, the Court DENIES the request of the SLC, and certain other Defendants, for an award of expenses, pursuant to the Amended Motion to Dismiss.

Signed August 14, 2009.

Michael Gomez
Judge Presiding

---

[1] The Court finds the termination of the derivative proceedings pursuant to the Amended Motion to Dismiss to be an adjudication on the merits based on the Court's finding that the SLC lawfully assumed control of derivative proceedings, concluded its investigation, and as a result moved to dismiss.

EXHIBIT "A"