IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| **In re:** § | Chapter 11 | |
| § | Jointly Administered Under | |
| **DEEP MARINE HOLDINGS, INC. et al.,** § | Case No. 09-39313-H1-11 | |
| Debtors. § | | |
| § | | |
| **In re:** § | | |
| § | | |
| **DEEP MARINE TECHNOLOGY** § | Chapter 11 | |
| **INCORPORATED** § | Case No. 09-39314-H1-11 | |
| Debtors § | | |
| § | | |
| **John D. Bittner, Liquidating Trustee,** § | | |
| Plaintiff § | | |
| § | | |
| Vs. § | Adversary No. 10-3312 | |
| § | | |
| **Nasser Kazeminy, NJK Holding, Corp.,** § | | |
| **DCC Ventures, LLC, Otto B. Candies, Jr.,** § | | |
| **Otto B. Candies, III, Otto Candies, LLC,** § | | |
| **and Candies Shipbuilders, LLC,** § | | |
| Defendants § | | |
| § | | |
| and § | | |
| § | | |
| **Deep Marine Holdings, Inc. and** § | | |
| **Deep Marine Technologies, Inc.,** § | | |
| Nominal Defendants/Debtors § | | |

**<u>LIQUIDATING TRUSTEE'S BRIEF ON CLAIM NO. 13</u>**

TO THE HONORABLE MARVIN P. ISGUR, UNITED STATES BANKRUPTCY JUDGE:

      Plaintiff, John D. Bittner, in his capacity as Liquidating Trustee of the Deep Marine Liquidating Trust (the "<u>Liquidating Trustee</u>"), files this Brief on Claim No. 13, and would respectfully show the Court as follows:

Austin 63376v8                                               1

## SUMMARY

1.      The Trustee seeks to recharaterize the Otto Candies LLC's acquisition of a $17 Million loan 50 days before the bankruptcy as an "equity contribution". As explained in further detail below, the loan acquisition was the legal equivalent of a "loan" made to the Debtors to take out a lender after the Debtor had defaulted. Courts routinely and historically have construed these last-ditch emergency loans from equity insiders as equity contributions. While the original loan was from a bank, the extrinsic evidence and equitable considerations will demonstrate upon proof of the underlying facts that the loan should be characterized as an equity contribution for the reasons set forth herein, including:

   a.    The loan acquisition was functionally identical to a capital contribution and was subjectively intended as such.

   b.    After acquisition, Otto Candies did not act as a lender, but rather an investor by:

   1) Waiving all defaults;
   2) Collecting no interest;
   3) Collecting no principal;
   4) Paying more for the loan than the collateral was worth;
   5) Acquiring the loan with knowledge the Debtor could not pay it and was facing immediate bankruptcy;
   6) Waiving secured positions on $6.8 Million in collateral;
   7) Acquiring the loan when the only hope of repayment was through future operations and expanded business; and
   8) Acquiring the loan to control the bankruptcy and distributions from the estate.

   c.    Acting inequitably with regard to the Debtors in a self-dealing transaction subject to heightened scrutiny.

## INTRODUCTION

2.      On October 18, 2010, during the fee application hearing, the Court expressed concern in the underlying basis of the Liquidating Trustee's claim objection (the "<u>Objection</u>") to

Otto Candies, LLC ("Candies LLC") claim no. 13 in case no. 09-39314 (consolidated into the administration of case no. 09-39313) (the "Claim") contained in the Trustee's Original Complaint and Objections to Defendants' Proofs of Claim (the "Trustee Complaint"). Specifically, the Trustee objected to the Claim because it represented loans made by an insider for wrongful purposes while Deep Marine was undercapitalized and that the loans should be recharacterized as equity contributions. As is common in initial complaints, the Objection did not delve into detail nor fully brief or explain how the purchase of a third party's debt instrument could be characterized as an equity contribution.

3. To quickly summarize, 50 days before Deep Marine filed for bankruptcy, Candies LLC purchased $19.49 Million of promissory notes issued by Deep Marine Technology Incorporated ("DMT") secured by its Remote Operated Vehicles ("ROVs"). These loans form the basis of the Claim. That debt should be recharacterized as an equity investment, because Candies LLC considered this transaction as an equity investment, never expected to be repaid, and never acted as a reasonable creditor. In the alternative, Candies LLC's other inequitable behavior of controlling DMT and the other Deep Marine companies for the benefit of their joint venture warrants subordinating the Claim as well.

## FACTS SURROUNDING CLAIM NO. 13

4. As explained in the Trustee Complaint, between 2004 and 2008, the Debtors[1] were clearly insolvent. From 2006 forward, the Debtors struggled to meet their operational expenses and suffered from problems with cash flow. Accordingly, each of the Debtors, including DMT, was undercapitalized at this time, entering bankruptcy with less than $1,000.

---

[1] Deep Marine Holdings, Inc. ("DMH"); DMT; Deep Marine 1, LLC; Deep Marine 2, LLC; Deep Marine 3, LLC; and Deep Marine 4, LLC (collectively, the "Debtors").

They were unable to pay their bills in the ordinary course from (at least) 2006 until their eventual liquidation in bankruptcy.

5. During this time, various insiders, including Candies LLC, Candies Shipbuilders ("Shipbuilders"), NJK Holding ("NJK"), DCC Ventures ("DCC"), and Nasser Kazeminy ("Kazeminy") received various transfers of cash and accepted obligations from the Debtors without giving reasonably equivalent value. The transfers and obligations totaled millions of dollars. *See* Trustee Complaint, ¶¶ 24, 34, 36, 40. The Trustee challenges these transfers as voidable preferences, fraudulent transfers, and debt that should be subordinated or recharacterized under principles of equity.

6. During the years preceding the bankruptcy, there were undocumented or "emergency" cash transfers made to the company from insiders to fund operations. In at least one instance, DMT received $500,000 (and returned $500,000) to Candies LLC without any formal documentation. In other instances the Debtors were overcharged for seaman's wages and expenses by Candies LLC, which it did not pay for years. Why? Because the Debtors and Candies LLC had entered into a partnership years before for their common enterprise benefit. Specifically, Candies LLC would provide crews and the Debtors would provide vessels and each would benefit as partners from the profit. Extrinsic evidence of this partnership is demonstrated by, among other things, Candies LLC's willingness to allow crew charges to mount for years without collecting them and the occasional payments from the Debtors consisting of excess cash.

7. Moreover, DMT was known in the community as a company run by Otto Candies, III ("Candies"). The community and trade vendors looked to Candies for repayment of trade debt based on the partnership. Further, Candies held himself out as the man behind Deep Marine.

8. Defendants exercised control over the Debtors to the exclusion of minority shareholders. For years, once a week, the Debtors' executives would create special reports summarizing cash flows, pending work, collections, and current contracts. Candies and Kazeminy would attend a weekly meeting and ensure that the executives were present and obeying their instructions. The minority shareholders did not receive these reports, nor were they told of the weekly executive meetings.

9. The Candies Defendants apparently joined in the defense of the criminal allegations against Kazeminy. The FBI and other elements of the Department of Justice conducted an investigation of Kazeminy as a result of allegations that DMT illegally funneled $75,000 to the election campaign of a sitting United States senator. While no indictment was issued, the fact remains that the Debtors paid $75,000 for insurance brokerage services to a company that employed the wife of the United States senator. At this time, the Trustee has determined that the Debtors did not receive reasonably equivalent value for the transfer.

10. The Candies Defendants and the Kazeminy Defendants made repeated loans/contributions to the struggling Debtors. The Defendants knew that the Debtors were undercapitalized because they could not pay their chief operating expenses consisting of Candies LLC crew charges and debt service to Candies LLC for vessel acquisition. Defendants had inside information about the daily operations of the business and controlled those operations.

11. Also during this period of insolvency, direct oversight, and undercapitalization, DMT incurred an additional $19.5 Million in secured debt from National City Commercial Capital Company ("National City"). From July 2007 until August 2008, National City issued five promissory notes to DMT (the "Notes"). Generally, the Notes had amortized payment schedules including monthly payments over 72 months and a balloon payment of approximately

twenty percent (20%) due at the end of the term. Further, the Notes were secured by one of DMT's primary assets—the ROVs. Each Note was collateralized by a different ROV, as detailed below:

| Note[2] | Initial Value | Date Issued | Interest Rate | Collateral Securing |
|---|---|---|---|---|
| 5&6 | $5,000,000 | 7/10/2007 | 8.5% | XLS 5; XLS 6 |
| 22 | $2,086,314 | 10/15/2007 | 8.9% | XLS 22 |
| 36 | $3,890,650 | 12/12/2007 | 7.6% | XLS 36 |
| 54 | $4,344,812 | 7/1/2008 | 8.0% | XLS 54 |
| 37 | $4,169,892 | 10/1/2008 | 8.0% | XLS 37 |

12. Despite severe cash flow problems, DMT made payments on the Notes until DMT made its last payment on August 1, 2009. Thereafter, on October 15, 2009, through a series of five allonges to the Notes, Candies LLC purchased the Notes. The allonges do not set forth any consideration but refer to National City as the seller and to Candies LLC as the purchaser without recourse or warranty.

13. At the time that Candies LLC purchased the Notes, DMT had missed two payment dates and the loans had accumulated an unpaid interest balance of $186,608. From October 15, 2009 until December 3, 2009, DMT missed two additional payment dates and the loans accumulated an additional $457,207 in interest. On December 4, 2009, the Debtors filed for protection under chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code").

14. On June 1, 2010, this Court confirmed the Debtors' Joint Plan of Reorganization (the "Plan") (Case No. 09-93913, Docket No. 504), which liquidated the Debtors. The Plan became effective by its terms on July 9, 2010 (Docket No. 584). The Plan consolidated all of the

---

[2] These are not the actual identifiers of the Notes, but strictly shorthand for identification purposes.

Debtors' claims into a trust and appointed John D. Bittner as Liquidating Trustee. In fulfillment of his fiduciary duties, the Liquidating Trustee filed the Trustee Complaint, which included the Objection.

## AUTHORITIES

15. The Liquidating Trustee is challenging the Claim on two grounds. First, the Trustee believes that the Notes should be recharacterized as equity. Second, and in the alternative, the Notes should be subordinated to other unsecured creditor claims because of Candies LLC's inequitable conduct.

**I.   Recharacterization**

16. When deciding whether or not to allow a claim, a bankruptcy court retains the equitable power "to ignore the form of a transaction and give effect to its substance." *In re Fabricators, Inc.*, 926 F.2d 1458, 1469 (5th Cir. 1991). Recharacterization is a remedy that ensures "that substance will not give way to form, that technical considerations will not prevent substantial justice from being done." *In re SubMicron Sys. Corp.*, 432 F.3d 448, 455 (3d Cir. 2006) (citing *Pepper v. Litton*, 308 U.S. 295, 305 (1939)). "[T]he focus of the recharacterization inquiry is whether a debt actually exists." *Id.* (internal citations and quotations omitted). Underlying this doctrine is the idea that *de facto* equity interests should not receive the priority and benefits of debt.

17. While some courts have adopted multi-factor "tests," courts decide whether to recharacterize debt based on a case-by-case inquiry focusing on the actual *intent* of the parties. *In re SubMicron*, 432 F.3d at 456 (3d Cir. 2006) ("[T]he characterization as debt or equity is a court's attempt to discern whether the parties called an instrument one thing when in fact they intended it as something else."). The *SubMicron* court explains:

> No mechanistic scorecard suffices. And none should, for Kabuki outcomes elude difficult fact patterns. While some cases are easy (*e.g.,* a document titled a "Note" calling for payments of sums certain at fixed intervals with market-rate interest and these obligations are secured and are partly performed, versus a document issued as a certificate indicating a proportional interest in the enterprise to which the certificate relates), others are hard (such as a "Note" with conventional repayment terms yet reflecting an amount proportional to prior equity interests and whose payment terms are ignored). Which course a court discerns is typically a commonsense conclusion that the party infusing funds does so as a banker (the party expects to be repaid with interest no matter the borrower's fortunes; therefore, the funds are debt) or as an investor (the funds infused are repaid based on the borrower's fortunes; hence, they are equity). Form is no doubt a factor, but in the end it is no more than an indicator of what the parties actually intended and acted on.

*Id.* at 456. Thus, the Court should look to the parties' behavior to discern their intent.

18. Indicia that a "debt" is actually an equity investment includes:

   (a) Whether the investor subjectively believed the investment was debt or equity;

   (b) Whether no reasonable creditor would have acted in the same manner;

   (c) Whether the company was insolvent when the investment was made;

   (d) Whether the investor was paid interest;

   (e) Whether the investor received payments;

   (f) Whether the payments are dependent on earnings or some other source;

   (g) Whether company made payments to the investor when due.

*See In re Autostyle Plastics, Inc.,* 269 F.3d 726, 748-750 (6th Cir. 2001); *In re Hedged-Investments Associates, Inc.,* 380 F.3d 1292, 1297 (10th Cir. 2004) )citing *Stinnett's Pontiac Serv., Inc. v. Comm'r of the Internal Revenue,* 730 F.2d 634, 638 (11th Cir. 1984)).

## II. Equitable Subordination

19. Equitable subordination is a judicially-created doctrine developed as "a policy against fraud and the breach of the duties imposed on a fiduciary of the bankrupt." *In re Fabricators*, 926 F.2d at 1464. At core, if a creditor engages in egregious behavior and that behavior impairs other creditors' rights, then a court will subordinate the creditor's debt in

bankruptcy. The Fifth Circuit has enunciated a three-prong test for equitable subordination: (a) the claimant must have engaged in some type of inequitable conduct; (b) the misconduct must have resulted in injury to the creditors or conferred an unfair advantage on the claimant; and (c) equitable subordination of the claim must not be inconsistent with the provisions of the Bankruptcy Code. *Id.* at 1464-65.

20. Courts have generally recognized three forms of inequitable conduct: (a) fraud, illegality, and breach of fiduciary duties; (b) undercapitalization; or (c) claimant's use of a debtor as a mere instrumentality or alter ego. *Id.* at 1467. Further, the claimant's misconduct "need not relate directly to the acquisition or assertion of its claim." *Id.* Instead, the court may use equitable subordination to combat inequity however the inequity arises. Additionally, the conduct of insider claimants, like Candies LLC, "is to be rigorously scrutinized by the courts." *Id.* at 1465. This is because insider creditors have greater opportunities for inequitable conduct. *Id.* Unlike with independent creditors, the inequitable conduct of insiders need not be "egregious," but simply actions in breach of fiduciary duty or in bad faith. *Id.*

## ANALYSIS

### I. Recharacterization

21. As the *SubMicron* court stated, the recharacterization analysis focuses on the economic reality of a transaction and the behavior of the parties to determine whether to characterize an investment as either debt or equity. *In re SubMicron*, 432 F.3d at 456. The evidence shows that Candies LLC purchased the Notes as a *de facto* equity contribution; it never expected to be paid on the Notes. This is by its objective behavior and the subjective intent of its corporate officers.

### A. Objectively, Candies LLC Never Acted Like A Creditor.

22. DMT was inadequately capitalized. "Thin or inadequate capitalization is strong evidence that the advances are capital contributions rather than loans." *In re Autostyle*, 269 F.3d at 751. DMT was inadequately capitalized when Candies LLC purchased the Notes. Further, DMT was also inadequately capitalized when National City initially made the Notes. This weighs in favor of characterizing the Notes as equity.

23. No reasonable creditor would have purchased the Notes from National City when they knew the Debtor was insolvent, with little cash flow or capital, and the Notes exceeded the collateral value (unless doing so for ulterior motives). "[T]he fact that no reasonable creditor would have acted in the same manner is strong evidence that the advances were capital contributions rather than loans." *In re Autostyle*, 269 F.3d at 752. When Candies LLC first purchased the Notes on October 15, 2009, the Notes were already undersecured. For example, Note 37 and Note 54 had a collective balance of $7.84 million, but XLS 37 and XLS 54 were only worth $6.5 million. *See* Claim, p. 2; Statement of Financial Analysis ("SOFA"), Schedule 2 (Case No. 09-39313, Docket No. 93). Similarly, Note 5&6 and Note 36 were collectively valued at $7.3 million. *See* Claim, p. 2. However, the collateral was only worth $6.4 million. *See* Debtor's Notice of Auction Results ("Auction"), p. 1.

| Notes[3] | Balance as of 10/15/2009 | Collateral Sales Price | Deficiency |
|---|---|---|---|
| 5&6, 36 | $7,840,498.95 | $6,400,000 | ($913,387.79) |
| 37, 54 | $7,313,387.79 | $6,500,000 | ($1,340,498.95) |
| 22 | $1,769,964.22 | $2,150,000[4] | $380,035.78 |
| **TOTAL:** | **$16,923,850.96** | **$15,050,000** | **($1,873,850.96)** |

Thus, Candies LLC began its investment undersecured. Further, as Candies LLC was well aware, DMT's perilous financial state meant that Candies LLC stood zero chance of receiving the balance in cash payments, let alone receiving interest payments as a creditor would expect. Thus, Candies LLC effectively invested $16.9 Million for rights to $15 Million in collateral. This is objectively unreasonable and weighs in favor of characterizing the Notes as equity.

24.   <u>No reasonable creditor would have permitted DMT to sell the collateral free and clear</u>. Candies LLC allowed DMT to sell its collateral without complaint, objection, or compensation. DMT sold XLS 37 and XLS 54 to Candies LLC free and clear in October 2009 for $6.5 Million. *See* SOFA, Schedule 2. None of those proceeds were spent settling Note 37 or Note 54. *See* SOFA, Schedule 3b. Furthermore, Candies LLC did not receive any replacement security interest in either the $6.5 Million as proceeds (as the Notes allowed) or other collateral. Effectively, Candies LLC simply gave away its security interest in XLS 37 and XLS 54. The existence of security weighs in favor of characterizing the investment as debt. *In re Autostyle*,

---

[3]   Unfortunately, the Notice of Auction results only lists the sales prices of ROVs collectively. It does not break the valuation into individual units. The table groups the loans to provide a proper comparison of value versus liability.

[4]   Estimated. The Auction sold XLS 21 and XLS 22 together for $4,300,000. The Trust has allocated the proceeds pro-rata, but the issue remains subject to dispute.

269 F.3d at 752. Conversely, voluntarily relinquishing the security interest without compensation must weigh against considering the investment as debt.

25. <u>Payments could only come from earnings</u>. "[I]f repayment is possible only out of corporate earnings, the transaction has the appearance of a contribution of equity capital[.]" *Estate of Mixon v. United States*, 464 F.2d 394, 405 (5th Cir. 1972). The only way that DMT could make payments on the Notes was through corporate earnings. This weighs in favor of characterizing the Notes as equity.

26. <u>Candies LLC never demanded interest</u>. "The absence of . . . interest payments is a strong indication that the advances were capital contributions rather than loans." *In re Autostyle*, 269 F.3d at 750. Candies LLC never received any interest payments. It refused to demand payment from DMT for November 1 and December 1 and never demanded payments for past due amounts for September 1 and October 1. These missed payments represented $643,816.19 in lost interest. Deferral of interest may suggest an equity contribution if the investor never expects to be repaid. *Id.* at 751.

27. <u>No reasonable creditor would have allowed its collateral to sit in bankruptcy</u>. After the Debtors filed for bankruptcy, Candies LLC never moved to lift the stay to repossess its collateral. *See* 11 U.S.C. § 362(d)(2). It was fairly clear early in the chapter 11 proceedings that the bankruptcy would involve a chapter 11 liquidation. At that point, a reasonable undersecured creditor would have wanted to take its collateral and sell it quickly. Candies LLC did not, instead seeking plan confirmation advantage to squeeze the unsecured creditors whom it had defrauded. This weighs in favor of characterizing the Notes as equity.

28. <u>Candies LLC ignored the formal debt document</u>. Formal debt instruments defining the contractual obligation are evidence that the instrument should be characterized as

debt. *In re Autostyle*, 269 F.3d at 750-752.  Nonetheless, Candies LLC completely ignored the terms of the Notes and never attempted to enforce its rights.  *Stinnett's*, 730 F.2d at 640 (stating that a failure to make payments weighs in favor of characterizing it as a capital contribution). Candies LLC refused to demand payment for November 1 and December 1.  Further, it never demanded payments for past due amounts for September 1 and October 1.  Because DMT and Candies LLC acted as if the document did not exist, it effectively did not exist and the investment was subject to no formalities.  This weighs in favor of characterizing the Notes as equity.

### B. Subjectively, Candies LLC Believed Its Investment Was Equity.

29. Where "the objective facts of the case are ambiguous and do not result in a clear manifestation of objective intent, then subjective intent is relevant on the issue."  *Estate of Mixon*, 464 F.2d at 407 (discussing recharacterization in a tax context).  On January 12, 2010, on the 70th floor of Chase Tower at 600 Travis Street, Houston, Texas there was a meeting of Hugh Ray, Jr., Hugh Ray, III, Paul Moak, Carl Zimmerman (representing Candies LLC), Robert Weinstine (representing Kazeminy), and K. B. Battaglini.  At this meeting, counsel repeatedly described the acquisition of the Notes before bankruptcy as an "equity infusion" and that neither Kazeminy nor Candies LLC expected to recover the Notes as debt but instead intended to recover their investment through their equity position.[5]

30. Upon information and belief, there is additional evidence within the control of Candies LLC or Kazeminy that demonstrates that both parties considered the purchase of the Notes as an equity contribution and that neither party expected to be repaid.

---

[5] While this settlement conference is not admissible for liability under FRE 408, it does prove that counsel has not violated Fed. R. Bankr. P. 9011 in making the allegation.

Austin 63376v8                    13

### C. Candies LLC's "Debt Investment" Functioned As Effective Equity Contributions.

31. Candies LLC clearly did not behave as a standard or reasonable creditor. Instead, its behavior is most understandable as an equity investor. By purchasing the Notes, Candies LLC made effective equity contributions. First, by purchasing the debt, DMT did not need to make payments on the Notes to prevent foreclosure on the critical ROV units. Staving off foreclosure would require additional financing of $643,816.19, which could only have come from additional capital contributions. Second, by allowing DMT to sell XLS 37 and XLS 54 free and clear, Candies LLC effectively gave DMT $6.5 Million in additional funds. This represented a *de facto* equity contribution of $7.14 Million.

32. Thus, Candies LLC subjectively believed and objectively behaved as if the Notes were an equity investment. The only time Candies LLC ever acted like a reasonable creditor is when it filed its claim during the bankruptcy. Otherwise, it treated the Notes as an equity investment. Further, the Notes acted as an equity investment.

## II. Equitable Subordination

33. Candies LLC committed several acts that justify equitable subordination of its interests. To reiterate the rule: Candies LLC has (a) committed inequitable conduct that (b) hurt other creditors, and (c) subordinating the debt other unsecured creditors will not violate the Bankruptcy Code. *In re Fabricators*, 926 F.2d at 1465. As an initial matter, there is nothing to suggest that subordinating Candies LLC's claims to the unsecured creditors would violate the Bankruptcy Code. Therefore, the third prong of the test is met.

34. Because Candies LLC had a controlling interest in DMT's parent company (DMH), Candies LLC's conduct is subject to "rigorous scrutiny." *In re Fabricators*, 926 F.2d at 1465. Further, Candies LLC's conduct does not need to be "egregious."

35. First, Candies LLC acted in bad faith by controlling the Debtors and undercapitalizing them, exercising improper control and dominating the board (among the other bad acts raised above and in the Trustee Complaint). When Candies LLC relinquished its security interest in the ROV's XLS 54 and XLS 37 without receiving any compensation or other security interest, it was not acting as any "lender". As explained above, selling the ROVs free and clear gave DMT an infusion of $6.5 Million in cash, which benefited Candies LLC equity. However, because Candies LLC received an unsecured claim for the equity contribution, Candies LLC's actions unfairly diluted the claims of unsecured creditors. Effectively, Candies LLC forced the unsecured creditors to invest in DMT. Further, by creating an additional unsecured claim, Candies LLC potentially secured a position of influence over the reorganization process. *Citicorp Venture Capital, Ltd. v. Comm. of Creditors Holding*, 160 F.3d 982, 989 (3d Cir. 1998) (finding vote influencing grounds for equitable subordination even if the bad actor never voted the shares).

36. Second, by purchasing the Notes, Candies LLC delayed DMT's bankruptcy by several weeks while benefiting insiders. National City, like any reasonable creditor, surely would have foreclosed on the collateral and forced DMT into bankruptcy. Instead, Candies LLC purchased the debt and refused to foreclose. By October 15, 2009, bankruptcy was inevitable, but the Notes continued to accrue $457,207.72 interest to the benefit of an insider. Further, another insider, John Hudgens, received an $80,000 "bonus/reimbursement" three days before the Petition Date. This also reduced the funds available to the unsecured creditors. Additionally, DMT continued to burn through cash, which further reduced the funds available to unsecured creditors. Finally, by the Petition Date, the Debtors lacked the cash necessary to retrieve all of its assets (i.e. docking fees, customs fees, and fuel). This impacted events even after bankruptcy.

Without cash, reorganizing the estate was impossible and resulted in a chapter 11 liquidation. A successful reorganization would have afforded the unsecured creditors a bigger payout.

37. Third, Candies LLC deliberately manipulated the bankruptcy process by influencing the composition of the unsecured creditors committee (the "Committee"). After October 15, 2009, DMT settled unsecured claims just before the Petition Date using the $6.5 Million of proceeds from the free and clear sale of the Notes' collateral. This altered the likely composition of the Committee. For example, Perry Slingsby received $534,000 after October 15, 2009. An unsecured claim of $534,000 would have made it the fifth largest independent unsecured creditor. Further, given its expertise in the underwater robot field, there was a great likelihood that Perry Slingsby would have been chosen for the Committee. Instead, through Candies LLC's actions, Perry Slingsby was not on the Committee. Similarly, Seagull Marine's claim was reduced by $327,000. This would have made Seagull Marine the sixth largest independent unsecured creditor. Further, both claims are likely recoverable as a voidable preference, which means that Candies LLC denied them their voting rights even though they are some of the largest independent creditors of the Debtors. By altering the size of the claims, Candies LLC manipulated the bankruptcy process to facilitate its own ends that were in direct opposition to the unsecured creditors. *In re Allegheny Intern., Inc.*, 118 B.R. 282, 299-300 (Bankr. W.D. Pa. 1990) (granting equitable relief where a creditor manipulated the bankruptcy process).

38. Finally, as explained in great detail in the Trustee's Complaint, Candies LLC and Kazeminy misused their control over the Debtors for years while the company was insolvent. Beginning in December 2005, DMT made several transfers to Candies LLC amounting to millions of dollars without receiving reasonably equivalent value. This disadvantaged unsecured

creditors two-fold. First, it impacted DMT's cash flow so significantly that it made DMT's bankruptcy inevitable. Second, it reduced the amount of available assets for distribution to unsecured creditors. While these inequitable acts are not directly related to Candies LLC's purchase of the Notes, "[i]mproper acts unconnected with the acquisition or assertion of a particular claim have frequently formed at least a part of the basis for the subordination of that claim." *In re Mobile Steel Co.*, 563 F.2d 692, 700-01 (5th Cir. 1977) *accord In re Fabricators*, 926 F.2d at 1467.

## CONCLUSION

39. As to recharacterization, Candies LLC subjectively believed that and objectively behaved as if the Notes were an equity contribution. It never collected a single payment on the Notes, refused to exercise its rights under the Notes, and made decisions that no reasonable creditor would by making the investment while DMT was clearly insolvent and allowing DMT to sell its collateral without compensation.

40. As to equitable subordination, Candies LLC misused DMT and all the Debtors through avoidable insider transfers, improperly used the Debtors and dominated them, and acted in other inequitable ways that reduced the overall availability of assets to unsecured creditors. This warrants equitable subordination of the Notes to the other unsecured creditors.

DATED: November 23, 2010.

Respectfully submitted,

**MCKOOL SMITH P.C.**

By:  */s/ Hugh M. Ray, III*
     HUGH M. RAY, III
     State Bar No. 24004246
     MARK L. MATHIE
     State Bar No. 13191550
     600 Travis, Suite 7000
     Houston, Texas 77002
     Telephone: (713) 485-7300
     Facsimile: (713) 485-7344

ATTORNEYS FOR LIQUIDATING TRUSTEE

## CERTIFICATE OF SERVICE

I hereby certify that on November 23, 2010, a true and correct copy of the foregoing document has been served via DLR 5.1 and the ECF system, to the parties on the ECF service list.

     */s/ Nicholas Zugaro*
     NICHOLAS ZUGARO