## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| In re: | § | (Chapter 11) |
| | § | Jointly Administered Under |
| DEEP MARINE HOLDINGS, INC. et al. | § | Case No. 09-39313-H1-11 |
|     Debtors | § | |

| | | |
|---|---|---|
| John D. Bittner, Liquidating Trustee | § | |
| | § | |
|     Plaintiff, | § | |
| | § | |
|     v. | § | Adv. Proc. No. 10-3312 |
| | § | |
| Nasser Kazeminy, | § | |
| NJK Holding, Corp., | § | |
| DCC Ventures, LLC, | § | |
| Otto B. Candies, Jr., | § | |
| Otto B. Candies, III, | § | |
| Otto Candies, LLC, and | § | |
| Candies Shipbuilders, LLC | § | |
| | § | |
|     Defendants, | § | |
| | § | |
|     and | § | |
| | § | |
| Deep Marine Holdings, Inc. and | § | |
| Deep Marine Technologies, Inc., | § | |
| | § | |
|     Nominal Defendants/Debtors. | § | |

## TRUSTEE'S RESPONSE TO THE SECOND MOTION OF DEFENDANTS TO DISMISS COMPLAINT AND/OR STRIKE PLEADINGS AS SANCTION FOR VIOLATION OF FED. R. BANKR. P. 9011 AND FOR IMPOSITION OF MONETARY SANCTIONS AND MOTION TO STRIKE

(Relates to Docket #55)

## <u>TABLE OF CONTENTS</u>

I.   RESPONSE TO THE COURT'S REQUEST FOR BRIEFING ...................................... 1

    A.   The conclusions of the SLC (and its counsel) do not forever bind DMH; the debtors can "change their minds" or disagree with the conclusions of counsel ................................................ 3

    B.   The SLC Report Would Likely be Inadmissible if Defendants Attempt to Use it at Trial .................................................. 6

II.  BACKGROUND UNDERLYING THE MOTION ......................................... 10

    A.   Incorporation of the Trustee's Prior Objection .................................... 10

    B.   The SLC and its Counsel's Lack of Independence ............................. 10

        1.   The SLC's lack of independence .................................... 10

        2.   Greenberg Traurig's lack of independence. ............................. 11

    C.   Four Board Members Immediately Resign ............................................ 12

    D.   The Texas and Delaware Actions and the Subsequent Short-Form Merger .............................................................. 13

    E.   The SLC Report ......................................................... 14

    F.   Defendants Seek Dismissal of the Texas Action ................................. 15

    G.   The Delaware Action is Re-filed ..................................................... 16

    H.   Deep Marine's Bankruptcy ........................................................ 17

    I.   The Joint Plan of Reorganization ................................................. 17

    J.   The Trustee's Investigation and Complaint .......................................... 18

III. PROCEDURAL HISTORY ................................................................. 19

    A.   Defendants' First Rule 11 Motion ................................................. 19

    B.   Defendants' Second Rule 11 Motion ............................................... 19

    C.   Defendants' Long History of Making Threats Against Opposing Counsel ..................................................... 20

        1.   Defendants made threats and sanctions allegations in the Delaware action........................................... 20

i

2.    Defendants made threats and sanctions allegations in the Texas state court action. ............................................... 20

IV.    LEGAL STANDARDS ....................................................................... 20

V.    ARGUMENT ....................................................................................... 22

A.    The Trustee Conducted a Reasonable Investigation Before Filing the Complaint ................................................................... 22

B.    There is a Sufficient Basis for the Claims in the Complaint. ............................. 22

1.    Defendants Do Not Even Attempt to Address the Overwhelming Majority of the Complaint ............................. 22

2.    The Complaint, including the paragraphs which are mentioned by Defendants, is supported by overwhelming evidence. ............................................... 23

C.    The SLC Report Does Not Absolve Defendants of their Wrongful Conduct ......................................................................... 30

1.    The SLC Report did not legally adjudicate a single fact at issue in the Trustee's Complaint. .............................. 30

2.    The SLC and Greenberg Traurig were neither independent nor disinterested. ............................................... 32

3.    The SLC Report is biased on its face. ..................................... 33

4.    The SLC Report fails to address the Defendants' Control of Deep Marine. ...................................................... 33

5.    The SLC's Counsel's Investigation was Incomplete. .............................. 34

a)    Greenberg Traurig failed to interview important witnesses. ................................................... 34

b)    Greenberg Traurig failed to review important documents. .................................................. 34

D.    The Trustee Did Not File the Complaint for an Improper Purpose ................................................................................ 35

VI.    MOTION TO STRIKE ....................................................................... 36

VII.    CONCLUSION ................................................................................... 38

ii

TO THE HONORABLE MARVIN ISGUR, UNITED STATES BANKRUPTCY JUDGE:

John D. Bittner, Liquidating Trustee ("Trustee"), by and through his attorneys of record, files his Response to the *Second Motion of Defendants to Dismiss Complaint and/or Strike Pleadings as Sanctions for Violation of FED. R. BANKR. P. 9011 and for Imposition of Monetary Sanctions* ("Motion"), as follows:

## I.     RESPONSE TO THE COURT'S REQUEST FOR BRIEFING

1.     In the Trustee's prior Response[1] to Defendants' first Rule 11 Motion,[2] the Trustee fully briefed the issues raised by Defendants in this second Motion.  There, the Trustee showed that the conclusions of counsel within the SLC Report do not prohibit him from bringing this adversary proceeding.  The Court dismissed Defendants' first Rule 11 Motion because Defendants' failed to comply with safe-harbor procedures of Rule 9011.

2.     Defendants' current Motion is identical to the earlier motion except for the addition of one sentence repeated twice in the brief.[3]  In that sentence, Defendants' contend that "the Board's decision not to bring the Related Claims is entitled to business judgment rule deference. *See Zapata v. Maldonado*, 430 A.2d 779, 784 (Del. 1981)."[4]  Defendants' reliance on *Zapata* is misplaced.  *Zapata* holds that a Court gives deference to an independent committee's recommendation not to pursue a shareholder-derivative suit.  430 A.2d at 784.  The deference is given by courts, not corporations.  The business judgment rule does not apply to the Trustee's decision to pursue claims of wrongdoing against Defendants.  The business judgment rule is a

---

[1] Docket No. 38.

[2] Docket No. 18.

[3] Motion at ¶¶ 13 & 34.

[4] *Id.*.

defense to a refusal to prosecute an action.  *Zapata* has no bearing whatsoever on this adversary proceeding where claims are made by the Debtors themselves.

3.      Thus, to save paper and time, the Trustee adopts and incorporates by reference his previous response and all exhibits attached thereto (Docket No. 38) as though set forth here in full.

4.      In dismissing Defendants' first motion, the Court asked the parties to address two specific issues when the Rule 11 Motion was re-presented, which the Trustee addresses first:

> a) Assuming the report of an independent counsel hired by an independent litigation committee were adopted by the Debtors,[5] can they "change their minds", or are they somehow bound by the report?[6]  The answer is unequivocally "yes, corporations change their minds all the time."  The report did not restrict the Debtors in any manner, and it does not purport to do so.  The law does not place any particular restriction on the Debtors to bind them to the SLC's[7] counsel's report.  No law has been cited to this Court to the contrary.

> b) Would the SLC's counsel's report even be admissible at trial?[8] Currently, this issue must remain unresolved until trial.   With insufficient evidence that the Debtors unambiguously manifested a belief the report was a true statement, it will be for the proponent to establish the admissibility of the report, both as to hearsay and legal relevance.  Defendants cite no evidence that the Debtors collectively, or any one of them, unambiguously adopted the SLC report,

---

[5] The Debtors are Deep Marine Holdings, Inc. ("DMH"), Deep Marine Technology Incorporated ("DMT"), Deep Marine 1, LLC ("DM1"), Deep Marine 2, LLC ("DM2"), Deep Marine 3, LLC ("DM3"), and Deep Marine 4, LLC ("DM4").  For convenience, the Debtors may be referred to collectively as "Deep Marine."

[6] "I frankly don't see any reason why the independent board, now substituted by Mr. Bittner, can't just change its mind."  In other words, I don't think that the claim gets killed by this "independence effect."  The independence effect controls: if it was independent, only the company could bring it, and that's basically the lower court ruling so far. Well, I shouldn't call them "lower courts".  The "non-federal court" rulings so far is that based on the independent's requirements, that the individuals wouldn't be allowed to bring the claims.  But I don't see why that would restrict Mr. Bittner and I don't see why he's bound by this.  That's sort of my first question."  October 18, 2010, hearing transcript at p. 12.

[7] DMH formed a special litigation committee ("SLC") to investigate a shareholder's derivative demand.

[8] "Second question is: Whether the independent report is now a statement of the party bringing the claim? . . . . And I find it a fascinating academic question to figure out when you then mix independent's in with that and say, "We want you to hire somebody independent to look into it"; is that independent group because it's "independent," by definition, not an agent of the company or is it an agent of the company?  I don't know.  And I don't know that I've been -- well, I do know that I haven't been able to find any law on it but I don't have as many people working for me as you all have working for you."  October 18, 2010, hearing transcript at p. 13.

2

or that the SLC's counsel was an agent speaking within the scope of authority on behalf of the Debtors.

5.      Defendants have not addressed these threshold questions in any way.

**A.      The conclusions of the SLC (and its counsel) do not forever bind DMH; the debtors can "change their minds" or disagree with the conclusions of counsel.**

6.      The SLC employed its own counsel who generated a report.  The SLC repeatedly claimed to be independent.  Accordingly, the SLC's counsel's report is not the statement of DMH unless it was adopted.  The DMH subsidiaries, DMT, DM1, DM2, DM3, and DM4 are not alleged to have adopted the report of the SLC's counsel.  All of the boards of directors of each entity resigned and were replaced by the Trustee before he filed this adversary proceeding.  The basis of the Defendants' present Rule 9011 Motion is that the conclusions of counsel within the report provided to the SLC somehow prevents the Trustee from bringing suit.

7.      Even if each of the Debtors had agreed with some of the conclusions within the SLC's counsel's report, it would not bind them.  A corporation is, unless restricted by law, considered a legal person, capable of making decisions and changing them.  Thus "*corporations can change their minds* as to how they choose to structure fundamental transactions, even in mid-stream".  *Gesoff v. IIC Indus.*, 902 A.2d 1130, 1150 (Del. Ch. 2006) (emphasis added). Corporations are no less able to reverse bad decisions than human beings.  The Coca-Cola Company proudly announced that it would be forever producing "new Coke" and cease production of "old Coke".  Shortly thereafter, it changed its mind.  Corporations, being legal persons, reverse their policies and positions often.

8.      A company's board of directors makes decisions regarding the company, including whether or not to pursue litigation.[9]  The only constraint on the board's decision-

---

[9] *Burks v. Lasker*, 441 U.S. 471, 487 (1979) (Stewart, J. concurring) ("The business decisions of a corporation are

3

making is the company's charter (articles of incorporation), bylaws, and the law.[10]   When, as here, the charter states that the company may engage in any lawful business practices, the board of directors has unfettered discretion to change policy.   It is the current board of directors that decides which business opportunities to pursue and when and why.   The decisions of past boards of directors are not binding on their replacements.   While previous boards can set a company on a course of action, a future board can always reverse course.   The present board can breach contracts, cancel programs, fire management, and overhaul the company.   The only way that a past board of directors can bind a future board of directors is by modifying the corporate bylaws, charter, or laws.   Otherwise, it is the current board of directors, not the past board, that governs business policy.[11]

     9.     Not only do corporations regularly modify their positions, corporate law supports and protects these changes.   Corporate law encourages actions by shareholders to remove intransigent boards of directors and replace them.[12]   Indeed, shareholder activism and hostile

---

normally entrusted to its board of directors.  A decision whether or not a corporation will sue an alleged wrongdoer is no different from any other corporate decision to be made in the collective discretion of the disinterested directors.").

[10] Del. Code Ann. tit. 8 ("DGCL"), § 141(a) ("The business and affairs of every corporation organized under this chapter shall be managed by or under the direction of a board of directors, except as may be otherwise provided in this chapter or in its certificate of incorporation.").

[11] Similarly, previous corporate committees cannot bind present boards.  Under standard corporate law, committees can always be reversed by boards because board retain the ultimately authority with regards to company decisions. DGCL § 141(a); *see e.g. Redmond v. Burlington N. R. Co. Pension Plan,* 821 F.2d 461, 469 (8th Cir. 1987) (board of directors reversed pension subcommittee).

12 *See First Nat'l Bank of Boston v. Bellotti*, 435 U.S. 765, 794-95 (1978) ("Ultimately shareholders may decide, through the procedures of corporate democracy, whether their corporation should engage in debate on public issues. Acting through their power to elect the board of directors or to insist upon protective provisions in the corporation's charter, shareholders normally are presumed competent to protect their own interests."); *Aronson v. Lewis*, 473 A.2d 805, 811 (Del. 1984) ("Moreover, a stockholder is not powerless to challenge director action which results in harm to the corporation. The machinery of corporate democracy and the derivative suit are potent tools to redress the conduct of a torpid or unfaithful management."); *Unocal Corp. v. Mesa Petroleum Co.*, 493 A.2d 946, 959 (Del. 1985) ("If the stockholders are displeased with the action of their elected representatives, the powers of corporate democracy are at their disposal to turn the board out.").

takeovers exist because boards of directors *make wrong decisions* and undervalue assets. When a company mis-values a business opportunity or asset, the company's owners can replace the board and *force* the company to reverse position.

10. Here, the SLC and their counsel reached conclusions about litigation.[13] The SLC calculated that the causes of action against the Kazeminy parties were not viable and would not produce assets for the company. But that was the old corporate leadership. Because of the bankruptcy there is effectively a new "board of directors."[14] The true owners of the company, the unsecured creditors, believe that the causes of action against the Kazeminy parties are viable and will increase the estate's assets. The creditors' evaluation is entitled to the same business judgment deference as the previous board of director's evaluation.

11. Finally, and most importantly, the SLC report had nothing to do with the bulk of the Trustee's claims in this adversary proceeding. The report did not impact any of the primary claims for relief in the Complaint, such as the claim objections[15], fraudulent transfer[16], preferential transfer[17], recharacterization[18], equitable subordination[19], partnership liability[20],

---

[13] The SLC is not entitled to any special deference either simply because it is a "special litigation committee." First, the board of directors can always overrule a subcommittee generally. Second, more specifically as to special litigation committees, a board should intentionally disregard their conclusions when based on erroneous facts or there is evidence of bias.

[14] Also, during the bankruptcy case the boards all resigned, placing John Bittner as the sole control person pursuant to this Court's order.

[15] Pages 37-57 of the Complaint.

[16] Count 1 of the Complaint.

[17] Count 2 of the Complaint.

[18] Count 3 of the Complaint.

[19] Count 4 of the Complaint.

[20] Count 16 of the Complaint.

conversion[21] or conspiracy.[22].   The counsel's report never discussed breach of duty in an insolvency context.  It did not address these issues because those issues were not before the SLC and the SLC did not ask its counsel for an opinion on them.  Thus, the report is not binding on the Trustee bringing the present adversary proceeding.

**B.     The SLC Report Would Likely be Inadmissible if Defendants Attempt to Use it at Trial.**

12.     During the October 18, 2010 hearing, the Court raised the issue of whether the SLC's counsel's report would be admissible at trial.[23]  As shown below, if the Court were to admit the SLC's counsel's conclusions as evidence at trial, the Trustee can contest admission.  It is doubtful that the SLC's counsel's report would be admissible should the Defendants attempt to introduce it at trial.  Any firm conclusion on the admissibility is best reserved for trial after both sides have an opportunity to discover facts underlying relevance and hearsay exceptions.

13.     The SLC's counsel's report is hearsay for the issues to be tried[24] because it is not a statement by the Debtors and would be introduced for the truth of the matter asserted.  The SLC claimed to have been acting independently and to have hired independent counsel to issue an independent report.  If this is true, then the report is not a statement of the Debtors.  Accordingly, the Trustee will assume for purposes of this response that the SLC's counsel's report is a third-party statement.  To be admitted, the statement would have to be "adopted" by

---

[21] Count 14 of the Complaint.

[22] Count 15 of the Complaint.

[23] Transcript at p. 12.

[24] The Court noted that the report is important for Rule 11 purposes because it allegedly shows "notice".  However, the issue of probative value and hearsay at trial is unresolved.  The report would be hearsay in a Rule 11 context if it is offered to show the truth of the matter asserted, namely, that Candies and Kazeminy did not loot the company of millions of dollars by self-dealing transactions that were not in the best interests of the company .

Dallas 314252v8

DMT or perhaps DMH, or some of the other Debtors.  Fed. R. Ev. 801(d)(2)(B).[25]

14.     The conclusions of the SLC's counsel, like most "independent reports" will be considered third party hearsay unless adopted.  *See In re Fibermark, Inc*, 339 B.R. 321, 327 (Bankr. D. Vt. 2006) (finding that the report prepared by an independent examiner appointed by the bankruptcy court was hearsay and finding that if the parties seeking admission of the report wished to prove the accuracy of its conclusions, they had to do so with admissible evidence); *Rickel & Assocs. Inc. v. Smith (In re Rickel & Assocs.)*, 272 B.R. 74, 81 (Bankr. S.D.N.Y. 2002) (finding examiner's report to be hearsay).  In *Rickel*, the court held that attaching a report clearly indicated a report had been created, but it did not make the facts in the report true and reliable.[26]

15.     Fed. R. Ev. 801(d)(2)(B) excludes from hearsay third-party statements in which an opposing party has "has manifested an adoption or belief in its truth."  The adoption must demonstrate the party "<u>unambiguously assented to those statements.</u>"  *United States v Coppola* 526 F.2d 764 (10th Cir. 1975) (emphasis added).[27].

16.     This manifestation of belief requires a clear affirmation of the contents as true, not merely the possession and ownership of the report.  *See United States v. Jefferson*, 925 F.2d 1242

---

[25] There is no allegation that the allegedly independent SLC was authorized to make their counsel's report a statement "on behalf of" the Debtors.  Such a claim would be absurd and would destroy the claim that the SLC is independent.  Thus, this response does not address the potential argument, not made, that the SLC was authorized to speak on behalf of the Debtors.  To the contrary, the SLC was limited in its power—investigate and report back to the board of DMH.  Likewise, there is no allegation that the SLC was an agent making the report as a statement for the Debtors.

[26] *Rickel* 272 B.R. at 81.  Also, relevant to this discussion below, is court's the holding that a report is not a substitute for a judge's findings. "The Examiner conducted an investigation, but he was not charged--nor could he be--with the duty to "hear and determine" any claims in this case." *Rickel* 272 B.R. at 87-88.

[27] Defendants do not allege that the allegedly independent SLC was authorized to make their counsel's report a statement "on behalf of" the Debtors.  Such a claim would be absurd and would destroy the claim that the SLC is independent.  Thus, this response does not address the potential argument, not made, that the SLC was authorized to speak on behalf of the Debtors.  To the contrary, the SLC was limited in its power—investigate and report back to the board of DMH.  Likewise, Defendants do not allege that the SLC was an agent making the report as a statement for the Debtors.

(10th Cir. 1991) (party could not be found to have adopted the contents of a bill merely because it was in his possession: "We can think of too many cases where the mere possession of a bill in no way constitutes an adoption of its contents."). Here, Defendants have argued that since DMH or DMT own and possess the report, it has become the Debtors' adopted statement. That is simply not the case.

17.     Indeed, 1) acting on a statement or information, or 2) repeating it, or 3) retaining or owning it, is not sufficient, standing alone, to justify finding that there has been adoption:

> Accordingly, the mere fact that the party has acted (or failed to act, in the case of an admission by silence) in some way in reference to the statement or information (as by repeating it or retaining it) is not sufficient, standing alone, to justify a finding that there has been an adoption.  See generally McCormick on Evidence, *supra* at 649.    Instead, the surrounding circumstances, including the circumstances and nature of the underlying statement itself, must be examined to determine whether an intent to adopt the statement is fairly reflected by the act or failure to act which is in question.

*White Indus. v Cessna Aircraft Co.*, 611 F Supp 1049, 1062 (W.D.Mo 1985).

18.     The court will examine all of the circumstances surrounding an event to determine whether an action such as possession, use, or repetition of a statement unambiguously manifests a belief that it is true. *Id.*   When it comes to adoption by acting in reliance, the proponent of the evidence must demonstrate that its opponent acted in a "*significant, identifiable way, in direct reliance upon the specific information in question.*" *Id.* (emphasis in original).  Moreover, the action must "demonstrate clearly that party's belief in and intentional adoption of that information". *Id.*

19.     The SLC counsel's report is not an admission by Deep Marine because the evidence is ambiguous as to whether DMH actually believed the content conclusions of counsel

were true, and which were true.[28]  A search of the Debtors' records shows no executed board of directors resolution or other document by DMH officially adopting the SLC's counsel's report.[29] The unresolved issue at this time is whether some other action by DMH may have adopted the report though a statement of belief that the counsel's report is true.  Although Defendants assert that Deep Marine adopted the SLC Report (Docket No. 55, at ¶ 13), Defendants have never cited to any evidence supporting such an assertion that the report was adopted as true.

20.     The report is irrelevant.  The issue is "did X do wrong".  The evidence that proves whether X is liable must be adduced at trial.  The issue is not whether "Y thinks X is not liable", unless Y sits at the bench or the jury box.  The facts will be proven by evidence and the conclusions must be reached by the trier of fact.  Absent very limited exceptions for arbitration, etc., the law does not allow defendants to prevent a suit by having a civilian opine that they are not liable.

21.     Finally, given the history of the SLC, Greenberg Traurig, as the investigator and writer of the SLC report, and the numerous factual problems with the report, there would be serious Rule 403 prejudice issues surrounding any attempt by Defendants to use the report at trial.  Greenberg Traurig's report it is not legally relevant because the obvious prejudice outweighs any probative value of its conclusions.

22.     After all the rhetoric is stripped away, the sole basis for the Defendants' argument is the mere existence of the SLC's counsel's report.  Contrary to Defendants' contention, the report is not some form of uncontroverted, definitive evidence absolving Defendants from

---

[28] Indeed, Defendants merely state, without citation to any evidence, that "The SLC adopted Greenberg Traurig's recommendations and conclusions.  Subsequently, the Board of DMH and DMT adopted the SLC's recommendations and conclusions"  Motion at ¶13.  Yet, Defendants produce no evidence in support of this claim. In no event have Defendants' pointed to the adoption of the claims in the report itself as true.  Indeed, the SLC (not the Debtors) acted in the state court to seek expenses (not sanctions) against McKim.

[29] The search of the Debtors' documents is still ongoing.

liability or extinguishing the Trustee's claims.  It is, at best, just an opinion.  At worst, it is a whitewash designed to mislead.

## II.      BACKGROUND UNDERLYING THE MOTION[30]

### A.    Incorporation of the Trustee's Prior Objection

23.     As stated above, the Trustee incorporates his previous Response (Docket No. 38) herein as if set forth verbatim.  With the exception of the addition of the two sentences discussed in paragraph 2 above, Defendants' present motion is identical to their prior one, to which the Trustee responded.  The new sentence added in both paragraphs 13 and 34 of the new Rule 11 Motion concerning adoption are wrong for the reasons stated above.  Use of a report and acting upon it do not unambiguously manifest a belief that the report is true.  Moreover, the *Zapata* case has nothing to do with the issue of whether an independent counsel's report binds the Trustee.

### B.    The SLC and its Counsel's Lack of Independence

#### 1.    The SLC's lack of independence

24.     As shown in the Trustee's prior response (Dkt No. 38), there is evidence calling into question the independence of SLC's members, Messrs. Lenig and Gilman.  Significantly, when Kazeminy and Candies selected Messrs. Lenig and Gilman to be the sole members of the SLC.   The stacked board did not conclude that Mr Lenig and Mr. Gilman were impartial. Rather, the board merely stated that that Mr Lenig and Mr. Gilman were the "most appropriate" of DMH's board members.

25.     Neither Larry Lenig nor Bruce Gilman was independent or impartial in reality. Self-proclaimed "controlling shareholder" Mr. Kazeminy had *personally* invited both Mr.

---

[30] Much of this factual background of this Response mirrors the Trustee's prior response (Docket #38) to the previous, procedurally defective, Rule 11 Motion.  The background facts are shortened here for the sake of efficiency, as the Court has been previously burdened with prolix pleading in the case.

Gilman and Mr. Lenig to serve on the board of directors of DMH.[31]   As compensation, Mr. Kazeminy had also *personally* committed DMH stock options on behalf of the company to both gentlemen.  The SLC and its counsel did not mention the obvious self-interested nature of these transactions, that they were dictated to the board by Mr. Kazeminy, or that the other shareholders were not informed of the appointment.

26.     Further, Mr. Kazeminy also had a significant relationship with Mr. Lenig through a private investment company called ComVest.  Mr. Kazeminy is a limited partner in, and a co-investor with, ComVest and a member of the ComVest Advisory Board.[32]   Additionally, Mr. Kazeminy owns Defendant DCC Ventures and is chairman of Defendant NJK Holding, both of which have partnered with ComVest in several business ventures.[33]

27.     Mr. Lenig has been employed by ComVest since August 2004, which happens to coincide with the time he became a board member of DMH.  Mr. Lenig is to this day listed as an Operating Partner for ComVest.[34]

### 2.     Greenberg Traurig's lack of independence.

28.     The Trustee's prior Response provided evidence which called into question the independence of SLC's special counsel, Greenberg Traurig.[35]   Thus far, Defendants have not offered evidence rebutting the Trustee's challenge to Greenberg Traurig's independence.

29.     In the main case proceeding regarding Greenberg Traurig's substantial-

---

[31] Docket #38 Ex. J, May 5, 2006 Letters from Nasser J. Kazeminy to Bruce Gilman and Larry Lenig.  The exhibits attached to Exhibit 1 of Docket #38 are not reattached here but rather incorporated by reference

[32] Docket #38, Ex. L, App. A to SLC Report at. 64, ¶ 85; Ex. M, The ComVest Group bio for Nasser J. Kazeminy.

[33] Docket #38 Ex. O, Chart of Relationships with Nasser J. Kazeminy; Ex. P, Catalyst International Announces New Board of Directors; Ex. Q, Mar. 4, 2005 Business Times Article.

[34] Docket #38 Ex. K, The ComVest Group bio for Larry Lenig.

[35] Greenberg Traurig may or may not have been independent from the Debtors, as Defendants contend.  Greenberg Traurig, however, was not independent from Mr. Kazeminy and his business interests.

11

contribution claim, the Court heard testimony from two of Greenberg Traurig's lawyers that they, individually, were not aware of the prior representation of NJK Holding and DCC Ventures.  In the context of Defendants' Rule 11 Motion, the question is not whether they are correct, but whether (knowing of that representation) the Trustee may rightly question the independence of their report.  There is at least some extrinsic evidence (in addition to the report itself) that the report was generated as a whitewash.  Although those specific lawyers may have been unaware of the prior representation, it is certain that Mr. Lenig knew that Mr. Kazeminy was on the advisory board of ComVest and that ComVest used Greenberg Traurig on a regular basis.  Indeed, Mr. Lenig selected Greenberg Traurig as ComVest's counsel.

30.    After acknowledging that he had "extensive experience" with Greenberg Traurig, Mr. Lenig suggested that Greenberg Traurig serve as the SLC's special counsel.[36]  On October 14, 2008, Messrs. Lenig and Gilman, as the sole members of the SLC, officially retained Greenberg Traurig as "special investigatory and litigation counsel."[37]  Greenberg Traurig was not independent because they had been lawyers for the two main Defendants.

31.    Greenberg Traurig represented Defendants DCC Ventures and NJK Holding, Mr. Kazeminy's companies that are connected with ComVest.   Greenberg Traurig has even represented ComVest in various matters over the past decade.[38]  In other words, it appears from public documents that the SLC hired Greenberg Traurig to "investigate" their own clients.

## C.    Four Board Members Immediately Resign

32.    The same day that the SLC retained Greenberg Traurig as "outside" counsel, and

---

[36] Docket #38 Ex. I.

[37] Docket #38 Ex. R, June 25, 2009 SLC Report, p. 3.

[38] Docket #38, Ex. S, T and U.

only eleven days after joining the DMT and DMH boards, and just one day after attending their one and only board meeting, three of Deep Marine's board members resigned (Wade Abadie, Eugene DePalma, and Daniel Erickson).[39]  Two days later, Otto Candies, III resigned from his positions on Deep Marine's boards, leaving Paul McKim, Larry Lenig and Bruce Gilman as the sole remaining board members.[40]  Based on the timing of the election and immediate resignation of these board members, it appears clear that Deep Marine's boards were formed for the sole purpose of forming an SLC, hand picking the SLC members, and retaining Greenberg Traurig as its special counsel.

**D.    The Texas and Delaware Actions and the Subsequent Short-Form Merger**

33.    On October 30, 2008, Paul McKim, Deep Marine's CEO, filed a lawsuit in state court in Texas to address Defendants' misconduct.  That state court action included both personal claims and derivative claims on behalf of DMH and DMT.  In response, on October 31, 2008, Otto Candies, LLC and Nasser Kazeminy, through his company DCC Ventures, using their positions as majority shareholders, immediately adopted a resolution to remove Paul McKim as a CEO.[41]  This left Mr. Gilman and Mr. Lenig as, not only the two sole SLC members but also the two sole Deep Marine board members.[42]

34.    On November 3, 2008, two of DMT's minority shareholders, FLI Deep Marine LLC and Bressner Partners Ltd., brought a shareholder derivative action in Delaware against Deep Marine's officers and directors and controlling shareholders, including many of the same Defendants in this case.  On April 21, 2009, the Delaware court dismissed the suit *without*

---

[39] Docket #38 Ex. V, Oct. 16, 2008 DMT Letter from Bruce Gilman.

[40] *Id.*

[41] Docket #38 Ex. W, Oct. 31, 2008 DMH Written Consent of Stockholders.

[42] *Id.*

*prejudice* to allow the SLC additional time to finish its investigation in response to the demand letter.[43]

35.     Ten weeks after the Delaware court's dismissal of that action on procedural grounds, the Kazeminy and Candies Defendants, with the help of their attorneys, began a scheme to avoid future derivative shareholder actions by simply getting rid of Deep Marine's minority shareholders through a short form merger.  Specifically, on July 1, 2009, the Kazeminy and Candies Defendants contributed their stock in Deep Marine to a new phantom corporation, NKOC, Inc., which then became the new parent of DMH.[44]  NKOC, Inc. then immediately merged with DMH, thereby making all shareholders of NKOC, Inc. shareholders of DMH. NKOC, Inc. then vaporized, leaving the Kazeminy and Candies Defendants as the sole DMH shareholders.  This merger was conducted in secret, without even Deep Marine's boards or the SLC's knowledge (or the knowledge of their counsel).  Although the essential corporate structure of DMH remained unchanged, this merger eliminated Mr. McKim (and all other minority shareholders) as DMH shareholders.

**E.     The SLC Report**

36.     By June, 25, 2009, the SLC had completed its alleged investigation of the shareholder derivative claims and Greenberg Traurig drafted a so-called "Final Report."[45] Greenberg Traurig's report ultimately concluded that there was not enough evidence of wrongdoing by Defendants to recommend suit, but instead essentially attributed many of the company's problems to Paul McKim.

---

[43] Docket #38 Ex. X, Order, *FLI Deep Marine v. McKim, et al.*, C.A. No. 4138-VCN.

[44] Ex. Y, July 3, 2009 Email chain re DMH short-form merger documentation.  NKOC, Inc. appears to be an acronym for Nasser Kazeminy and Otto Candies, Jr.

[45] Summary attached to Docket #38 as Ex. R.

**F.      Defendants Seek Dismissal of the Texas Action**

37.      After eliminating Mr. McKim as a shareholder through the short-form merger and with the SLC report in hand, Defendants moved the Texas state court to dismiss Mr. McKim's derivative claims for lack of standing.[46]   On August 14, 2009, the Texas state court found that Paul McKim no longer had standing to pursue the derivative claims on behalf of DMH and DMT because he was no longer a shareholder of DMH or DMT.[47]

38.      The Texas state court went on, however, to find, without citations to any evidence, that the SLC lawfully assumed control of the derivative proceedings and determined in good faith, after conducting a reasonable inquiry that the continuation of the action would be detrimental and not in the best interest of DMH and DMT.[48]   Even though this is boilerplate statutory language, the inclusion of this language in the state court's order is perplexing for several reasons.   First, the state court did not make a factual determination regarding the independence of the SLC.[49]   In fact, because the short form merger eliminated, not just Mr. McKim but, *all* minority shareholders, there was not a single viable derivative plaintiff or independent shareholder left to even pursue or address the numerous problems with the SLC Report in the Texas state court action.   Second, Mr. McKim was not opposing the dismissal of his shareholder derivative claims and, in fact, was seeking dismissal of those claims after being eliminated as a shareholder.

39.      In the same order, the Texas state court also found that Defendants had failed to

---

[46] Ex. Z, Amended Motion to Dismiss, *McKim v. Kazeminy, et al.*, Cause No. 2008-64385.

[47] Ex. AA, Order Granting the Amended Motion to Dismiss, *McKim v. Kazeminy, et al.*, Cause No. 2008-64385

[48] *Id.*

[49] Ex. AA.

15

show that the derivative claims were filed without reasonable cause or for an improper purpose.[50]

Mr. McKim's personal claims remain pending in the Texas action.

## G.    The Delaware Action is Re-filed

40.    On October 26, 2009, the Delaware plaintiffs re-filed their shareholder derivative action after the SLC had received the report and decided to conclude the investigation.  During a hearing on November 2, 2009, Judge Leo Strine commented on:  (1) his impression that Defendants had misrepresented to the court what had happened in the original Delaware derivative action; (2) the fact that the judicial magistrate in the original derivative action had doubts that the SLC was independent; (3) his belief that the SLC was formed to delay the process in order to create an argument to dismiss the claims; and (4) the appearance that the short-form merger was done to wipe out the derivative claims:

> I'm allowing expedited discovery because, frankly, this is a record that creates a situation that - at least a colorable perception that people are horsing around.  I mean, the moving papers, with all fairness to the defendants, telling me that they somehow got vindicated in the derivative action, that's not what happened at all.  This is not what vice Chancellor Noble's decision says.  What it says is people goofed up.  It's not the first time I've seen people goof up like this.  Folks who don't consult with Delaware lawyers early on in a process sometimes, when they make a demand, they go, "Oops."  But the point is, there's basis under the law to challenge even a special committee's investigation.  But you have to wait until it's done.
>
> As I understand what the defendants did before Vice Chancellor Noble is say, "Look, the law's the law." They goofed up.  I believe Vice Chancellor Noble indicated some doubts about the independence of the committee.  He let the process go forward.
>
>                              \* \* \*
>
> A special committee is formed in order to delay, doesn't really do a professional job or an independent job, issues a report which - to somebody, but not to any of the people who brought the derivative claims.  And while it gets the case

---

[50] *Id.*

dismissed on the grounds of delay, that we need to investigate this, and immediately upon concluding this thing, a short-form merger is done to excuse - to essentially wipe out the claim.  We do know that there is jurisprudence that says, when a merger is done specifically for the purpose of getting rid of claims, that that doesn't really get rid of the claims.  If there's ever a circumstance again where people have played themselves into a perception, I could not on a motion to dismiss rule out the inference that these folks wanted to get rid of these claims and did a short-form merger.  You know, mergers are powerful things.  They're not just thought of instantaneously.  This one was done fairly shortly after Vice Chancellor Noble considered a motion to dismiss and granted it.

Docket #38 Ex. BB, Nov. 2, 2009, Office Conference Transcript, pp. 8-11, *FLI Deep Marine v. McKim, et al.*, C.A. No. 5020-VCS.  The Delaware Case is currently stayed pending this bankruptcy.

**H.    Deep Marine's Bankruptcy**

41.    On December 4, 2009, Deep Marine filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code.[51]  On December 21, 2009, the Official Committee of Unsecured Creditors filed an application to employ and retain the law firm of McKool Smith, P.C.[52]  On January 21, 2010, the Court granted the application.[53]  Thereafter, the Debtors filed a Joint Plan of Reorganization ("Plan"), which became July 9, 2010.  The Plan created the Trust, governed by John Bittner pursuant to the liquidating trust agreement.[54]

**I.    The Joint Plan of Reorganization**

42.    Under Article 4 of the Plan, Deep Marine's causes of action were transferred to the Liquidating Trust.[55]  The Trustee was appointed as a representative of Deep Marine's estates

---

[51] Case No. 09-39313, Docket No. 1.

[52] Case No. 09-39313, Docket No. 64.

[53] Case No. 09-39313, Docket No. 147.

[54] Case No. 09-39313, Docket No. 516-1.

[55] *Id*.

under 11 U.S.C. § 1123(b) to pursue any such causes of action.

**J.     The Trustee's Investigation and Complaint**

43.     Before the creation of the Liquidating Trust, the Committee had engaged McKool Smith to investigate the strengths and weaknesses of the proofs of claim and other potential claims by the Kazeminy and Candies Defendants.[56]  This investigation dovetailed into McKool Smith's subsequent representation of the Trustee as litigation counsel, which included further investigation of these claims against Defendants and preparation of the Complaint.

44.     During that time period, McKool Smith conducted an extensive litigation-oriented investigation which included[57]:

| | |
|---|---|
| Document Collection & Review | • collecting documents from various sources<br>• creating databases to house and organize documents<br>• reviewing collected documents<br>• creating indices, timelines, charts, and other summaries<br>• reviewing and summarizing deposition transcripts<br>• reviewing pleadings<br>• reviewing proofs of claims |
| Interviews | • interviewing GE's counsel several times<br>• interviewing Mr. McKim's counsel multiple times |
| Meetings with the Trustee | • meeting with the Trustee on several occasions |
| Research | • conducting research on numerous legal theories and causes of action |
| Pleadings | • drafting an extensive Complaint |

45.     On July 16, 2010, the Trustee filed his *Original Complaint and Objections to Defendants' Proofs of Claim*.  The Trustee's Complaint totaled 58 pages and 258 paragraphs.

---

[56] Docket #38 Ex. 1, ¶ 2, testimony of Mark Mathie and Paul Moak at Fee Application Hearings October 18, 2010 and November 2, 2010.

[57] Docket #38 Ex. 1, ¶ 3, prior testimony of Mark Mathie and Paul Moak at Fee Application Hearing October 18, 2010 and November 2, 2010

### III.      PROCEDURAL HISTORY

#### A.      Defendants' First Rule 11 Motion

46.      On September 7, 2010, Defendants filed their first Rule 11 Motion.[58]  On October 18, the Court held a hearing on that motion.  Despite clear binding authority to the contrary, Defendants repeatedly argued to the Court that their motion was not required to precisely follow the strict procedural requirements of Rule 11.  The Court disagreed and denied Defendants' First Rule 11 motion for failure to comply with the safe harbor requirements.[59]

47.      At that hearing, the Court also provided some guidance on the SLC report:

> I also want to give you all some guidance, having gone through this, and hopefully it will get the next hearing more organized. The statute, to me, does not say that if an independent counsel recommends to the Board that a matter has no merit, that the Board is bound by the independent-- that the independent Board members are bound by the independent counsel's recommendation and, therefore, it seems that the independent Board could reject independent counsel's recommendation not to bring a claim and bring it anyway. There may be a Rule 11 violation if there isn't adequate investigation, but the fact that independent counsel recommended not proceeding on a cause of action does not, under applicable non-bankruptcy law, mean that the cause of action doesn't exist. It just means that's what an independent board needs to consider.

Transcript of October 18, 2010 Hearing at p. 11.

#### B.      Defendants' Second Rule 11 Motion

48.      Eight days later, on October 26, 2010, Defendants served their second Rule 11 letter upon counsel for the Trustee. This letter was virtually identical to the previous Rule 11 letter originally served upon the Trustee.[60]

---

[58] Docket #18.

[59] Docket # 51.

[60] Docket. # 55-1.

49.     On November 18, 2010, Defendants filed their second Rule 11 Motion.[61]  Again, this Rule 11 Motion was virtually the same as Defendants' first Rule 11 Motion.  Defendants chose not to revise their first Rule 11 motion to address the Court's comments during the October 18, 2010 hearing.

## C.     Defendants' Long History of Making Threats Against Opposing Counsel

### 1.     Defendants made threats and sanctions allegations in the Delaware action.

50.     Unfortunately, Defendants' counsel uses sanctions threats as a standard litigation tactic.  In the Delaware action, Defendants' counsel was "extremely aggressive and unpleasant," and threatened to sue not only the Delaware plaintiffs, but their counsel personally.[62]

### 2.     Defendants made threats and sanctions allegations in the Texas state court action.

51.     Defendants' counsel took the same approach in the Texas action.  As discussed above, Defendants disposed of the shareholder derivative suits by improperly eliminating all minority shareholders through the short-form merger.  In the Texas action, Defendants' counsel filed a motion for sanctions and attorneys' fees even though the Court had already denied Defendants' previous request for fees.[63]  The Texas state court has not ruled on that motion because the case is currently stayed during bankruptcy proceedings.[64]

## IV.     LEGAL STANDARDS

52.     As the Defendants concede, true situations meriting Rule 11 sanctions are

---

[61] Docket #55.

[62] Docket #38 Ex. FF, Affidavit of Katherine B. Harrison, ¶¶ 11, 14; Ex. GG, Oct. 15, 2008 Letter from Robert R. Weinstine to Katherine B. Harrison ("This is not a threat, it is reality.").

[63] See Docket #38, Ex. HH, Oct. 2, 2009 Nasser Kazeminy's Motion for Sanctions Against Plaintiff, *McKim v. Kazeminy, et al.*, Cause No. 2008-64385.

[64] Ex. AA.  Again, all lettered exhibits, unless otherwise noted, are from Exhibit 1 to Docket #38 and not recopied here.

extremely rare and the burden to prove that such a situation exists is extraordinarily high.[65]

53.     It is well established that legal claims should be resolved on the merits and that dismissal as a Rule 11 sanction is a severe draconian remedy of last resort and implicates serious due process issues.  *FDIC v. Connor.*, 20 F.3d 1376 (5th Cir. 1994).

54.     The Court should presume that the Trustee filed the Complaint in good faith and Defendants bear the heavy burden to overcome this presumption.  *See*, *Pogo Producing Co. v. Moore*, No. H-06-2432, 2007 WL 4191757, at *3 (S.D. Tex. Nov. 21, 2007) (citing *Tompkins*, 202 F.3d at 788).   Indeed, in analyzing a defendant's request for sanctions, courts should not even evaluate the merits of a plaintiff's case.  *National Association of Government Employees v. National Federation of Federal Employees*, 844 F.2d 216, 222 (5th Cir. 1988) (reversing award of sanctions); *Schoenfeld Materials, Inc. v. Pioneer Concrete Services, Ltd.*, 1988 U.S. Dist. LEXIS 15595 (W.D. Tex. Aug. 9, 1988).  The Court need only review the applicable facts and law to the extent necessary to determine if plaintiff and its attorneys met the reasonableness standard.  *Schoenfeld* at *7.

55.     28 U.S.C. § 1927 imposes an even higher burden than Rule 11.  *Argent Mortgage*, 2006 WL 2092430, at *4.  28 U.S.C § 1927 is construed in favor of the opposing party, and the moving party must show that bad faith conduct multiplied proceedings and was unreasonable and vexatious.  *Id.* (citing *Proctor & Gamble Co. v. Amway Corp.*, 280 F.3d 519, 525 (5th Cir. 1997)).   Section 1927 is only used in instances evidencing a serious disregard for the orderly process of justice.  *Id.*

---

[65] Docket #55 at ¶ 24-30

21

## V.      ARGUMENT

### A.      The Trustee Conducted a Reasonable Investigation Before Filing the Complaint

56.      Defendants cannot legitimately dispute the reasonableness of the investigation performed by the Trustee and his counsel.  McKool Smith, first on behalf of the Committee, and then on behalf of the Trustee, conducted an extensive investigation into the facts before filing the Complaint.[66]  The range of Defendants' misconduct is vast and McKool Smith spent hundreds of hours investigating, reviewing documents, reviewing transcripts, creating databases, researching the law, drafting the Complaint, etc.  *Id*.  The Trustee has also spent significant time personally investigating Defendants' wrongdoing.   Although, there is certainly a need for additional discovery, it is simply indisputable that McKool Smith's extensive pre-filing factual investigation far exceeded the minimum reasonable investigation required by Rule 9011.

57.      This fact was further confirmed during the October 18, 2010 and the November 2, 2010, hearings on McKool Smith's Fee Application. Mr. Mathie, Mr. Chambers, and Mr. Moak testified at length as to the details of the pre-filing investigation.  As the Court found, there is no question that McKool Smith spent an extensive amount of time on its prefiling investigation. (See November 2, 2010 Fee Application Hearing "There is no question in my mind, but that the time here was spent -- as to whether it was spent on fully compensable items… all of that's in play").

### B.      There is a Sufficient Basis for the Claims in the Complaint.

####       1.      Defendants Do Not Even Attempt to Address the Overwhelming Majority of the Complaint.

58.      The Trustee's 58 page Complaint contains 258 paragraphs.   It contains 17

---

[66] See generally the October 18, 2010 and November 2, 2010 hearing transcripts.

separate counts, including fraudulent transfer, preferential transfer, recharacterization, equitable subordination, breach of fiduciary duties, aiding and abetting breach of fiduciary duties, shareholder oppression, fraud and fraudulent inducement, negligent misrepresentation, breach of contract, tortious interference, restitution and unjust enrichment, money had and received, conversion, conspiracy, partnership liability, and attorneys' fees.  The Complaint also includes numerous objections to Defendants' various proofs of claim.

59.     Defendants do not even attempt to specifically address the comprehensive Complaint in any meaningful detail.  In fact, Defendants cite to a mere 48 out of the 258 paragraphs.  As discussed, below, none of those paragraphs support Defendants' misguided Rule 11 Motion in the least.  Moreover, after citing just those few paragraphs, Defendants, *in a single sentence*, and without any alleged authority, argue that the Court should simply dismiss the remainder of the Complaint because it is "infected."[67]   The fact that Defendants would file a sanctions motion and actually request that the Court dismiss the Complaint—without ever having addressed the overwhelming majority of the Complaint—confirms Defendants' unlimited willingness to make accusations with absolutely no legal or factual support.

**2.     The entire Complaint, including the paragraphs mentioned by Defendants, is supported by overwhelming evidence.**

60.     It is indisputable that the Complaint is well supported.  As an initial matter, it is worth noting that every single law firm that has investigated Defendants' conduct in relation to Deep Marine (other than Defendants' own counsel and Greenberg Traurig), has found extensive actionable conduct, irrespective of the biased report of the SLC's counsel.  Haynes and Boone filed suit for Mr. McKim and discovered a web of self-interested transactions.  Paduano &

---

[67] Docket # 55, ¶ 21.

Weintraub filed suit for the FLI parties and discovered the weekly phone calls and special financial reports given to Kazeminy and Candies. Each of these firms was, in turn, threatened by Defendants' counsel. Defendants' argument that all of these reputable law firms would fail to perform investigations and then file unsupported lawsuits against Defendants speaks for itself.

61.     In any event, Defendants admit that the "allegations made in the Complaint are . . . tied to specific testimony allegations *taken from the deposition of McKim*."[68]   Thus, although Defendants have attacked Mr. McKim at every turn, it is undisputed that the Complaint is factually supported by sworn evidence. This alone is sufficient to defeat Defendants' entire motion. For Fed. R. Bankr. P. 9011, the issue is not whether there are facts that would disprove the Complaint, but whether there are any facts to support it. There are.

62.     The claims are also supported by the voluminous documents as well as the testimony of other witnesses. Defendants attempt to incorporate their most recent Rule 11 letter which includes a chart of excerpts from 48 out of 258 paragraphs in the Complaint as some kind of alleged support for their argument that the Trustee's claims are not supported.[69]   Defendants contend these paragraphs were "specifically discredited in the SLC Report." *Id.* at 3.   As discussed below, the fact that the SLC's counsel was able to cobble together a biased report is irrelevant to whether the Complaint is factually supported. Even a cursory review of Defendants' self-serving chart shows that it does not affect the merits of the Trustee's allegations in the least.

63.     For example, Defendants question the factual grounds for paragraph 63 of the Complaint, which concerns Deep Marine's right to terminate a charter agreement with Otto

---

[68] Docket # 55 ¶ 36.

[69] Docket # 55, Exhibit A, at 3-18.

24

Candies:

| Paragraph of Complaint | Section of SLC report |
|---|---|
| Paragraph 63:  The trustee alleges that DMT was free to back out of the time charter agreement for the Mother Theresa at any time.  If that allegation is true, then there will be no merit to OC's proof of claim number 10.  Proof of claim number 10 is for the $1,698,899.85 in lost revenue when DMT backed out of the time charter.<br><br>*See* also Paragraph 119 | P. 65 of the Final Report: "the crux of the dispute is whether the Company timely terminated the charter, thus avoiding about $1.1 million in charges sought by OC.  To date, the amount in question has not been paid by the Company.  While the Company now has determined, after conduct of due diligence, that the amounts in question are owed to OC, the fact that this dispute lasted nearly two years and the amounts have not yet been paid demonstrates about as effectively as any other evidence that OC does not dominate the management or board of the Company" - more detail can be found on p. 40-41 of Appendix A and p. 42-43 of Appendix B |

Notably, Defendants cite a portion of the SLC's counsel's report that does not specifically address the contractual issue.  Instead, the SLC's counsel's report merely states that "the amounts in question are owed to OC."

64.     The Trustee, on the other hand, found that Deep Marine clearly had the right to cancel the charter agreement, that Deep Marine exercised that right, that Otto Candies wrongfully refused to recognize the termination, and that Otto Candies wrongfully continued to bill DMT under the charter agreement.  There is extensive, and indeed conclusive, evidence establishing the allegations in paragraph 63, including the following:

| Evidence | Excerpt |
|---|---|
| August 25, 2004 Blanket Time Charter Agreement (Ex. JJ) | "3…B. Subject to the provisions of Article 2 hereof, **CHARTERER may terminate the hire of any vessel upon giving OWNER 7 days written notice** by certified mail, and charter hire shall continue during the vessels normal running time from the place of release to the place where redelivery has been specified in the Charter Order except |

25

| | that if the vessel released reports to neither charterer at a lesser distance from such place of release, charter hire shall be paid only for the time reasonably required to arrive at the point where the subsequent Charter commences." |
|---|---|
| October 25, 2006 Letter from Otto Candies to McKim re Exhibit "A"  (Ex. KK) | "Pursuant to the terms of our Blanket Time Charter, dated August 25, 2004, this is to evidence our understanding and agreement that Otto Candies, LLC shall charter to you the M/V Mother Theresa subject to the following:<br><br>1.  Date of Delivery on or about : October 6, 2006<br>**2.  Either OWNER or CHARTERER may terminate this charter by advance written notice to the other, normal mobilization time to be added in case of replacement vessel under this Charter."** |
| November 16, 2006 Letter from McKim to Candies  (Ex. LL) | "In abiding by the terms and conditions of the Blanket Time Charter dated August 25, 2004 between Deep Marine Technology, Inc. ('DMT') and Otto Candies, LLC ('Otto Candies'), **please accept this as an official notice to exercise our option of termination per Exhibit A, Time Charter of the M/V Mother Teresa,** job number 214022 effective as of the commencement date of the current job the vessel has assumed." |
| January 17, 2007 Letter from Candies to McKim  (Ex. MM) | "An agreement was reached that all would try to work the vessel for others as much as possible but DMT would be responsible for shortfalls in revenue until contract expired April 13, 2007." |
| February 2, 2007 Letter from McKim to Candies  (Ex. NN) | "Please see the attached letter of termination sent to Otto Candies, LLC on November 16, 2006.  We kindly request your attention to this matter and await your re-issuance of a corrected and adjusted invoice." |

65.     As another example, Defendants challenge the factual basis for paragraph 55 of the Complaint, which relates to Mr. Kazeminy's influence and control over Deep Marine's business affairs.  Defendants' chart on paragraph 55 is as follows:

26

| Paragraph of Complaint | Section of SLC Report |
|---|---|
| Paragraph 55: "Over time, Mr. Kazeminy increased his influence and control over Deep Marine's business affairs. He personally influenced and controlled Deep marine's Board of Directors and was a member of the board for a period of time." | P.12 of Appendix A: "**While both Nasser Kazeminy and Otto Candies Jr. exercise considerable influence** by virtue of the shareholder status of DCC Ventures and Otto Candies LLC, it is an overstatement to say that DMT is dominated and controlled by Nasser Kazeminy and Otto Candies, LLC. Rather, DMT is managed by its officers and directors, and is controlled by its Board." |

Here, Defendants cite to a section of the SLC Report that actually admits that "Nasser Kazeminy and Otto Candies Jr. exercise[d] considerable influence" over Deep Marine. Nevertheless, the SLC Report goes on to assert in a conclusory manner that it would be an overstatement to say that Mr. Kazeminy and Otto Candies, LLC "dominated and controlled" Deep Marine. The SLC Report further asserted that "DMT is managed by its officers and directors, and is controlled by its Board."[70]

66.    The Trustee and his counsel's investigation determined that this assertion is clearly incorrect.  There is extensive evidence that both Mr. Kazeminy and Mr. Candies did control Deep Marine.  For example, some of the evidence establishing Mr. Kazeminy's control is:

| Evidence | Excerpt |
|---|---|
| May 5, 2006 Letters to Larry Lenig and Bruce Gilman from Nasser Kazeminy (Ex. J) | "**I will be pleased to instruct the board** of Deep Marine Holdings to issue you an option for 15,000 shares." |
| July 30, 2008 Letter to Employees of DMT from Nasser Kazeminy (Ex. | "**To: Employees of DMT**<br>**From: Nasser Kazeminy - <u>Controlling Shareholder</u>** |

---

[70] Docket #38, Ex. L, at 12.

| C) | … |
|---|---|
| | One of the most important obligations of management is to ensure that we are appropriately to bring our firm to the next level.  That means that we should be prepared to shift our internal talent in a way that they are positioned to meet the challenges in front of us, not the challenges we have already met.  It also means that we should seek, externally, talented people if they can help make us a better company.  The Board, I, Otto Candies, Jr., and Paul McKim have had many discussions on how best to achieve that end." |
| June 12, 2006 and May 31, 2008 Oversight Services Agreements | "NJK hereby agrees that during the term of this Agreement it shall render to the Company, by and through such of NJK's officers, employees…NJK in its sole discretion, shall designate from time to time, advisory, consulting and other services… in relation to the day-to-day operations of the  Company, strategic planning, domestic and international marketing and financial oversight and including, without limitation, advisory and consulting services in relation to the selection, retention and supervision of independent auditors, the selection retention and supervision of outside legal counsel, and the selection, retention and supervision of investment bankers or other financial advisors or consultants." |
| McKim Deposition Testimony 211:20-212:8  (Dkt, No. 38 Ex. QQ) | "[Nasser] didn't want it to go to a vote.  Remember he has oversight.  He's the oversight guy.  He had - he's going to tell what the board is going to vote on or not.  There was not one vote ever with Nasser in place that the board did that Nasser did not already say what we're going to vote on and how that vote's going to turn out.  Every single vote that we did and I'm telling you every single vote, Nasser already told us what - we discussed it and Nasser said, 'Well, here's what I want.  Okay.  Now, you guys vote.'  Every single vote, every single - we never had one damn board meeting without Nasser telling us exactly what to stay - what this is going to go on and how he's going to take care of his buddy Otto.  And now this company is going kaput." |
| Thomas Deposition Testimony 104:19-25 (Docket #38 Ex. SS) | "Q:  Why was Mr. Kazeminy going to be the one who ultimately decided?<br>A:  NJK Holding had an oversight agreement with Deep Marine |

28

| | Technology.  Mr. Kazeminy, through his various entities, owned a significant if not controlling interest in DMT.  So he was, he was a reasonably active owner.  And it was, it was going to be his call." |
|---|---|
| Abadie Deposition Testimony p. 39 1ine 3-18 (Ex. D). | "Q: How frequently would you deal with Mr. Kazeminy by telephone? A: We typically had -- as a group the management team had a weekly phone call scheduled…" |
| Thomas Deposition Testimony 63:22-25 (Ex. RR). | "Q: Do you know why Larry Lenig became a member of the board? A: Yes. That was from Mr. Kazeminy. He had, he knew Mr. Lenig and wanted him on the board." |

As shown, Mr. Kazeminy openly referred to himself as the controlling shareholder, openly "instructed" the Deep Marine board and personally selected Deep Marine board members. Under the Oversight Services Agreements, Mr. Kazeminy, through NJK Holding, was purportedly given yet additional far reaching power over Deep Marine.  Mr. Kazeminy was even personally involved in weekly management meetings.  And multiple witnesses have confirmed that Mr. Kazeminy always dominated and controlled Deep Marine.  Defendants' chart regarding paragraph 55 is meritless.

67.     The other portions of Defendants' chart are equally unavailing.

68.     There are also instances where the SLC's counsel's report actually supports the claims in the Trustee's Complaint.   For example, the SLC's counsel's report supports the Trustee's claims based on the vessel transactions:

• **Mother Teresa**:  The SLC Report admits there were ongoing problems with the Candies Defendants regarding the charter agreement at issue.  (Ex. TT, App. B to the SLC Report at 40-42)

• **Agnes/Topaz**:  The SLC Report admits the boat sat in dry dock in Boston (but also claims that no revenue was lost).  (*Id.* at 43-44)

• **Emerald**:  The SLC Report does not attempt to rebut the crew problems and

subsequent loss of the BP contract.

• **Diamond**:   The SLC admits that there were numerous problems with the Diamond vessel  and that the Candies crews had to be replaced.  The SLC Report does not attempt to rebut the fact that Candies put his crews back on the vessel after Mr. McKim's departure. (*Id.* at p. 49)

• **Sapphire**:   The SLC Report admits there were deficiencies in the defective crane.  (*Id.* at pp. 50-53)

In any event, the mere fact that the SLC Report made some assertions that are contrary to the Trustee's Complaint has no bearing on the fact that the Trustee has support for the claims in the Complaint.  At best, Defendants' chart shows that Defendants intend to contest certain facts, not exactly an uncommon occurrence during litigation.  At worst, Defendants' chart confirms that the SLC Report was an attempted whitewash of the wrongdoing by Mr. Kazeminy and Mr. Candies.

**C.**     **The SLC Report Does Not Absolve Defendants of their Wrongful Conduct**

    **1.**     **The SLC Report did not legally adjudicate a single fact at issue in the Trustee's Complaint.**

69.     When all the rhetoric is stripped away, Defendants' entire argument is that the SLC's use of their independent counsel's report somehow cleansed Defendants of any wrongful conduct indirectly related to the derivative suit the report addressed.[71]  Yet again, Defendants cannot offer any legal or factual authority for this argument.  The facially biased SLC Report does not preclude the Trustee's claims in this case in any way whatsoever.  The report addressed derivative claims, not direct and bankruptcy claims.

70.     Defendants actually argue that this Court should consider the SLC's counsel's

---

[71] Docket #55, at p. 13-14.

conclusions as "uncontroverted evidence."[72]   In support, Defendants cite to the TEX. BUS. ORG. CODE § 21.558 (2010) and an article from Texas Business Litigation.   The Texas Business Litigation article is obviously not legal authority.   But more importantly, neither the article nor TEX. BUS. ORG. CODE § 21.558 are relevant to this action; rather, both of those sources concern the potential deference given by a court to an independent report on *shareholder-derivative actions*.   Defendants have failed to cite a single case, or any other legal authority, for the absurd notion that any report (let alone a biased, inaccurate SLC report which was controlled by company insiders) somehow extinguishes any claims that the company may later decide to bring *on its own behalf* to address the wrongful conduct of the company insiders.   Indeed, the Court seemed to agree that "[T]he fact that independent counsel recommended not proceeding on a cause of action does not, under applicable non-bankruptcy law, mean that the cause of action doesn't exist. It just means that's what an independent board needs to consider."[73]

71.   Defendants also suggest that one sentence of boilerplate dicta in the Texas state court action somehow affects the Trustee's claims.[74]   For the reasons discussed above, the substance of that order has no effect on Trustee's claims because the case was dismissed on standing to bring a derivative claim.   As this Court has previously noted, that order is not even a final judgment on the facts:

> THE COURT: Yeah, I'm wondering though.   But when he says that "the opposing party has no standing," whether that has any effect on the world at all because --
>
> MR. WEINSTINE: Well, but he does say it in this.
>
> THE COURT: -- it's kind of like me commenting this morning about the

---

[72] Docket #55, ¶ 32.

[73] Transcript of October 18, 2010 hearing at p. 11, line 18.

[74] Motion at ¶ 14.

31

merits of the Rule 11 when I'm saying I'm not going to hear it.

MR. WEINSTINE: Yeah, I understand.

October 18, 2010 Hearing Transcript at p.16.

### 2. The SLC and Greenberg Traurig were neither independent nor disinterested.

72. As discussed above, in the Delaware case, Judge Leo Strine stated on the record his serious concerns about Defendants' and Defendants' counsel's conduct in relation to the SLC. Among other things, he noted that the judicial magistrate had doubts about whether the SLC was independent, and pointed out that a special litigation committee can be improperly used to delay the process and create an argument to dismiss shareholder derivative claims.

73. The Trustee and his counsel's investigation uncovered evidence confirming the Delaware Court's concerns regarding the SLC's lack of independence, including strong connections between Mr. Lenig and Mr. Kazeminy. Greenberg Traurig had been tasked to "investigate" its own former clients—without ever disclosing any conflict of interest to Deep Marine.

74. Despite Greenberg Traurig's public disclosure that it represented NJK Holdings and DCC Ventures, the counsel who wrote the report disclaimed that it did—they were just "tagalong co-investors on deals" where Greenberg represented ComVest.[75] Moreover, immediately after Greenberg Traurig's relationship with DCC Ventures and NJK Holdings became an issue in this case, Greenberg Traurig removed all references to both companies from its website. In any event, Greenberg Traurig has not disclaimed its relationship with Mr. Lenig or ComVest.

---

[75] October 12, 2010 Hearing Transcript at p. 65.

32

75.     Finally, in the SLC report itself, Greenberg Traurig glosses over whether the SLC was truly independent.  Despite known connections between the Defendants and the SLC, the report simply made the conclusory assertions that "there is no evidence that Bruce Gilman or Larry Lenig are beholden to Nasser Kazeminy" and that "Bruce Gilman and Larry Lenig have been independent directors throughout the investigation."[76]  Further, the report failed to mention that Greenberg Traurig had relationships with Mr. Lenig, had relationships with Mr. Kazeminy through his companies and had represented ComVest.  Greenberg Traurig's failure to substantively address these numerous conflicts of interest alone demonstrates the bias of the report.

**3.     The SLC Report is biased on its face.**

76.     No objective reader with knowledge of the undisputed facts would perceive the SLC's counsel's report as a neutral factual analysis.  Despite the evidence, the report actually asserted that the Defendants had not done a *single* thing that was even *questionable*.  Instead, the report went on the offensive and attempted, essentially, to attribute all of the company's problems to Paul McKim.  Greenberg Traurig even spent considerable effort scrutinizing the expense reports and personal problems of Mr. McKim as well as Mr. Thomas.  A simple review of the report reveals it for what it is—a one-sided advocacy brief.

**4.     The SLC Report fails to address the Defendants' Control of Deep Marine.**

77.     The SLC counsel's report admits that Mr. Kazeminy and Mr. Candies had absolute control over Deep Marine.  Nonetheless, it goes on to assert, without explanation, that they did not dominate the decision-making of the board.  In doing so, the report does not so much as mention the overwhelming evidence of the Mr. Kazeminy and Mr. Candies' control and

---

[76] Docket #38 Ex. L, ¶ 86.

domination over Deep Marine, including weekly telephone calls, special financial reports, letters from "controlling shareholder" Kazeminy, etc.  The report's unsupported assertion that there was "no domination" by either Mr. Kazeminy or Mr. Candies contradicts the actual evidence.

**5.      The SLC's Counsel's Investigation was Incomplete.**

     **a)      Greenberg Traurig failed to interview important witnesses.**

78.      During its "investigation," Greenberg Traurig allegedly interviewed 24 people. This list does not include a single operations related employee of Deep Marine.  Indeed, Greenberg Traurig did not interview *anyone* from Deep Marine's deep water, diving or marine divisions even though individuals from these divisions have detailed knowledge about insider transactions with the Candies Defendants.  If asked, the project managers and vessel operations people would have presumably provided important evidence, including information about Candies' incompetent crews and mismanagement which resulted in serious losses to Deep Marine.  Instead, Greenberg Traurig primarily relied on Otto Candies and his subordinates with respect to those transactions.

     **b)      Greenberg Traurig failed to review important documents.**

79.      Although the SLC's counsel's report lists documents that Greenberg Traurig allegedly reviewed, there are almost no emails included in that list.[77]  In particular, there is not a *single* email from Mr. Kazeminy, Mr. Candies, Jr., or Mr. Candies, III. It also appears that Greenberg Traurig did not review operations related documents, such as ship logs or correspondence between operations people regarding the vessel transactions at issue.  Thus, there is a serious question whether Greenberg Traurig avoided documents that would have

---

[77] Also, as discussed in previous testimony, apparently many of the documents reviewed, and interview notes were either destroyed or withheld from the Trustee.

34

Dallas 314252v8

contradicted their conclusions.[78]

**D.      The Trustee Did Not File the Complaint for an Improper Purpose**

80.      Defendants make a cursory and unsupported argument that the Trustee and his counsel filed the Complaint for an improper purpose.[79]   Once again, Defendants show their willingness to make extremely serious accusations without factual or legal support.  The Trustee has a proper purpose—even a statutory obligation—to file the Complaint.

81.      The Trustee was appointed under the Joint Plan of Reorganization, which transferred all of the debtor's causes of actions to the Trust.    The Trustee has the express authority to pursue these claims.  *See* 11 U.S.C § 1123(b)(3).  And he has a "duty to maximize the value of the estate."  *La. World Exposition v. Fed. Ins. Co.*, 858 F.2d 233, 246 (5th Cir. 1988) (quoting *Commodity Futures Trading Comm'n v. Weintraub*, 471 U.S. 343, 352 (1985) (citing 11 U.S.C. § 704(1)).  Since these claims are part of the Debtors' estates, the Trustee is "duty bound to assert [them] if doing so would maximize the value of the estate."  *Id.* at 246.  Therefore, not only was it entirely proper for the Trustee to bring the claims to address the damage caused to Deep Marine by Defendants' wrongful conduct., it would have been a dereliction of the Trustee's duty not to bring the claims.

82.      Defendants cannot make any good faith argument that pursing claims of the estate is an "improper purpose" under Rule 9011.  *See Sheets v. Yamaha Motors Corp., U.S.A.*, 891 F.2d 533, 538 (5th Cir. 1990) ("If a reasonably clear legal justification can be shown for the filing of the paper in question, no improper purpose can be found and sanctions are inappropriate.").

---

[78] The conclusions of counsel are not "findings", but the Defendants repeatedly characterize them as such.

[79] Motion at  ¶ 37.

83.     Moreover, as shown above, because the allegations in the Complaint are not frivolous, there is no need to consider the subjective prong of Rule 9011. *See FDIC v. Maxxam, Inc.*, 523 F.3d 566, 581 (5th Cir. 2008) ("And so long as the merits of their claim, viewed objectively, are supported by a good-faith belief that the allegations are well founded and not frivolous, the subjective motivation for pursuing the claim and the multiple purposes are ordinarily of no moment."). Indeed, the Fifth Circuit has held that "if an initial complaint passes the test of non-frivolousness, its filing does not constitute harassment for the purposes of Rule 11." *Nat'l Ass'n of Gov't Employees, Inc. v. Nat'l Federation of Fed. Employees*, 844 F.2d 216, 223 (5th Cir. 1988).[80]

## VI.     MOTION TO STRIKE

84.     Once again, Defendants failed to comply with the strict procedural requirements of Rule 9011(c)(1)(A). Specifically, Rule 9011 states that "a motion for sanctions under this rule shall be made separately from other motions or requests." FED. R. CIV. P. 9011(c)(1)(A). The use of "shall" makes the separateness requirement mandatory. Here, Defendants combined their Rule 11 Motion with a request for sanctions under 28 U.S.C. §1927 and the Court's inherent power.

85.     Specifically, in paragraph 2 under the heading "Relief Sought." Defendants request "sanctions pursuant to (a) Rule 9011, (b) 28 U.S.C. § 1927 and/or (c) this Court's inherent power to police litigation commenced in this Court." Thus, they are seeking additional relief beyond that found in Rule 9011—sanctions under the inherent power and 28 U.S.C. §1927

---

[80]  To the extent the Trustee is required to object to the passing references to the inherent power and 28 U.S.C. § 1927, the Trustee notes that Defendants fail to set forth a colorable basis for such relief. Indeed, they offer no justification at all. Given that there is absolutely no basis for Defendants' Rule 11 and § 1927 arguments, there is no basis for any argument justifying sanctions under the Court's inherent power. *See Vlasek*, 2008 WL 167082, at *7 (finding that inherent powers "may be exercised only if essential to preserve the authority of the court" (quoting *Natural Gas Pipeline of Am. v. Energy Gathering Inc.*, 86 F.3d 464, 467 (5th Cir. 1996)).

within the Rule 11 motion.  Defendants' prayer also asks that the Court "impose monetary sanctions pursuant to 28 U.S.C. § 1927 against counsel for the Trustee for engaging in unreasonable and vexatious litigation in this proceeding."[81]

86.     Courts enforce the "separateness" requirement of Rule 11(c)(1)(a) and hold that combining relief under Rule 11 with another request is a fatal defect.  *Gordon v. Unifund CCR Partners*, 345 F.3d 1028, 1029-1030 (8th Cir. 2003) (district court abused its discretion by awarding sanctions when movant requested sanctions in memorandum responding to motion for default rather than in separate document); *Hadges v. Yonkers Racing Corp.*, 48 F.3d 1320, 1323, 1328 (2[d] Cir. 1995) (request for sanctions included in motion to dismiss was denied because it failed to comply with procedural requirement for separate motion); *Raffaele v. Marrama*, 164 F. Supp. 2d 224, 228 (D. Mass. 2001) (court denies sanctions when motion for sanctions is included as part of motion to dismiss); *Glutzer v. Prudential Ins. Co. of Am.*, 183 F.R.D. 632, 639 (N.D. Ill. 1999) (court denied request for sanctions made in reply brief to summary judgment motion on grounds it was not made separately from any other motion); *Birch v. Kim*, 977 F. Supp. 926, 937 (S.D. Ind. 1997) (defendant's motion for sanctions denied, *inter alia*, because motion was included with counterclaim, rather than filed separately); *Tate v. Lau*, 865 F. Supp. 681, 691 (D. Nev. 1994) (request for sanctions in summary judgment motion was denied because request may not be made as additional prayer for relief in another motion); *Circuit Omega Sports, Inc. v. Sunkyong Am., Inc.*, 872 F. Supp. 201, 203 (E.D. Pa. 1995) (request for sanctions was denied because it was included in motion for remand); *Circuit Hoydal v. Prime Opportunities, Inc.*, 856 F. Supp. 327, 329 (E.D. Mich. 1994) (motion for sanctions included with motion to dismiss was denied because not in compliance with Fed. R. Civ. P. 11).

---

[81] Docket #55 at p. 18.

87.     This procedural element even applies when, as here, the movant combines a Rule 11 motion with a motion under 28 U.S.C. § 1927.  *Gortat v. Capala Bros.*, 2008 U.S. Dist. LEXIS 102500 (E.D.N.Y. Dec. 18, 2008) (combined §1927 and Rule 11 motion violates requirement that a Rule 11 motion be "made separately").

88.     The Fifth Circuit, like the courts above, mandates strict compliance with the procedural requirements of Rule 9011 (and Rule 11), and a failure to comply is fatal to any related motion for sanctions.  *See Cadle Co. v. Pratt (In re Pratt)*, 524 F.3d 580, 586 (5th Cir. 2008) (denial of sanctions motion under Rule 9011 for failure to comply with strict procedural requirements); *Tompkins v. Cyr*, 202 F.3d 770, 788 (5th Cir. 2000) (affirming denial of sanctions because the defendant failed to comply with the 21-day safe-harbor provision).  The Fifth Circuit requires such strict compliance because of the severe nature of the rule.

## VII.     CONCLUSION

89.     The Advisory Committee notes to Rule 11 show great concern that the rule could be abused as an improper litigation device.  The goal of the Rule was not to conduct pre-answer discovery.  It was to discourage frivolous claims.  Under the terms of Rule 9011, the Court awards legal fees to the party who has a Motion wrongfully brought against it.  This is such a case.  Defendants are engaging in harsh tactics and bad faith, making unsupportable Rule 11 allegations to intimidate and conduct discovery.  This most recent Motion was filed after the Defendants became aware of 1) the Trustee's extensive investigation, 2) the lack of any legal basis to have the conclusions of SLC counsel "bind" the Trustee, and 3) the deficiencies within the counsel's report itself.

90.     No counter-motion is required for the Court to remedy the injustice caused by Defendants' baseless motion.  Under Fed. R. Bankr. P. 9011(c)(1) the Court has broad authority

to award legal fees and costs to the Trustee to reimburse the estate for the expense of defending the Motion.

91.     For its obvious procedural defect of combining the motion with relief outside of Rule 11, Defendants' motion should be struck or denied.  Alternatively, the Motion should be denied on the merits and fees and costs awarded in favor of the Trustee against the firms, jointly and severally, who signed the Motion.

DATED: December 13, 2010.

<div style="margin-left: 50%;">

Respectfully submitted,

MCKOOL SMITH P.C.

By:      */s/ Hugh M. Ray, III*
_____
HUGH M. RAY, III
State Bar No. 24004246
MARK L. MATHIE
State Bar No. 13191550
600 Travis, Suite 7000
Houston, Texas 77002
Telephone: (713) 485-7300
Facsimile: (713) 485-7344

ATTORNEYS FOR LIQUIDATING
TRUSTEE

</div>

## CERTIFICATE OF CONFERENCE

I hereby certify that on September 30, 2010, I conferred via a telephone call with Thomas Henderson, counsel for Defendants about the Rule 11 motion filed as Docket #18.  The present motion is identical.  The parties remain unable to resolve the matter.

<div style="margin-left: 50%;">

_____*/s/ Mark L. Mathie*
MARK L. MATHIE

</div>

## CERTIFICATE OF SERVICE

I hereby certify that on December 13, 2010, a true and correct copy of the foregoing document has been served via DLR 5.1 and the ECF system, to the parties on the ECF service list.

/s/ Hugh M. Ray, III

HUGH M. RAY, III

Dallas 314252v8