UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | CHAPTER 11 |
| DEEP MARINE HOLDINGS, INC., et al. | § | Jointly Administered Under: |
| | § | Case No. 09-39313-H1-11 |
| | § | |
| Debtors. | § | |

| | | |
|---|---|---|
| JOHN BITTNER, LIQUIDATING TRUSTEE, | § § | |
| Plaintiff, | § § | |
| V. | § § | ADVERSARY NO. 10-3312 |
| NASSER KAZEMINY, NJK HOLDING CORP., DCC VENTURES, LLC, OTTO B., CANDIES, JR., OTTO B. CANDIES, III, OTTO CANDIES, LLC AND CANDIES SHIPBUILDERS, LLC, | § § § § § § | |
| Defendants, | § § | |
| - and - | § § | |
| GENERAL ELECTRIC CAPITAL CORP. AND GE BUSINESS FINANCIAL SERVICES, | § § § § | |
| Plaintiffs-in-Intervention | § | |

**REPLY IN SUPPORT OF DEFENDANTS' MOTION FOR
SANCTIONS AND DISQUALIFICATION
(Related to Doc. No. 70)**

TO THE HONORABLE UNITED STATES BANKRUPTCY JUDGE:

Nasser Kazeminy, NJK Holding Corp. and DCC Ventures, LLC (collectively, the "Kazeminy Defendants"), and Otto B. Candies, Jr., Otto B. Candies, III, Otto Candies, LLC and Candies Shipbuilders, LLC (collectively, the "Candies Defendants") (the Kazeminy Defendants and the Candies Defendants are collectively referred to herein as "Defendants"), by and through

{B0436294.3}

their attorneys, file this Reply in Support of their Motion for Sanctions and Disqualification ("Reply"). The Defendants' Motion for Sanctions and Disqualification ("Defendants' Motion") is supported by the record and should be granted.

## INTRODUCTION

Desperate to avoid the fact that he and his counsel failed to mediate in good faith, the Trustee has responded to Defendants' Motion with unsubstantiated and incorrect statements and with citations to unpersuasive and inapposite case law as shown below. In a transparent attempt to comply with the Court's order in "body only," the Trustee appeared at the mediation with five lawyers but a predetermined plan of refusing to negotiate. Parties and attorneys travelled from around the country in an earnest attempt to resolve this matter in an orderly fashion and save the estate hundreds of thousands, if not millions, of dollars in attorneys' and professionals' fees. The Trustee's refusal to make a counteroffer, let alone move from his original demand of "pay 100%," clearly demonstrates a lack of good faith in the circumstances of this case. The Trustee and his counsel should not be rewarded for their bad faith lack of compliance with the Court's Order. The Trustee and his counsel's conduct was not only an affront to Defendants, but also to the Court itself. Defendants respectfully request that Defendants' Motion be granted, that sanctions in the form of reimbursement of Defendants' fees and costs related to the mediation be granted, that McKool Smith be disqualified as counsel to the Trustee, and that the Trustee and his new counsel be ordered to mediate this matter in good faith and make an opening compromise settlement proposal prior to the mediation.

## I.    THE TRUSTEE FAILED TO MEDIATE IN GOOD FAITH.

1.    Throughout the pendency of this case, the Trustee and his counsel have refused to negotiate with the Defendants.[1]  They continued to refuse to negotiate even though the Defendants made a substantial offer to initiate the Mediation held on December 14 (the "Mediation").  When that offer was made, the Trustee was required to attend the Mediation and participate in good faith.  The Trustee led the Defendants and the Court to believe that settlement was a real possibility but at the Mediation refused to negotiate from his initial position: Defendants pay 100% of all claims and take responsibility to deal with the FLI claimants.  This act, or refusal to act, coupled with the refusal to inform the Court or Defendants of the zero chance of a compromise settlement constituted a violation of the good faith requirement of Federal Rule of Civil Procedure 16.

2.    To excuse his failure to negotiate, the Trustee relies on *Dawson v. United States*, 68 F.3d 886 (5th Cir. 1995).  His reliance on *Dawson* is misguided, as he cites it for the proposition that refusing to make a settlement offer is not a violation of the good faith requirement.  What the Fifth Circuit actually held in *Dawson* was that the failure to make a settlement offer was not a violation of the good faith requirement under the specific facts of the case—facts that are completely inapposite from the instant matter.

3.    Dawson was a prisoner at the Fort Worth Federal Correctional Institute who was injured when he ran into a pole while playing softball on the prison grounds.  Dawson, *pro se*, filed suit against the U.S. in the Northern District of Texas under the Federal Tort Claims Act ("FTCA"), seeking $900,000 in total damages plus attorney fees.  *Id.* at 888.  The U.S. denied liability on the grounds that it was Dawson's negligence, not the prison's, that caused his

---

[1]    His counsel once stated to the Court that before settling, they wanted the parties go through the expensive discovery process, "kick … each other in the shin and los[e] a bunch of summary judgment motions …."  *See* Oct. 18, 2010 Transcript of Scheduling Conference and Motion to Dismiss, pp. 25-26.

injuries; that Dawson failed to state a claim upon which relief could be granted; that he was not entitled to punitive damages or attorney fees; and that Texas law barred his claim.

4. Thereafter, the parties attended two court-ordered settlement conferences. The first conference did not result in settlement even though the government offered to provide Dawson with future surgery if necessary. *Id.* at 888-89. The government made no offer whatsoever at the second conference, and the parties again failed to settle. *Id.*

5. At a hearing on a motion for summary judgment filed by the government, the District Court inquired about the settlement conferences. In response to questioning about whether a monetary offer had been made at the conferences, the government's attorney responded that it had not made a monetary offer because of the pending summary judgment motion and their belief that Dawson's claim was frivolous. *Id.* at 890. At this point, the Court chastised the attorneys for not taking Dawson's claim seriously and set a hearing for the government to show cause why it should not be sanctioned for failing to participate in the settlement conferences in good faith. *Id.* Additionally, Dawson was ordered to show cause why he should not be sanctioned for failing to attend the instant hearing despite being ordered to do so. *Id.*

6. At the show cause hearing, which Dawson failed to attend, the government's attorneys attempted to justify not making an offer to Dawson at the two settlement conferences. *Id.* at 890-91. The District Court lambasted the attorneys for their perceived ineptitude and failure to take Dawson's claim seriously. *Id.* at 891-92. The Court also ordered Dawson to file an affidavit explaining why he had once again failed to appear at a mandatory hearing or face dismissal with prejudice. Dawson failed to comply with this order and his case was dismissed with prejudice. *Id.* at 893.

7.      Sixteen months later, the District Court issued a 33-page opinion wherein he leveled non-monetary sanctions against the government's attorneys for failing to participate in the settlement conferences in good faith. *Id.* at 893-94. The government moved to amend the judgment, which prompted a 37-page opinion by the District Court denying the motion. *Id.* at 894-96. The District Court acknowledged that it could not force the parties to settle and did not intend to do so in this case but refused to alter or amend the sanctions order. *Id.* at 896. The government appealed.

8.      The Fifth Circuit Court of Appeals reversed, holding "that [the district court] abused its discretion by interpreting the rule to require, for this action, making a settlement offer as part of a good-faith effort to settle." *Id.* at 897 (emphasis added). It began its analysis by citing the general rule that courts cannot coerce parties to settle or make a settlement offer and pointing out that

> parties may have valid and principled reasons for not wishing to settle particular cases. These reasons may not be based necessarily on the merits of a particular case, or the party's possible exposure in it, but because of the effect that a settlement might have on other pending or threatened litigation.

*Id.*

9.      The Fifth Circuit concluded that the government had several legitimate reasons to not make an offer in this case. First, Dawson did not seem interested in pursuing his own claim, as evidenced by his repeated failure to attend court-ordered activities. Second, a legitimate policy concern disinclined the government to make settlement offers to prisoners where the claim seems to be without merit. In this regard, the Fifth Circuit stated:

> Here, two of the Government's numerous (and, it seems, very valid) reasons for not making a monetary offer were because Dawson was (before his release while his action was pending) a pro se prisoner who had not shown much interest in prosecuting his claims, and because of the concomitant (and most legitimate) concern that settlement might encourage other prisoners to file frivolous lawsuits

> in the hopes of recovering a "nuisance value" settlement. It goes without saying that courts, among other entities, provide recourse for pro se prisoners, just as they do for other litigants; but, a plaintiff's status as a prisoner, pro se or otherwise, is a legitimate factor for the opposing party to consider in determining whether to make a settlement offer. In light of the increasing flood of prisoner litigation that threatens to submerge our courts, such a factor is extremely relevant, especially when the Government is the defendant and the taxpayers will be footing the bill for any settlement.

*Id.* at 897-98.

10. The Fifth Circuit also pointed out that Dawson had pursued an administrative claim before filing his FTCA suit, and the Federal Bureau of Prisons had rejected it. The agency had investigated the claim and found that the pole Dawson ran into was open and obvious and, therefore, he assumed the risk. *Id.* at 898. Based on the foregoing, the Court concluded:

> Armed with this claim rejection, as well as other information, [the government's attorneys] complied with the court's orders to meet with Dawson and discuss settlement. It goes without saying, that, as noted, they appear to have had numerous legitimate reasons for not offering the taxpayers' money to Dawson. …
>
> In sum, Hughes and Brown should not have been sanctioned. …

*Id.*

11. The facts of *Dawson* are so divergent from the instant matter as to render it inapplicable. In *In re A.T. Reynolds & Sons, Inc.*, 424 B.R. 76 (Bankr. S.D.N.Y. 2010), Wells Fargo attempted to argue, as does the Trustee here, that *Dawson* stands for the bright line rule that a party's failure to make a settlement offer can never constitute bad faith negotiation. *Id.* at 90. The Court dismissed that contention, stating:

> *Dawson* is so factually distinguishable from the case at bar that it is irrelevant and of no guidance to this Court. In *Dawson*, the appellate court was more concerned with the public policy of not squandering taxpayer dollars on frivolous prisoner lawsuits than enforcement of a local rule regarding settlement conferences[.]…
> This Court will not be persuaded by any statement in *Dawson* that suggests that a party may not be sanctioned for failure to participate in court-ordered mediation in good faith.

*Id.*

12. Here, the same logic holds: as in *A.T. Reynolds*, none of the factors that went into the Fifth Circuit's decision in *Dawson* are present; thus, *Dawson* does not absolve the Trustee's behavior in this case. The Fifth Circuit held that under the peculiar facts of the case the government had good reason to refrain from making a monetary offer. The Trustee, however, had no such reasons to refrain from making an offer—no underlying policy exists that excuses the Trustee's failure to negotiate, and Defendants did nothing, as did Dawson, which might give the Trustee legitimate pause to respond to the Defendants' attempts at negotiation. There is no concern about wasting taxpayer dollars in paying a settlement to a prisoner here; there is no history of the Defendants in this case not having faith in their legal position (Dawson left his case dormant and failed to attend conferences); and there is no pre-existing finding that the Defendants' positions lack merit (an administrative tribunal had already rejected Dawson's claim). To the contrary, the SLC has validated Defendants' positions, and a Texas Court has affirmatively found in favor of the Defendants' positions on many of the claims made by the Trustee in its dismissal of the case against them with prejudice. In fact, the Trustee does not even attempt to offer any reasons for refusing to negotiate. The Trustee simply argues, erroneously, that a bright line rule permits its behavior and that the Court is essentially barred from inquiring into it.

13. The Defendants stand by the discussion in their Motion for Sanctions and Disqualification of the jurisprudence on these issues in spite of the Trustee's discussion of *Dawson* and the cases cited by the Defendants. Federal Rule 16 and the case law provide the Court authority to grant Defendants' Motion.

14. Defendants were willing to negotiate, as evidenced by their "substantial" offer. They believe vehemently in their position in this litigation, yet they attended the Mediation prepared to settle the claims. They were thwarted by the Trustee, who apparently had no intention of negotiating at the Mediation.

15. The Trustee feebly tries to justify his refusal to notify the parties that the Mediation would be pointless by arguing that he "could not have known ahead of time without knowing what Defendants were going to argue or submit (or refuse to argue or submit) during the mediation."[2] That rationalization is nonsensical: The Defendants had submitted extensive position papers and a detailed compromise settlement proposal before the Mediation.

16. Evidence of the Trustee's contempt for the Mediation is replete in the record and was extensively reported in the Defendants' Motion. Nevertheless, the Trustee's Response provides further support for this contention. It states:

> [T]he Trustee has had a deliberate plan for settlement negotiations, which includes exploring the legal and factual disputes with multiple parties through discovery and dispositive motions. The Trustee always viewed that the accomplishment of a complete resolution in this matter would more likely be achieved in a number of sequential steps rather than all at once, given the number of parties and the complexity of the issues involved.
>
> Defendants were not pleased with the Trustee's deliberate approach and began demanding settlement negotiations almost immediately. The Trustee, however, maintained the same position since Defendants first began agitating for settlement negotiations: mediation was premature. The parties had yet to explore the factual and legal disputes. Defendants had yet to file an answer to the Original Complaint [docket #1] when first demanding settlement negotiations. Further, the Trustee had yet to take any discovery. The Trustee wanted to delay mediation until the factual and legal issues were fleshed out through motions for summary judgment.[3]

---

[2] Response at ¶ 29.

[3] Response at ¶¶ 16-17 (emphasis added).

{B0436294.3}  8

17. These and other comments illustrate the Trustee's hostile attitude toward the Mediation and settlement in general. This is the attitude the Trustee brought to the Mediation. Obviously, there was no good faith participation on the Trustee's behalf when he went to the Mediation with no intention of negotiating.

18. The Trustee opposes the Motion by stating that Defendants' allegations are false. Yet the Trustee offers no proof of such slanderous accusations.[4] The Trustee is simply attempting to mislead the Court by hiding behind the confidentiality curtain and instructing the Court that it cannot look behind the curtain. If this trick is tolerated, Federal Rule 16 would be meaningless; it would have no teeth at all. The Trustee's argument elsewhere in its Response corroborates that it made no offer of compromise or adjustment in its legal positions. For example, in the first paragraph of the section entitled "The Trustee Is Not Required To Modify His Settlement Position," he states:

> [T]he Trustee has principled reasons for his consistent position with regard to a global settlement between Defendants, GE and FLI. Defendants have not given the Trustee a principled reason to adjust his stance. Defendants' various motions, pleadings, demands, and answers did not identify facts or legal arguments which would cause the Trustee to modify his position.[5]

This statement confirms that the Trustee had no intention of making an offer beyond that set out in the complaint filed against the Defendants, i.e., the Defendants must pay all creditors in full. Another example in the Trustee's Response that confirms that he made no compromise settlement proposal appears at paragraph 38, where the Trustee states, "Trustee approved of McKool Smith's litigation strategy and supported conditioning mediation on Defendants dropping the First Rule 11 Motion."

---

[4]  *See, e.g.*, Response at ¶¶ 28 and 33.

[5]  Response at ¶ 27.

19. The Trustee's other attempts to backpedal and rationalize in his Response further indicate that he feels compelled to justify having forced the Mediation with no intent to compromise his claims. This can be seen from his inaccurate attempts to cast himself as reluctant to mediate but forced to do so by Court Order. For example, first, he attempts to argue that he did not agree to the Mediation.[6] That revisionist history is refuted by the discussion and citations to the transcript in Defendants' Motion.[7]

20. Second, the Trustee suggests that the Mediator, not the Trustee, determined that Defendants' settlement offer prior to the Mediation was "substantial" as required by the Court's order to trigger the Trustee's obligation to attend the Mediation.[8] This again is a revision of history. The Trustee actually attempts to state innocently that "[t]he Mediator conducted the mediation (presumably concluding that Defendants' settlement offer was substantial)" as if the Trustee was mystified about how the process unfolded and as if he had no control over being dragged along by the process into the Mediation.[9] Yet, neither the Trustee nor any other party ever contested whether the offer was substantial. It clearly was, and the Trustee did not request the Mediator to resolve any dispute about that. The Trustee did not hesitate to attend the Mediation on that basis or any other. It was up to the Trustee to raise that question, if he had one, and to ask the Mediator to resolve it. Surely the Trustee would not have willingly attended the mediation if he disputed that the Defendants had met their obligation to make a substantial

---

[6] Response at ¶ 18 and n.12.
[7] Motion, pp. 8-11 and particularly ¶ 18.
[8] Response at ¶ 18 and n.13. Note that the Trustee makes both of these contentions without citation to support them.
[9] Response at ¶ 18.

{B0436294.3}                                   10

offer. The Trustee has cited no letter or any other evidence where he did so. He cannot cite such evidence because he did not do so.[10]

21. The entirety of the record, including the Trustee's Response, reveals that he did not intend to negotiate at the Mediation and did not do so. The majority of the Response attempts to justify, using *Dawson*, the failure to make an offer. Failure to negotiate is not a "confidential communication" within the meaning of Local Rule 16.4.

22. In short, the Trustee's Response does nothing but bolster Defendants' position. The Trustee restated his unwillingness to participate in the Mediation from the beginning and spent most of the Response arguing that he did not have to waver from his "consistent position with regard to a global settlement."[11] The Trustee should have made his position clear that he did not intend to participate in the Mediation. Had he done so, he could have prevented the waste of resources spent preparing for and attending the Mediation by Defendants and the Trust.

## II.    MCKOOL SMITH SHOULD BE DISQUALIFIED.

23. The Trustee's effort to "set the record straight" regarding McKool Smith's conflict of interest is a feeble attempt to obfuscate the truth.[12] He argues that since the Rule 11 Motion was filed against the Trustee *and* McKool Smith, Mr. Mathie's letters—only partially quoted in footnote 43 of the Response—must have referred to McKool Smith's efforts to protect *the Trustee* from the Rule 11 Motion. This is disingenuous. When the Court admonished McKool Smith at the October 18 hearing, they did not object or attempt to explain the situation as they are attempting to do now. McKool Smith's intent in sending the letters is as clear now as

---

[10]   Additionally, the Trustee contends that even attending the Mediation without making a single compromise settlement proposal was not "pointless." Yet, again, the Trustee gives no explanation or evidence to support this contention. As the Trustee points out, the parties were not even in the same room together to discuss the issues.

[11]   Response at ¶ 27.

[12]   Response at ¶ 33.

it was on October 18, and the Court correctly perceived the impropriety of McKool Smith's actions. They improperly linked their willingness to participate in mediation in good faith on behalf of their client with their demand that the Rule 11 Motion against McKool Smith be dismissed. The Court described this and instructed McKool Smith not to do it, and the McKool Smith attorney Mark Mathie agreed.[13]

24. The remainder of the Trustee's argument on this point also misses the mark. The Trustee certainly has the right to choose his counsel; that much is not in dispute. Nevertheless, attorneys with a conflict of interest are still prohibited from representing the client. Upon McKool Smith's disqualification, the Trustee will be free to choose another counsel.

25. Further, Defendants do not seek disqualification only under 11 U.S.C. § 327,[14] but the conflict of interest principles in the cases interpreting that section are directly analogous to this matter.[15] Those cases illustrate the courts' and Congress's antipathy toward conflicts of interest in the bankruptcy context, particularly with regard to professionals hired to represent the estate. The only difference between those cases and the instant matter is that the estate has been replaced by the liquidating trust. The principles involved in those cases are analogous and relevant here.

---

[13] Motion p. 17.
The Defendants also note that preliminarily in the Trustee's Response, he mentions that he responded to the Second Rule 11 Motion with a Motion to strike the pleading because it was combined with other relief. Response at ¶ 6. The Defendants note that the Court denied the Trustee's Motion to Strike at the outset of the hearing on the Second Rule 11 Motion and found that Second Rule 11 Motion complied with the rules. *See* Transcript of Jan. 18, 2001 hearing, p. 8.

[14] Defendants also seek disqualification pursuant to Tex. Disc. R. of Prof. Cond. 1.06. Federal District Courts sitting in Texas apply the Texas Rules of Disciplinary Conduct and look to the ABA Model Rules for guidance. *See In re Am. Airlines, Inc.*, 972 F.2d 605, 609-10 (5th Cir. 1992); *Milliken v. Grigson*, 986 F. Supp. 426, 429 (S.D. Tex. 1997), *aff'd*, 158 F.3d 583 (5th Cir. 1998).

[15] *In re Kendavis Industries Int'l, Inc.*, 91 B.R. 742 (Bankr. N.D.Tex. 1988); *In re Humble Place Joint Venture*, 936 F.2d 814 (5th Cir. 1991); *In re Am. Airlines, Inc.*, 972 F.2d 605, 611 (5th Cir. 1992); *In re Consol. Bancshares, Inc.*, 785 F.2d 1249, 1256 n.7 (5th Cir. 1986); *In re MFlex Corp.*, 172 B.R. 854, 860 (Bankr. W.D. Tex. 1994).

26. Furthermore, those cases illustrate the use of general conflict of interest principles in bankruptcy cases, principles that are directly applicable to the instant matter. For example, in *In re Consol. Bancshares, Inc.*, 785 F.2d 1249 (5th Cir. 1986), the Fifth Circuit stated:

> The standards for the employment of professional persons are strict, for Congress has determined that strict standards are necessary in light of the unique nature of the bankruptcy process. Professionals engaged in the conduct of a bankruptcy case should be free of the slightest personal interest which might be reflected in their decisions concerning matters of the debtor's estate or which might impair the high degre [sic] of impartiality and detached judgment expected of them during the course of administration.
>
> The court should be guided by the principle that court-appointed attorneys are officers of the court, and fiduciaries, and the court must strictly apply the equitable principle that a fiduciary can only serve one master. …

*Id.* at 1256 nn.6-7 (citations and quotations omitted).

27. These principles have been reiterated time and again by the Fifth Circuit, a court that "rigorously appl[ies] the relevant ethical standards" when reviewing a conflict of interest question. *In re Am. Airlines, Inc.*, 972 F.2d 605, 611 (5th Cir. 1992). The Fifth Circuit often takes a hard stance against conflicts of interest. In *American Airlines*, for example, the Fifth Circuit rejected a more flexible approach to conflicts in favor of a rigid test. The Court stated:

> Some courts have taken the position … that "[t]he business of the court is to dispose of litigation and not to act as a general overseer of the ethics of those who practice here unless the questioned behavior taints the trial of the cause before it." An attorney's ethical violation by itself does not warrant disqualification under this approach. Rather, disqualification is proper only in cases where a court also finds that the unethical conduct threatens to taint the trial. This more limited test largely rests on a belief that disqualification motions are often made for tactical reasons such as delay or harassment. While the "taint" standard "fails to correct all possible ethical conflicts," it is argued that this limited disqualification rule serves to deter many meritless, tactical motions that would otherwise be filed.
>
> This circuit, however, has struck a different balance, electing to remain "sensitive to preventing conflicts of interest." *Matter of Consolidated Bankshares, Inc.*, 785 F.2d 1249, 1256 (5th Cir. 1986). We have squarely rejected this hands-off approach in which ethical rules "guide" whether counsel's presence will "taint" a proceeding, holding instead that a "[d]istrict [c]ourt is obliged to take measures

> against unethical conduct occurring in connection with any proceeding before it." For this reason, we have emphasized that "[a] motion to disqualify counsel is the proper method for a party-litigant to bring the issues of conflict of interest or breach of ethical duties to the attention of the court." We recognize of course that disqualification motions may be used as "procedural weapons" to advance purely tactical purposes. But we do not believe that a priori assumptions concerning the motivations underlying disqualification motions in general justify a more relaxed ethical rule. Our prior cases disclose that a careful and exacting application of the rules in each case will separate proper and improper disqualification motions.

Id. at 610 (citations omitted). In short, the Fifth Circuit demands that District Courts police conflicts cases with a strict eye and heavy hand.

28. The principles announced in *Bancshares* and *American Airlines* apply equally to the instant matter even though the estate has been replaced by the liquidating trust. McKool Smith was hired to represent the Trustee and the trust, and McKool Smith is bound in a fiduciary relationship with those parties. Accordingly, McKool Smith can only "serve one master," and it failed to do so when it attempted to use the Defendants' desire to settle against the Defendants by demanding that the Rule 11 Motion be dropped or there would be no settlement negotiations in spite of the obvious possible benefit of settlement negotiations to McKool Smith's client. The trust assets are being depleted by hundreds of thousands of dollars every month in attorneys' and professionals' fees. This act, particularly after the Court directly admonished McKool Smith not to do so, illustrates McKool Smith's self-interest in violation of Texas Disciplinary Rule of Professional Conduct 1.06 and should result in disqualification under the Fifth Circuit's rigid approach to conflicts of interest.

## **CONCLUSION**

29. Considering the foregoing and the Defendants' Motion for Sanctions and Disqualification, the Motion should be granted.

Dated: March 3, 2011

**Respectfully submitted:**

THOMAS S. HENDERSON, Attorney at Law

*/s/ Thomas S. Henderson*
THOMAS S. HENDERSON (TBA No. 09432300)
South Tower, Pennzoil Place
711 Louisiana, Suite 3100
Houston, TX   77002-2716
Telephone:     (713) 227-9500
Facsimile:      (713) 620-3023

BALDWIN HASPEL BURKE & MAYER, LLC

*/s/ Thomas J. Cortazzo*
KARL J. ZIMMERMANN (La. Bar No. 14481)
THOMAS J. CORTAZZO (La. Bar No. 18174)
JENA W. SMITH (La. Bar No. 25255)
Energy Centre – Suite 2200
1100 Poydras Street
New Orleans, LA   70163
Telephone:     (504) 569-2900
Facsimile:      (504) 569-2099

WINTHROP & WEINSTINE

*/s/ Robert R. Weinstine*
ROBERT R. WEINSTINE (Bar No. 115435)
JOSEPH WINDLER (Bar No. 387758)
Capella Tower – Suite 3500
225 South Sixth Street
Minneapolis, MN   55402-4629
Telephone:     (612) 604-6400
Facsimile:      (612) 604-6800

*COUNSEL FOR THE DEFENDANTS*

**CERTIFICATE OF SERVICE**

I hereby certify that the foregoing pleading has been served on the attorneys for the Plaintiff, Hugh M. Ray, III and Paul D. Moak, McKool Smith, 600 Travis, Suite 7000, Houston, Texas 77002, and on the attorney for GECC, Susan C. Mathews, Adams and Reese LLP, 1200 McKinney, Suite 4400, Houston, Texas 77002, by ECF filing on the 3rd day of March, 2011.

                                                /s/ *Thomas S. Henderson*
                                                  Thomas S. Henderson